TONY WEST
Assistant Attorney General
PAUL J. FISHMAN
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director, Federal Programs Branch
PETER D. LEARY
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
Tel: (202) 514-3313
Fax: (202) 616-8470
E-mail: peter.leary@usdoj.gov

*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW JERSEY*

| | |
|---|---|
| INTERACTIVE MEDIA ENTERTAINMENT & GAMING ASSOCIATION, INC., *ET AL.*,<br><br>Plaintiffs,<br><br>v.<br><br>ERIC H. HOLDER, JR., *ET AL.*,<br><br>Defendants. | HON. GARRETT E. BROWN, JR.<br><br>*Civil Action No.* 09-1301 (GEB-TJB) |

FEDERAL DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION. ....................................................................................... 1

STATUTORY BACKGROUND. ................................................................. 1

PROCEDURAL HISTORY. ........................................................................ 3

ARGUMENT. .............................................................................................. 5

I.    Plaintiffs' Complaints Must Be Dismissed Pursuant To Federal Rule of
      Civil Procedure 12(b)(1) for Lack of Subject Matter Jurisdiction. ............... 5

      A.    Standard of Review. ............................................................... 5

      B.    Plaintiffs Lack Standing To Bring Their Claims. ................................. 7

            1.    Plaintiffs Cannot Show Injury, Traceability,
                  or Redressability. ....................................................... 7

            2.    Plaintiffs Lack Standing To Allege a Tenth Amendment
                  Violation. ................................................................. 11

            3.    Plaintiffs Lack Standing To Allege an Eleventh Amendment
                  Violation. ................................................................. 15

            4.    Senators Lesniak and Sweeney Lack Standing To Allege
                  a First Amendment Violation. ......................................... 16

            5.    iMEGA Lacks Standing To Bring a Constitutional Right to
                  Privacy Claim on Behalf of Third-Party Gamblers. ................ 18

II.   Plaintiffs' Complaints Should Be Dismissed Pursuant To Federal Rule
      of Civil Procedure 12(b)(6) for Failure To State a Claim. .......................... 20

      A.    Standard of Review. ............................................................ 20

B.   Even If Plaintiffs Had Standing To Bring Their Claims, This
     Action Should Be Dismissed Because PASPA Is Constitutional. ..... 21

     1.   PASPA Does Not Violate the Commerce Clause. ................... 21

     2.   PASPA Does Not Violate the Equal Protection Clause. .......... 27

     3.   PASPA Is Not Void for Vagueness or Overbreadth. ............... 30

     4.   PASPA Does Not Violate the Tenth Amendment. .................. 34

     5.   PASPA Does Not Violate the Eleventh Amendment. ............. 35

     6.   PASPA Violates Neither Senator Lesniak Nor Senator
          Sweeney's First Amendment Rights. ...................................... 37

     7.   PASPA Violates Neither Procedural Nor Substantive
          Due Process. .............................................................................. 38

     8.   PASPA Interferes With No Constitutional Right to
          Privacy. ..................................................................................... 39

CONCLUSION. ................................................................................. 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

Ackerman v. Columbus, GA,
    269 F. Supp. 2d 1354 (M.D. Ga. 2003). ........................................................... 30

Aiello v. City of Wilmington, Delaware,
    623 F.2d 845 (3d Cir. 1980). ........................................................................ 18

Alaska Legislative Council v. Babbitt,
    181 F.3d 1333 (D.C. Cir. 1999). ...................................................................... 14

Alden v. Maine,
    527 U.S. 706 (1999). ....................................................................................... 36

Allen v. Wright,
    468 U.S. 737 (1984). ......................................................................................... 5

Am. Future Sys., Inc. v. Pennsylvania State Univ.,
    688 F.2d 907 (3d Cir. 1982). ......................................................................... 39

Ashcroft v. Iqbal,
    --- U.S. ---, 129 S. Ct. 1937 (2009). ............................................................... 20

Ballentine v. United States,
    486 F.3d 806 (3d Cir. 2007). ........................................................................... 6

Barnes v. Glen Theatre, Inc.,
    501 U.S. 560 (1991). ....................................................................................... 37

Bd. of Trustees of the Univ. of Alabama v. Garrett,
    531 U.S. 356 (2001). ....................................................................................... 35

Board of Regents of State Colleges v. Roth,
    408 U.S. 564 (1972). ....................................................................................... 38

Buckley v. Valeo,
    424 U.S. 1 (1976)........................................................................................ 37

Carter v. City of Philadelphia,
    181 F.3d 339 (3d. Cir. 1999). ..................................................................... 15

Chapman v. United States,
    500 U.S. 453 (1991).................................................................................... 33

Coates v. Cincinnati,
    402 U.S. 611 (1971).................................................................................... 31

Columbia Natural Res., Inc. v. Tatum,
    58 F.3d 1101 (6th Cir. 1995). ..................................................................... 33

Common Cause of Pennsylvania v. Pennsylvania,
    558 F.3d 249 (3d Cir. 2009). ...................................................................... 14

Currin v. Wallace,
    306 U.S. 1 (1939)................................................................................. 24, 25

De Leon-Reynoso v. Ashcroft,
    293 F.3d 633 (3d Cir. 2002). ...................................................................... 28

Doe v. Pa. Bd. of Probation and Parole,
    513 F.3d 95 (3d Cir. 2008). ........................................................................ 27

Elk Grove Unified School Dist. v. Nedow,
    542 U.S. 1 (2004)........................................................................................ 17

Evancho v. Fisher,
    423 F.3d 347 (3d Cir. 2005). ...................................................................... 20

F.C.C. v. Beach Commc'ns, Inc.,
    508 U.S. 307 (1993).............................................................................. 27, 30

Flager v. U.S. Attorney for Dist. of New Jersey,
    No. 06-3699, 2007 WL 2814657 (D. N.J. Sept. 25, 2007)......................... 7, 8, 9

Gilstrap v. United States,
    389 F.2d 6 (5th Cir. 1968). ................................................................... 34

iMEGA v. Gonzales,
    No. 07-2625, 2008 WL 5586713 (D. N.J. Mar. 4, 2008). ..................... 12, 19, 37

iMEGA v. Gonzales,
    580 F.3d 113 (3d Cir. 2009). ..................................................... 12, 19, 33, 37, 39

Gonzales v. Raich,
    545 U.S. 1 (2005)................................................................................... 21

Heart of Atlanta Motel, Inc. v. United States,
    379 U.S. 241 (1964)............................................................................... 22

Hill v. Colorado,
    530 U.S. 703 (2000)............................................................................... 32

Hodel v. Indiana,
    452 U.S. 314 (1981)............................................................................... 25

Initiative and Referendum Institute v. Walker,
    450 F.3d 1082 (10th Cir. 2006). ......................................................... 32

Karcher v. May,
    484 U.S. 72 (1987)................................................................................. 13

Kreimer v. Bureau of Police for Town of Morristown,
    958 F.2d 1242 (3d Cir. 1992). ............................................................. 32

Laird v. Tatum,
    408 U.S. 1 (1972)............................................................................... 16, 18

Lujan v Defenders of Wildlife,
    504 U.S. 555 (1992)................................................................................. 6

May v. Cooperman,
    578 F. Supp. 1308 (D. N.J. 1984)....................................................... 12

McCarthy v. Hawkins,
    381 F.3d 407 (5th Cir. 2004). .............................................................. 36

Nasir v. Morgan,
    350 F.3d 366 (3d Cir. 2003). ................................................................ 19

Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales,
    468 F.3d 826 (D.C. Cir. 2006). .............................................................. 8

OFC Comm'r Baseball v. Markell,
    579 F.3d 293 (3d Cir. 2009). ........................................... 29, 32, 34, 36

Oldroyd v. Kugler,
    352 F. Supp. 27 (D. N.J. 1972). .......................................................... 16

Oxford Assoc. v. Waste Sys. Auth. of E. Montgomery County,
    271 F.3d 140 (3d Cir. 2001). ................................................................ 7

Paton v. La Prade,
    524 F.2d 862 (3d Cir. 1975). .............................................................. 17

Pennhurst State Sch. & Hosp. v. Halderman,
    465 U.S. 89 (1984). ............................................................................ 35

Pennsylvania v. New Jersey,
    426 U.S. 660 (1976). ......................................................................... 7, 8

Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh,
    229 F.3d 435 (3d Cir. 2000). .............................................................. 37

Poe v. Ullman,
    367 U.S. 497 (1961). ............................................................................ 6

Railway Exp. Agency v. People of State of N.Y.,
    336 U.S. 106 (1949). .......................................................................... 29

Raines v. Byrd,
    521 U.S. 811 (1997). ............................................................................ 7

Roe v. Wade,
    410 U.S. 113 (1973)............................................................................... 39

Schwartz v. Judicial Retirement System of New Jersey,
    584 F. Supp. 711 (D. N.J. 1984). ...................................................... 29

Steel Co. v. Citizens for a Better Envt.,
    523 U.S. 83 (1998)............................................................................... 6

Tennessee Elec. Power Co. v. TVA,
    306 U.S. 118 (1939)............................................................................. 12

Tenney v. Brandhove,
    341 U.S. 367 (1951)............................................................................. 38

Travis v. Reno,
    163 F.3d 1000 (7th Cir. 1998). ......................................................... 36

United States v. Avarello,
    592 F.2d 1339 (5th Cir. 1979). ......................................................... 35

United States v. Barrow,
    363 F.2d 62 (3d Cir. 1966). .............................................................. 34

United States v. Bond,
    581 F.3d 128 (3d Cir. 2009). ............................................................ 12

United States v. Harris,
    460 F.2d 1041 (5th Cir. 1972). ......................................................... 22

United States v. Lopez,
    514 U.S. 549 (1995)............................................................................. 21

United States v. Parker,
    108 F.3d 28 (3d Cir. 1997). .............................................................. 34

United States v. Sacco,
    491 F.2d 995 (9th Cir. 1974). ........................................................... 24

United States v. Villano,
   529 F.2d 1046 (10th Cir. 1976). ......................................................... 35

United States v. Vlanich,
   75 Fed. Appx. 104 (3d Cir. 2003)...................................................... 23

United States v. Williams,
   553 U.S. 285 (2008)............................................................................ 31

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
   455 U.S. 489 (1982)........................................................... 30, 31, 32

Warth v. Seldin,
   422 U.S. 490 (1975)............................................................................ 6

West Virginia v. United States,
   479 U.S. 305 (1987)........................................................................... 36

Whitmore v. Arkansas,
   495 U.S. 149 (1990)........................................................................... 16

Wickard v. Filburn,
   317 U.S. 111 (1942)........................................................................... 21

Wisconsin Dept. of Corrections v. Schacht,
   524 U.S. 381 (1998)........................................................................... 15

Ex parte Young,
   209 U.S. 123 (1908)........................................................................... 35

## STATE CASES

Atlantic City Racing Ass'n v. Attorney General,
   98 N.J. 535 (1985). ........................................................................... 10

In re Casino Licensees,
   633 A.2d 1050 (N.J. Super. Ct. App. Div. 1993). ....................... 3, 10

Karcher v. Kean,
　　479 A.2d 403 (1984). ........................................................................ 13

Van Ness v. Borough of Deal,
　　352 A.2d 599 (N.J. Super. Ch. 1975), *reversed on other grounds by*
　　Van Ness v. Bourough of Deal, 393 A.2d 571 (N.J. Oct. 16, 1978). ............... 13

## FEDERAL STATUTES

18 U.S.C. § 1952 ................................................................................ 35

18 U.S.C. § 1955.............................................................................. 23, 35

28 U.S.C. § 3702 ............................................................................... 2, 3

28 U.S.C. § 3703................................................................................... 3

28 U.S.C. § 3704................................................................................ 3, 29

## STATE STATUTES

N.J.S.A. 52:17A-4................................................................................ 12

## LEGISLATIVE MATERIALS

S. REP. No. 102-248........................................................................ *passim*

138 Cong. Rec. 7274 (1992). ................................................................. 29

138 Cong. Rec. 17,434 (1992). .......................................................... 23, 26

# CONSTITUTIONAL PROVISIONS

U.S. Const., Art. I, § 8, cl. 3 ..................................................................... 21

U.S. Const. amend. X ................................................................................. 11

U.S. Const. amend. XI. ............................................................................... 15

# MISCELLANEOUS

Claire Heininger, *Gov. Chris Christie Declines To Join Legal Battle To Bring Sports Betting to N.J.*, Newark Star Ledger, July 12, 2010. ..................................... 5

Press Release, Lesniak-Sweeney Disappointed Governor Christie Hasn't Joined Sports Betting Lawsuit (July 12, 2010). ................................................................. 8

*Sports Betting Debate Revisited*, Atlantic City Central, Mar. 27, 2009 .................. 10

## **INTRODUCTION**

At its core, this lawsuit reflects a frustration that seventeen years ago the State of New Jersey elected not to grandfather itself into the Professional and Amateur Sports Protection Act of 1992 (PASPA).  But Plaintiffs—who do not represent the State—cannot undo history.  Moreover, Plaintiffs have not shown how PASPA has injured them, nor can they demonstrate how any alleged injury would be redressed by a favorable decision in this case.  Because Plaintiffs lack standing to challenge the constitutionality of PASPA, this action must be dismissed for want of subject-matter jurisdiction.

Even if the Court were to reach the merits of Plaintiffs' allegations, this case should be dismissed.  Plaintiffs disagree with Congress' judgment that the spread of sports betting and its accompanying harms should be arrested through federal legislation.  But it is not the Court's role to pass on the wisdom of a Congressional act.  PASPA is plainly constitutional, and it readily survives Plaintiffs' challenge.

## **STATUTORY BACKGROUND**

In October 1992, Congress enacted PASPA, codified at 28 U.S.C. §§ 3701-3704, intending to further regulate interstate sports gambling and to mitigate its negative effects by restricting the states where sports betting could take place. Congress passed the Act after weighing extensive testimony from experts in the

fields of sports, lotteries and pathological gambling, and it enjoyed broad support.[1] After weighing this evidence, the Senate Judiciary Committee concluded that the law served "an important public purpose, to stop the spread of State-sponsored sports gambling and to maintain the integrity of our national pastime." S. REP. No. 102-248, at *4. The harms the Act targeted were clear. "Sports gambling threatens to change the nature of sporting events from wholesome entertainment for all ages to devices for gambling. It undermines public confidence in the character of professional and amateur sports. Furthermore, State-sanctioned sports gambling will promote gambling among our Nation's young people." Id., at *5.

In relevant part, PASPA prohibits any person or governmental entity from sponsoring, operating, advertising or promoting:

> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

---

[1]  PASPA enjoyed the support of, *inter alia*, the National Football League, the National Basketball Association, Major League Baseball, the National Collegiate Athletics Association, the National Center for Pathological Gambling, the Christian Life Commission of the Southern Baptist Convention, the International Association of Chiefs of Police, the National Association of Collegiate Directors of Athletics, the National Association of Professional Baseball Leagues, Pop Warner Football, the National American Association of School Administrators, the National Federation of State High School Associations, the U.S. Baseball Federation, and the National Association of Secondary School Principals. S. REP. No. 102-248, at *3, *8 (1991). The Act passed the Senate by a vote of 88-5 with 59 cosponsors. It passed the House by voice vote.

28 U.S.C. § 3702.  Any violation of PASPA may result in an injunctive civil action by either the U.S. Attorney General or by "a professional sports organization or amateur sports organization whose competitive game is alleged to be the basis of such violation."  28 U.S.C. § 3703.

A grandfather clause provided that PASPA did not apply to states or governmental entities that had conducted or authorized sports betting prior to the Act's passage under certain circumstances.  28 U.S.C. § 3704(a)(1)-(2).[2]  Congress also provided a one-year window from the effective date of PASPA during which any state that had operated casino gaming for the previous ten-year period could authorize sports betting.  28 U.S.C. § 3704(a)(3).  New Jersey, the only State which qualified under this provision, failed to take advantage of the opportunity.[3]

## PROCEDURAL HISTORY

Plaintiffs Interactive Media Entertainment & Gaming Association, Inc. (iMEGA), the New Jersey Thoroughbred Horsemen's Association, Inc., the Thoroughbred Breeders Association of New Jersey, the Standardbred Breeders &

---

[2] These provisions cover Delaware, Montana, Nevada, and Oregon.

[3] In 1993, the New Jersey legislature considered—but did not pass—a joint resolution that would have given the State's citizens the option of legalizing state-sponsored sports betting.  See In re Casino Licensees, 633 A.2d 1050, 1051 (N.J. Super. Ct. App. Div. 1993) ("Earlier this year, the Legislature chose not to vote on a joint resolution to place a referendum on the ballot permitting a proposed constitutional amendment authorizing casino betting on sports events.").

Owners Association of New Jersey, Inc. (collectively the N.J. Horsemen's Associations), and State Senator Raymond J. Lesniak (Senator Lesniak) filed this case on March 23, 2009.  On July 2, 2009, then-New Jersey Governor Jon S. Corzine (Governor Corzine) moved to intervene.  Federal Defendants opposed this Motion, primarily on the ground that only the State of New Jersey, acting through its Attorney General (AG), would have standing to bring the constitutional claims raised in the Complaint, and the New Jersey AG had not moved to intervene.

On November 2, 2009, U.S. Magistrate Judge Tonianne J. Bongiovanni granted Governor Corzine's Motion to Intervene, ruling that "Governor Corzine's interests in this litigation are separate from those of the state of New Jersey and qualify as sufficient legal interests in the instant litigation[.]"  Doc. 20 at 3. Magistrate Judge Bongiovanni gave Governor Corzine until November 12, 2009 to file a Complaint.  But Governor Corzine lost his reelection bid the day after the ruling, and instead of filing a Complaint, he filed an unopposed Motion to Stay to let Governor-Elect Chris Christie (Governor Christie) decide whether he wished to pursue this lawsuit.  This Motion was granted.[4]  Governor Christie's motion for an extension of time to file a Complaint until July 12, 2010 was granted thereafter.

---

[4] This order also tolled Federal Defendants' deadline to object to the November 2, 2009 Order allowing the Governor to intervene until such a Complaint was filed.  See Doc. 23.

-4-

While Governor Christie was considering whether to join this lawsuit, Senator Stephen M. Sweeney, President of the New Jersey Senate, filed an unopposed Motion to Intervene on behalf of the State Senate.  The Senator's Motion was granted, and his Intervenor Complaint (Doc. 34) was filed. Subsequently, counsel agreed that Federal Defendants would address the issues raised by all Plaintiffs in a single, consolidated Motion to Dismiss after Governor Christie decided how he wished to proceed, if at all, in this litigation.

Ultimately, Governor Christie decided not to participate, and informed the Court that he would not file a Complaint.  According to the Governor's spokesman, "there were just too many steep legal hurdles to clear, and it would at best be a legal long shot."  Claire Heininger, *Gov. Chris Christie Declines To Join Legal Battle To Bring Sports Betting to N.J.*, Newark Star Ledger, July 12, 2010, http://www.nj.com/news/index.ssf/2010/07/gov_chris_christie_declines_jo.html.

## ARGUMENT

### I.   Plaintiffs' Complaints Must Be Dismissed Pursuant To Federal Rule of Civil Procedure 12(b)(1) for Lack of Subject Matter Jurisdiction

#### A.   Standard of Review

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  Allen v. Wright, 468 U.S. 737, 750 (1984).  In

the absence of an actual case or controversy, the Court is without jurisdiction to decide the case.  See Warth v. Seldin, 422 U.S. 490, 499 (1975); see also Steel Co. v. Citizens for a Better Envt., 523 U.S. 83 (1998).  Otherwise, "courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."  Warth, 422 U.S. at 500.  These considerations "press with special urgency in cases challenging legislative action . . . as repugnant to the Constitution" where the Supreme Court has warned courts "not to entertain constitutional questions in advance of the strictest necessity."  Poe v. Ullman, 367 U.S. 497, 503 (1961).

A plaintiff seeking to invoke federal jurisdiction bears the burden of demonstrating he possesses "standing" to challenge the action sought to be adjudicated.  See Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007) ("[S]tanding is a jurisdictional matter.").  The principle of standing encompasses both constitutional and prudential components.  Warth, 422 U.S. at 498.  At an "irreducible constitutional minimum," a plaintiff suing in his own right must allege (1) an actual or imminent personal injury (2) fairly traceable to the challenged conduct and (3) likely to be redressed by a favorable judicial decision. See Lujan v Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Prudential

standing concerns "the need for judicial restraint" and comprises a "supplemental aspect of the basic standing analysis." Oxford Assoc. v. Waste Sys. Auth. of E. Montgomery County, 271 F.3d 140, 145 (3d Cir. 2001). A court's inquiry into standing should be "especially rigorous when reaching the merits of the dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819-20 (1997).

**B.      Plaintiffs Lack Standing To Bring Their Claims**

**1.      Plaintiffs Cannot Show Injury, Traceability, or Redressability**

Plaintiffs allege two primary injuries—the inability to sponsor or engage in sports betting and the threat of a civil injunction. Neither of these "injuries" constitutes valid, direct harm. As an initial matter, there is no right to promote or participate in sports betting. See Flager v. U.S. Attorney for Dist. of N.J., No. 06-3699 (JAG), 2007 WL 2814657, *2 (D. N.J. Sept. 25, 2007) ("Plaintiff has provided this Court with no explanation of how a right to gamble on professional and amateur sports would be or could be a 'legally protected interest.'"). In any event, "[n]o State can be heard to complain about damage inflicted by its own hand." Pennsylvania v. New Jersey, 426 U.S. 660, 664 (1976). Congress expressly granted New Jersey the opportunity to grandfather itself into PASPA,

and its state legislature chose not to act.  To the extent that any Plaintiff claims to represent New Jersey's interests in this case (a claim Federal Defendants dispute, see Section I.B.2), the State has no standing to pursue a lawsuit that is based on concededly self-inflicted harm.[5]  See id. ("The injuries to the [State] plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . ."); see also Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.  Such harm does not amount to an 'injury' cognizable under Article III.") (citations omitted).

Plaintiffs' second claim of harm—that they "may face civil actions"—lacks imminence.  This lawsuit comes eighteen years after PASPA was enacted, and yet Plaintiffs have shown no attempt to secure an injunction against them.  Cf. Flager, 2007 WL 2814657, at *2 ("Plaintiff has made no showing of any harm suffered, i.e., an invasion of his right to gamble, that is both 'concrete and particularized' and 'actual or imminent.'").  Nor has any Plaintiff alleged an intent to operate a sports betting scheme so as to support a pre-enforcement challenge based on a

---

[5] Senator Sweeney recently admitted as much, stating in a press release that "voters in the Garden State today are handcuffed by the Legislature's failure to act in 1992 to grandfather us in under the federal sports wagering ban.  This [lawsuit] is about undoing a past mistake [.]"  Press Release, Lesniak-Sweeney Disappointed Governor Christie Hasn't Joined Sports Betting Lawsuit (July 12, 2010) (available at http://www.njsendems.com/release.asp?rid=3459).

credible threat of prosecution.  A claim that Plaintiffs *could* be sued is not ripe.

Next, Plaintiffs cannot establish that any injury they have allegedly suffered can fairly be traced to PASPA.  Plaintiffs' inability to gamble on sports today is the direct result of the New Jersey legislature's previous inaction.  Congress gave the State an entire year to grandfather itself into the Act.  It chose not to do so.

Finally, a lack of redress permeates Plaintiffs' entire case.  A judgment in Plaintiffs' favor is unlikely to remedy the injuries they have allegedly sustained.  If PASPA were struck down, there would still be no state law in New Jersey allowing sports betting.  As former U.S. District Judge Joseph A. Greenaway, Jr. of the U.S. District Court in New Jersey[6] previously held, rejecting another Plaintiff's challenge to the constitutionality of PASPA:

> To meet the third prong of the *Lujan* test, Plaintiff needs to establish that declaring the PASPA unconstitutional would "likely, as opposed to merely speculative[ly]" redress his issue of being able to gamble on professional and amateur sports.  As discussed above, Congress has allocated to the State of New Jersey a full year to enact legislation allowing gambling on sports; the state legislature, however, never has passed such a law.  Therefore it is unlikely that invalidating the PASPA will entitle Plaintiff to gamble on professional and amateur sports.

Flager, 2007 WL 2814657, at *3.

Plaintiffs allege that Senate Resolution 12 "manifests that the intent of the

---

[6] Judge Greenaway now sits on the U.S. Court of Appeals for the Third Circuit.

Legislature is to pass legislation to authorize a form of Sports Betting if PASPA is declared to be unconstitutional." Compl. ¶ 56; see also Intervenor Compl. ¶ 34. But all the Resolution actually does is "respectfully urge[] the United States Congress to remove the federal ban on sports wagering." By its own terms, it expresses no intent to pass legislation authorizing sports betting thereafter. Moreover, and more importantly, it is not a law that authorizes sports betting in New Jersey. A vaguely-worded advisory statement issued two years ago on behalf of one legislative House is a far cry from the passage of a law.

Assembly Bill No. 1909 is equally unavailing. The General Assembly may have passed Bill No. 1909, but as Senator Sweeney admits, "[t]he Senate did not move on this Bill[.]"[7] Intervenor Compl. ¶ 35. Even if the Bill had been enacted, which it was not, the result would just have been the submission of the issue for a voter referendum, the outcome of which must necessarily remain unknown.[8]

---

[7] Such inaction is apparently commonplace. According to a 2009 article, "[t]hree times in the past five years, the N.J. Assembly passed legislation authorizing a referendum to gauge the public's appetite for sports betting. Each time, the N.J. Senate declined to take up the cause." *Sports Betting Debate Revisited*, Atlantic City Central, Mar. 27, 2009, http://blogs.atlanticcityweekly.com/ac-central/2009/03/27/sports-betting-debate-revisited/.

[8] Passage of such a referendum is, of course, far from assured. The Supreme Court of New Jersey, in a unanimous opinion, has noted that: "The evolution of legalized gambling in New Jersey has been grudging. Because of widespread abuses in various gambling activities and the attendant social and economic ills engendered, gambling has historically been viewed as an undesirable activity." Atlantic City Racing Ass'n v. Attorney General, 98 N.J. 535, 539-40 (1985); see also In re Casino Licensees, 633 A.2d at 1052 ("Gambling has been legalized in New Jersey very cautiously, one step at a time.").

-10-

Plaintiffs pile speculation upon speculation: the General Assembly *might* pass legislation authorizing a voter referendum on sports betting, the Senate *might* pass the same bill, voters *might* approve the referendum.  Concrete redressability is nowhere to be found.  What the Court can be sure of is that New Jersey had the opportunity to authorize sports betting seventeen years ago, and it did not do so.  The entirety of Plaintiffs' Complaints should be dismissed for a lack of standing, just as Judge Greenaway dismissed the Plaintiff's claims in <u>Flager</u>.

### 2.    Plaintiffs Lack Standing To Allege a Tenth Amendment Violation

In addition to the aforementioned jurisdictional barriers, Plaintiffs are the improper parties to advance a claim that PASPA unlawfully encroaches on New Jersey's sovereign power in violation of the Tenth Amendment.  <u>See</u> Compl. ¶ 127, Intervenor Compl. ¶ 69.  The State of New Jersey is not a Plaintiff in this case, and none of the current Plaintiffs act with the State's authority.  None of the current Plaintiffs are entitled to raise this claim, which is reserved to the State.

The Tenth Amendment provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  But it is well settled in the Third Circuit that "a private party lacks standing to claim that the federal Government is impinging on state sovereignty in violation of the Tenth

Amendment, absent the involvement of a state or its officers as a party or parties."
United States v. Bond, 581 F.3d 128, 137 (3d Cir. 2009); see also Tennessee Elec.
Power Co. v. TVA, 306 U.S. 118, 144 (1939).  Thus, it is beyond cavil that the
private party plaintiffs—iMEGA, the N.J. Horsemen's Associations, and Senator
Lesniak[9]—lack standing to pursue a Tenth Amendment claim.  See Bond, 581
F.3d at 137; see also iMEGA v. Gonzales, No. 07-2625, 2008 WL 5586713, at *10
(D. N.J. Mar. 4, 2008) (dismissing an attempt by iMEGA to raise a Tenth
Amendment claim due to lack of standing), aff'd 580 F.3d 113 (3d Cir. 2009).

Senator Sweeney also lacks standing to raise a Tenth Amendment challenge,
despite his title of State Senate President, because he is not a "state officer"
authorized to act on the State's behalf in this lawsuit.  In fact, under New Jersey
law only the State AG may represent the State's sovereign interests in litigation.
See N.J.S.A. 52:17A-4 ("[The State AG] shall exclusively attend to and control all
litigation and controversies to which the State is a party or in which its rights and
interests are involved . . . .") (emphasis added); see also May v. Cooperman, 578
F. Supp. 1308, 1310 (D. N.J. 1984) ("[The New Jersey Attorney General] ha[s]
exclusive control over all litigation in which the State is a party or in which its

---

[9] Although Senator Lesniak holds an elected office in New Jersey, he is not a state officer
empowered to represent the sovereign interests of the State in this lawsuit.  He is no more
entitled to raise a Tenth Amendment claim on the State's behalf here than any other private party.

rights or interests are involved."); <u>Van Ness v. Borough of Deal</u>, 352 A.2d 599,

605 (N.J. Super. Ch. 1975) ("It would appear that the Attorney General must

determine whether the State is interested in any situation."), *reversed on other*

*grounds by* <u>Van Ness v. Borough of Deal</u>, 393 A.2d 571 (N.J. Oct 16, 1978).  The

New Jersey AG—the only state officer empowered to represent the sovereign

interests of the State in a case such as this[10]—is not a party here.

Insofar as Senator Sweeney represents the interests of the New Jersey

Senate[11] rather than those of New Jersey itself, he still lacks standing to bring a

Tenth Amendment claim.  While the Senate might have standing to defend the

constitutionality of its enacted laws if the State AG refused to do so, <u>see, e.g.</u>,

<u>Karcher v. May</u>, 484 U.S. 72 (1987), or to defend an encroachment by the

Governor on its authority to appropriate funds, <u>see, e.g.</u>, <u>Karcher v. Kean</u>, 479

A.2d 403 (1984), it lacks standing to assert a claim on the State's behalf under the

Tenth Amendment.  The D.C. Circuit rejected a similar attempt by Alaska

legislators to challenge federal fish and wildlife laws on Tenth Amendment

---

[10] To the extent any argument exists that the New Jersey Constitution of 1947 authorizes
the Governor to file lawsuits to defend the State's interests (New Jersey Constitution of 1947, art.
V, para. 11), this issue is moot.  Governor Christie expressly declined to participate in this action.

[11] Although Senator Sweeney may occasionally appear to speak for the entire Legislature,
<u>see</u> Intervenor Compl. ¶¶ 32, 34, 73, his Complaint recognizes that he has only been authorized
by the New Jersey Senate to take legal action on *its* behalf.  Intervenor Compl. ¶¶ 9, 96.

grounds.  Rejecting a complaint "about federal limitations on State prerogatives in the management of fish and wildlife"—a grievance that mirrors the Senators' complaint about federal limitations on the State's right to raise funds through gambling—the Court held that any "resulting injury is not to the Legislature and it is not to the individual legislators.  It is to the State itself."  Alaska Legislative Council v. Babbitt, 181 F.3d 1333, 1338 (D.C. Cir. 1999).  As the Court concluded, denying standing: "the Legislature suffers no separate, identifiable, judicially cognizable injury that entitles it to sue on its own behalf."  Id.

Finally, Senator Sweeney's assertion that PASPA "unconstitutionally require[s]" the Senate to do something—"to provide in any law authorizing a form of gambling or a lottery a provision prohibiting a form of legalized and regulated sports betting"  (Intervenor Compl. ¶ 73)—is merely another way of saying that PASPA regulates sports betting.  This Act restricts a power of the states, not of their legislatures.  Any possible injury, and thus any possible Tenth Amendment claim, would have to be brought by the State itself.  "Legislators, like other litigants in federal court, must satisfy the jurisdictional prerequisites of Article III standing."  Common Cause of Pennsylvania v. Pennsylvania, 558 F.3d 249, 265 (3d Cir. 2009) (quotation omitted).  Senator Sweeney has failed to do so, whether he is acting individually, as a legislator, or on behalf of the New Jersey Senate.

3.    **Plaintiffs Lack Standing To Allege an Eleventh Amendment Violation**

Plaintiffs are also the improper parties to advance a claim that PASPA unlawfully encroaches New Jersey's sovereign immunity under the Eleventh Amendment.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has held that "the Eleventh Amendment grants *the State* a legal power to assert a sovereign immunity defense should it choose to do so."  Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 389 (1998) (emphasis added).  "[T]he Supreme Court has consistently interpreted the Amendment to immunize an unconsenting state from suits brought in federal courts by her own citizens as well as by citizens of another state.  In addition, a suit may be barred even though the state is not named a party to the action, as long as the state is the real party in interest."  Carter v. City of Philadelphia, 181 F.3d 339, 347 (3d. Cir. 1999) (citations and quotations omitted).  Perforce, "Eleventh Amendment immunity is an affirmative defense."  Id.

Plaintiffs complain that PASPA permits the commencement of civil actions

-15-

against New Jersey by sports organizations, but Plaintiffs have no more standing to assert the State's Eleventh Amendment rights than they do to raise its Tenth Amendment rights.  Furthermore, the Eleventh Amendment operates as an affirmative defense, and New Jersey is not a defendant in this (or any related) case. Plaintiffs' claim is based on speculation about possible lawsuits that might be filed at some point in the future by unnamed sports organizations.  Plaintiffs lack constitutional and prudential standing to raise an Eleventh Amendment affirmative defense on behalf of a non-party State as a prospective attack on PASPA.

### 4.    Senators Lesniak and Sweeney Lack Standing To Allege a First Amendment Violation

Senators Lesniak and Sweeney have alleged no injury in fact to support a First Amendment claim; to the contrary, the facts asserted in their Complaints and the terms of PASPA itself belie any such allegation.  To support constitutional standing, an injury must be "concrete" and "palpable," not merely "conjectural." See Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).  "[I]t is not enough that [Plaintiff] claim[s] to 'feel inhibited' in the exercise of First Amendment rights." Oldroyd v. Kugler, 352 F. Supp. 27, 29 (D. N.J. 1972).  Such an allegation cannot substitute for a claim of specific objective harm.  See Laird v. Tatum, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for

a claim of specific present objective harm [.]"); see also Paton v. La Prade, 524

F.2d 862, 874 (3d Cir. 1975) (concluding that an allegation that defendants'

conduct constituted an "inhibiting force" was insufficient to confer standing).

The Senators claim that PASPA has chilled their First Amendment rights

"to introduce, along with co-sponsors, laws which would permit Sports Betting in

New Jersey." See Compl. ¶ 142; see also Intervenor Compl. ¶ 99.  At the same

time, Senator Lesniak states that he has already "introduced legislation to permit

Sports Betting in New Jersey[.]" See Compl. ¶ 140.  Given Senator Lesniak's

asserted introduction of the very legislation he complains he cannot propose

because of PASPA, the Senators cannot show that the Law has chilled their speech

or "caused [them] to suffer an 'injury in fact' that a favorable judgment will

redress." See Elk Grove Unified Sch. Dist. v. Nedow, 542 U.S. 1, 12 (2004).

Neither Senator has shown a concrete injury to his First Amendment rights—their

concerns are entirely conjectural.

In fact, the terms of PASPA foreclose the Senators' ability to demonstrate

any connection between the Act and their alleged chill.  The Senators claim an

impermissible chill from the "requirements and/or restrictions of PASPA," but the

Act only provides for injunctive relief against states and entities which operate

sports betting schemes contrary to the federal law.  It contains no provision that

-17-

forecloses the Senators from introducing, sponsoring or voting for whatever sports betting bill they would like—it just provides that the operator of any resulting scheme could be subject to a civil injunction.  No connection between the Act and the activity the Senators allege has been chilled is evident.  See <u>Laird</u>, 408 U.S. at 14 (holding plaintiffs' claim of a chilling effect was not a cognizable injury where they "left somewhat unclear the precise connection between the mere existence of the challenged system and their own alleged chill"); <u>see also</u> <u>Aiello v. City of Wilmington, Delaware</u>, 623 F.2d 845, 862 (3d Cir. 1980) (suggesting that a claim of an actual chill may be enough to confer standing where there is a "*reasonable possibility* that a regulation will be applied *directly*" to plaintiff ) (emphasis added).  The Senators have shown no connection between PASPA and their purported chill; subjective allegations alone are not enough to confer standing.

### 5. iMEGA Lacks Standing To Bring a Constitutional Right to Privacy Claim on Behalf of Third-Party Gamblers

iMEGA claims that PASPA violates a constitutional right of members of the general public to engage in gambling-related activity in the privacy of their homes. But iMEGA lacks third-party standing to assert the rights of third-party gamblers.

"To successfully assert third-party standing: (1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and

(3) the third party must face some obstacles that prevent it from pursuing its own claims." <u>Nasir v. Morgan</u>, 350 F.3d 366, 376 (3d Cir. 2003).  iMEGA, a trade association representing gambling businesses, cannot satisfy any prong of this test. First, iMEGA has demonstrated no injury.  As previously discussed, neither the inability to operate an unfettered sports betting scheme nor the abstract threat of a civil injunction for doing so constitutes a valid, direct injury.  And as explained *infra* in Section II.B.8, there is no constitutional privacy right to engage in internet gambling—or sports betting—from one's home.  See <u>iMEGA</u>, 580 F.3d at 118.

Nor can iMEGA satisfy the second or third prongs of the test, as this Court previously held when rejecting a virtually identical claim by the group.  "[iMEGA] here has failed to explain how it, as an association promoting electronic gambling, shares a 'close relationship' with individual electronic gamblers. . . . [iMEGA] also does not articulate what obstacles exist to prevent those individuals from bringing their own actions." <u>iMEGA</u>, 2008 WL 5586713, at *9, *aff'd* 580 F.3d at 118 ("We share the District Court's doubts regarding [iMEGA's] standing to assert these claims [.]").  iMEGA lacks standing to advance this claim.

## II.    Plaintiffs' Complaints Should Be Dismissed Pursuant To Federal Rule of Civil Procedure 12(b)(6) for Failure To State a Claim

### A.    Standard of Review

A motion under Rule 12(b)(6) tests the legal sufficiency of a complaint. The Supreme Court recently identified the two working principles which underlie the failure to state a claim standard.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009); Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss").  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  Iqbal, 129 S. Ct. at 1950 (citation and quotation omitted). Even if this Court concludes that it has jurisdiction over Plaintiffs' claims, those claims should be dismissed because PASPA is constitutional, Plaintiffs' conclusory statements notwithstanding.

**B.      Even If Plaintiffs Had Standing To Bring Their Claims, This Action Should Be Dismissed Because PASPA Is Constitutional**

**1.      PASPA Does Not Violate the Commerce Clause**

Under the Commerce Clause, Congress may "regulate Commerce . . . among the several states."  U.S. Const., Art. I, § 8, cl. 3.  More specifically, this power extends to three areas of regulation: 1) "the use of the channels of interstate commerce"; 2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and 3) "activities that substantially affect interstate commerce."  United States v. Lopez, 514 U.S. 549, 558-59 (1995).  With respect to the third category of regulation, Supreme Court case law

> firmly establishes Congress' power to regulate *purely local* activities that are part of an economic "class of activities" that have a substantial effect on interstate commerce.  As we stated in Wickard, "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."

Gonzales v. Raich, 545 U.S. 1, 17 (2005) (emphasis added) (quoting Wickard v. Filburn, 317 U.S. 111, 125 (1942)).  Furthermore, the standard is not "whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce *in fact*, but only whether a 'rational basis' exists for so concluding." See Raich, 545 U.S. at 22 (emphasis added) ("In assessing the scope of Congress' authority under the Commerce Clause, we stress that the task before us is a modest

-21-

one.").  Finally, "[i]n legislating for a legitimate end under the Commerce Clause,

Congress is not restricted to merely an economic definition of commerce but it

may also legislate against matters considered to be 'deemed a moral and social

wrong.'" United States v. Harris, 460 F.2d 1041, 1047 (5th Cir. 1972) (quoting

Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257 (1964)).

Plaintiffs do not allege that sports betting has no effect on interstate

commerce, nor could they.  Indeed, Plaintiffs filed this case in large part due to

their concern about the substantial interstate economic effects of sports betting.

One of Plaintiffs' core allegations is that the ability of the four grandfathered

States to pursue sports betting within their boundaries threatens Plaintiffs' own

economic livelihood.  See Compl. ¶ 64 ("New Jersey race tracks will continue to

lose customers to Delaware and other states exempt from PASPA that can offer

features that accommodate Sports Betting at their race tracks which PASPA

precludes in New Jersey."); see also Compl. ¶ 67 ("The entire horse racing

industry and horse betting industry in the State of New Jersey faces imminent

financial ruin, closure, and termination of its employees due to the prohibitions

contained in PASPA that, at the same time, permit horse racing tracks in Nevada,

Delaware, Oregon, and Montana to participate in Sports Betting.").[12]  Taking

Plaintiffs' own allegations as true, there can be no serious question that a rational

basis exists to conclude that gambling in general, and sports betting in particular,

substantially affect interstate commerce.  Indeed, numerous courts, including the

Third Circuit, have reached this result.  See, e.g., United States v. Vlanich, 75 Fed.

Appx. 104, 106 (3d Cir. 2003) ("Large-scale gambling obviously has commercial

implications . . . . [18 U.S.C. § 1955, which prohibits illegal gambling businesses]

continues to be valid under the Commerce Clause.").

     If more proof was needed of sports betting's interstate effects, one need

---

[12] It should be noted that Congress was not blind to similar arguments when it enacted PASPA, it just found them unpersuasive:

> Opponents of this legislation argue that legalizing sports gambling is a question of raising State revenues and should be left to the States.  The committee recognizes that sports gambling offers a potential source of revenue for the States, but so do other destructive activities that could be regulated or taxed.  As former Bengals linebacker and Cincinnati City Council member Reggie Williams noted, one of our primary responsibilities is to draw a line between legal and illegal, right and wrong.  That line cannot be maintained, he observed, "if any profitable activity, however, socially destructive, is seized upon to generate revenue for the States."  The answer to State budgetary problems should not be to increase the number of lottery players or sports bettors, regardless of the worthiness of the cause.  The committee believes the risk to the reputation of one of our Nation's most popular pastimes, professional and amateur sporting events, is not worth it.

S. REP. No. 102-248, at *7; see also 138 Cong. Rec. 17,434 (1992) (statement of New Jersey Sen. Bradley) ("We all recognize the fiscal constraints under which States operate in these tough economic times.  But we must not forget the consequences of sports betting.  Based on what I know about the dangers of sports betting, I am not prepared to risk the values that sports instill in youth just to add a few more dollars to state coffers.").

look no further than the legislative history of PASPA, which is replete with

examples of sports betting's national impact.  The Senate specifically found that:

> Sports gambling is a national problem.  The harms it inflicts are felt
> beyond the borders of those States that sanction it.  The moral erosion
> it produces cannot be limited geographically . . . . The committee
> agrees with David Stern, commissioner of the National Basketball
> Association, that "[t]he *interstate ramifications* of sports betting are a
> compelling reason for federal legislation."

S. REP. No. 102-248, at *5-6 (emphasis added).  Ultimately, the Senate concluded

that "[s]ports are national institutions, and Congress has recognized a distinct

Federal interest in protecting sports from corruption. . . . [PASPA] represents a

judgment that sports gambling–whether sponsored or authorized by a State or

other governmental entity–is a problem of legitimate Federal concern for which a

Federal solution is warranted."  Id., at *6-7.

The gravamen of Plaintiffs' Commerce Clause challenge is the allegation

that "[u]nder the Commerce Clause, Congress is required to legislate uniformly

amongst the several states."  Compl. ¶ 78; Intervenor Compl. ¶ 43.  Plaintiffs are

incorrect.  To the contrary, "[t]here is no requirement of uniformity in connection

with the commerce power [.]"  Currin v. Wallace, 306 U.S. 1, 14 (1939); see, e.g.,

United States v. Sacco, 491 F.2d 995, 1003 (9th Cir. 1974) ("When Congress

exercises its power under the commerce clause, there is no requirement of national

-24-

uniformity [.]").  The Supreme Court has found "no warrant" for "a contention that

mere lack of uniformity in the exercise of the commerce power renders the action

of Congress invalid."  Currin, 306 U.S. at 14.  "A claim of arbitrariness cannot rest

solely on a statute's lack of uniform geographic impact . . . . Nor does the

Commerce Clause impose requirements of geographic uniformity . . . . Congress

may devise . . . a national policy with due regard for the varying and fluctuating

interests of different regions."  Hodel v. Indiana, 452 U.S. 314, 332 (1981)

(citation and quotations omitted).

　　　　The legislative history of PASPA offers two equally compelling, rational

reasons for the fact that the Act grandfathered four states.  First, PASPA was

enacted to "stop the *spread* of State-sponsored sports gambling . . . ."  S. REP. No.

102-248, at *4 (emphasis added).  Congress had concluded that a problem already

existed and was rationally acting to stop it from getting any worse.  Second, the

decision to allow certain States to maintain their status quo reflects the reality of

the bargaining process inherent in the passage of legislation.  Although the Senate

Judiciary Committee "firmly believe[d] that *all* such sports gambling is harmful,"

id., at *8, the supporters of PASPA recognized that a step in the right direction

was better than no step at all, and they made the rational decision to compromise

and grandfather in certain States which had already authorized or conducted sports

betting in recognition of their unique status.[13]  The same spirit of compromise led to the incorporation of a one-year window for New Jersey to pass state legislation grandfathering itself into the Act.  This, despite the fact that New Jersey Senator Bill Bradley, a former college and National Basketball Association star, and one of PASPA's original cosponsors (who testified on its behalf), opposed the provision.[14]

Plaintiffs cannot prevail on their Commerce Clause claim.  Plaintiffs' own Complaint supports the inescapable conclusion that sports betting substantially affects interstate commerce, and in enacting PASPA, Congress set forth a legislative history that demonstrates its concerns about sports betting's pervasive interstate effects.  Plaintiffs may disagree with PASPA's purpose and its lack of national uniformity, but they cannot prove that the Act or its grandfathering provisions were an unreasonable means to achieve Congress' ends.  PASPA is a constitutional exercise of Congress' power under the Commerce Clause.

---

[13] "[The committee] has no . . . desire to threaten the economy of Nevada, which over many decades has come to depend on legalized private gambling, including sports gambling, as an essential industry. ..."  S. REP. No. 102-248, at *8.

[14] "Mr. President, the bill the Senate has passed today contains a provision which effectively allows the State of New Jersey 1 year to establish casino-based sports betting by referendum.  While I wish this bill did not contain such a provision, I am convinced that it would not have been possible to pass a ban on sports betting without it.  My hope is that New Jersey will decide not to exercise this right."  138 Cong. Rec. 17,434 (statement of Sen. Bradley).

## 2.    PASPA Does Not Violate the Equal Protection Clause

"In reviewing a claim that government action violates the Equal Protection Clause, we must first determine the appropriate standard by which we are to review the claim." Doe v. Pa. Bd. of Probation and Parole, 513 F.3d 95, 107 (3d Cir. 2008). "If the challenged state action involves a 'suspect' classification based on race, alienage or national origin, or infringes on a fundamental constitutional right, we must apply the strict scrutiny standard." Id. But "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Rational basis review "is a paradigm of judicial restraint." Id. at 314. For courts, this means that "[w]here there are plausible reasons for Congress' action, our inquiry is at an end." Id. at 313-14 (citation and quotation omitted)

Initially, it is obvious that this Court should apply rational basis review to Plaintiffs' equal protection challenge to PASPA. The Act regulates squarely in the areas of social and economic policy, and it infringes no fundamental constitutional

-27-

right.[15]  "Rational basis review does not empower courts to judge the wisdom,

fairness, or logic of legislative choices, and legislation subject to rational basis

review has a strong presumption of validity."  De Leon-Reynoso v. Ashcroft, 293

F.3d 633, 639 (3d Cir. 2002) (citation and quotation omitted).

Under rational basis review, "[l]egislation is constitutional if there is a

rational relationship between the disparate treatment and some legitimate

governmental purpose. . . . The legislation must be sustained if any reasonably

conceivable state of facts provide a rational basis for the classification."  Id.  There

can be no doubt that PASPA serves a legitimate governmental purpose and that

Congress had more than "plausible" reasons for grandfathering in existing state

laws.  After hearing extensive testimony from numerous experts in the arenas of

sports and pathological gambling, Congress concluded sports betting "undermines

public confidence in the character of professional and amateur sports.

Furthermore, State-sanctioned sports gambling will promote gambling among our

Nation's young people."  S. REP. No. 102-248, at *5.  After hearing testimony and

accepting evidence from law enforcement representatives, the Committee

concluded that "[l]egalization of sports gambling would not reduce illegal sports

---

[15] PASPA infringes no constitutional right to privacy.  See Section II.B.8. infra.

-28-

gambling in a State." Id., at *7.[16]  Thus, Congress enacted PASPA to "serve[] an important public purpose, to stop the spread of State-sponsored sports gambling and to maintain the integrity of our national pastime."  Id., at *4; see also OFC Comm'r Baseball v. Markell, 579 F.3d 293, 303 (3d Cir. 2009) ("[PASPA's] central purposes [are] to limit the spread of state-sponsored sports gambling and maintain the integrity of sports.").

At the same time, Congress decided not to apply this ban to States that had previously enacted some type of sports betting.  See S. REP. No. 102-248, at *8. While this distinction may strike Plaintiffs as unfair, it is eminently rational.  As previously discussed, this "disparate treatment" between States and their citizens helped arrest the *spread* of sports betting, avoided disruption to existing State economies, and helped ensure the passage of the law.[17]  And, in the words of the Supreme Court, "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all."  Railway Exp. Agency v. People of State of N.Y., 336 U.S. 106, 110 (1949); Schwartz v. Judicial Retirement System of

---

[16] "According to the director of New Jersey's Division of Gaming Enforcement, 'most law enforcement professionals agree that legalization has a negligible impact on, and in some ways enhances, illegal markets.'"  S. REP. No. 102-248, at *7.

[17] This same rational "disparate treatment" also led Congress to include an provision in PASPA for New Jersey's benefit—§ 3704(a)(3)—while rejecting an amendment that would have offered other non-grandfathered states the same opportunity.  See 138 Cong. Rec. 7274 (1992).

New Jersey, 584 F. Supp. 711, 728 (D. N.J. 1984) ("Underinclusive legislation . . .

need not be invalid."); Ackerman v. Columbus, GA, 269 F. Supp. 2d 1354, 1358

(M.D. Ga. 2003) ("[T]he inherent nature of the legislative process requires that

legislative bodies be allowed to proceed one step at a time, which sometimes

results in the means not fitting with mathematical precision to the ends.").

Plaintiffs may dislike the decisions made by Congress in enacting PASPA, but

> equal protection is not a license for courts to judge the wisdom,
> fairness, or logic of legislative choices. . . . The Constitution
> presumes that, absent some reason to infer antipathy, even
> improvident decisions will eventually be rectified by the democratic
> process and that judicial intervention is generally unwarranted no
> matter how unwisely we may think a political branch has acted.

Beach Commc'ns, 508 U.S. at 313-14.

### 3.    PASPA Is Not Void for Vagueness or Overbreadth

"In a facial challenge to the overbreadth and vagueness of a law, a court's

first task is to determine whether the enactment reaches a *substantial amount* of

constitutionally protected conduct."  Village of Hoffman Estates v. Flipside,

Hoffman Estates, Inc., 455 U.S. 489, 494 (1982) (emphasis added).  This analysis

involves examining whether the challenged law (1) infringes a claimant's First

Amendment rights or (2) is overbroad because it inhibits the First Amendment

rights of other parties.  See id. at 495.  "If it does not, then the overbreadth

challenge must fail." Id. at 494.

Next, a court should "examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in *all* of its applications." Id. (emphasis added).  A law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 286 (2008); Coates v. Cincinnati, 402 U.S. 611, 614 (1971) (holding a statute is void for vagueness "not [when] it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather [when] no standard of conduct is specified at all.").  Finally, courts judge statutes providing for civil penalties with greater tolerance for vagueness than those providing for criminal penalties "because the consequences of imprecision are qualitatively less severe." Flipside, 455 U.S. at 499.

This Court need not dwell long on whether PASPA is unconstitutionally overbroad.  Plaintiffs' Complaints passingly invoke the overbreadth doctrine, but they appear to do so only talismanically.  Plaintiffs have articulated no reason for PASPA to be held unconstitutional as being impermissibly overbroad; their true

objection focuses on the Act's alleged vagueness.  In any event, PASPA is targeted at the sponsorship of sports betting—which is not a protected activity—and it implicates no form of protected expression.  Accordingly, the overbreadth doctrine has no application to this case.[18]  See, e.g., Initiative and Referendum Inst. v. Walker, 450 F.3d 1082, 1105 (10th Cir. 2006) ("Because the . . . requirement presents no realistic danger that the statute itself will significantly compromise recognized First Amendment protections, the overbreadth doctrine is not applicable.") (citations and quotations omitted); see also Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242, 1265 (3d Cir. 1992) ("Because the overbreadth doctrine is strong medicine, it is to be used sparingly, where the demonstrated overbreadth is considerable.") (citation and quotation omitted).

Plaintiffs' vagueness claims fare no better than their overbreadth allegations.  The Third Circuit recently explained that "PASPA unmistakably prohibits state-sponsored gambling . . . subject to certain exceptions [.]"  Markell, 579 F.3d at 303.  This straightforward prohibition gives "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  Plaintiffs' contention that the Act is

---

[18]  To the extent, if any, Plaintiffs may claim that PASPA has an overbroad scope because it encompasses protected commercial speech, this argument is "irrelevant . . .  because the overbreadth doctrine does not apply to commercial speech."  Flipside, 455 U.S. at 496-97.

unintelligible because people may struggle to understand when they might be subject to a civil injunctive action for violating PASPA strains credulity.  Compl. ¶¶ 113, 115.  Simply put, 46 states and their citizens have clear notice that they may not sponsor or operate a gambling scheme based on amateur or professional sporting events or the performances of such athletes in such games, with a handful of clearly defined exceptions.  Likewise, the four grandfathered states and their citizens need only reference state law to understand what specific sports betting is allowed in those particular states.[19]  And, as the Third Circuit has held, "a statute is not unconstitutionally vague merely because it incorporates other provisions by reference; a reasonable person of ordinary intelligence would consult the incorporated provisions."  iMEGA, 580 F.3d at 116 (citation omitted).

"The classification of a federal statute as void for vagueness is a significant matter."  Columbia Natural Res., Inc. v. Tatum, 58 F.3d 1101, 1105 (6th Cir. 1995).  "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  Chapman v. United States, 500 U.S. 453, 464 (1991) (citation omitted).  The terms Plaintiffs challenge are clear enough to

---

[19] Even assuming that some state laws might be so vague as to make it impossible to ascertain which types of gambling they proscribe, that would indicate the vagueness of the state enactments – not the Act at issue here.  And any question about the constitutionality of particular state statutes should be presented in an as-applied challenge in which the terms of those laws are at issue, not in a pre-enforcement challenge to a federal statute that is clear on its face.

provide a person of ordinary intelligence with fair notice of the conduct PASPA

prohibits.  Accordingly, the Court should dismiss Plaintiffs' vagueness claim.[20]

### 4.    PASPA Does Not Violate the Tenth Amendment

Even if Plaintiffs had the standing to raise it, which they do not, their

contention that PASPA violates the Tenth Amendment is unfounded.  It is well

settled that the Tenth Amendment "does not operate as a limitation upon the

powers delegated to the Congress by the Commerce Clause."  United States v.

Barrow, 363 F.2d 62, 65 (3d Cir. 1966); see also United States v. Parker, 108 F.3d

28, 31 (3d Cir. 1997) ("If Congress acts under one of its enumerated powers - here

its power under the Commerce Clause- there can be no violation of the Tenth

Amendment").  As set forth in section II.B.1., PASPA is a constitutional exercise

of Congress' authority under the Commerce Clause, and courts repeatedly have

upheld such regulation against Tenth Amendment challenges.  See, e.g., Gilstrap

---

[20] Plaintiffs' vagueness challenge also mentions in passing that "PASPA further restricts the legitimate legislative actions of a state which allowed a particular form of sports betting prior to the enactment of PASPA to authorize a different form of wagering on that same sports event subsequent thereto" (Compl. ¶ 114).  As an initial matter, Plaintiffs lack standing to raise a claim on behalf of the four grandfathered states.  In any event, last year the Third Circuit rejected the argument of Delaware, a PASPA-grandfathered state, that its sovereign status permitted it to implement a sports betting proposal that exceeded the scope of its pre-PASPA sports betting scheme.  "Because we do not find PASPA ambiguous, we find unpersuasive Delaware's argument that its sovereign status requires that it be permitted to implement its proposed betting scheme. . . . Through PASPA, Congress has 'altered the usual constitutional balance' with respect to sports wagering, although Delaware retains the right to implement a sports wagering scheme 'to the extent that the scheme was conducted' previously.  Those words of limitation are not rendered nugatory by generalized notions of 'state sovereignty.'"  Markell, 579 F.3d at 303.

v. United States, 389 F.2d 6, 8 (5th Cir. 1968) (upholding 18 U.S.C. § 1952, which

prohibits the use of freight, telephone, and telegraph facilities in interstate

commerce with intent to carry on unlawful gambling, against a Tenth Amendment

challenge); United States v. Villano, 529 F.2d 1046, 1056 (10th Cir. 1976) (same);

United States v. Avarello, 592 F.2d 1339, 1345 (5th Cir. 1979) (upholding 18

U.S.C. § 1955, which prohibits conducting an illegal gambling business, against a

Tenth Amendment challenge).  The same result is compelled here.

### 5.    PASPA Does Not Violate the Eleventh Amendment

"The ultimate guarantee of the Eleventh Amendment is that nonconsenting

States may not be sued by private individuals in federal court."  Bd. of Trustees of

the Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001).  However, the

Supreme Court has recognized an exception to the doctrine of Eleventh

Amendment immunity that allows suits against state officials in their official

capacities where the plaintiff seeks prospective, injunctive relief for ongoing

violations of federal law.  See Ex parte Young, 209 U.S. 123, 159-60 (1908).  The

Court has explained that the Ex parte Young exception to state sovereign

immunity is "necessary to permit the federal courts to vindicate federal rights and

hold state officials responsible to 'the supreme authority of the United States.'"

Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105 (1984).  Under the

Ex parte Young doctrine, where a plaintiff seeks prospective injunctive and

declaratory relief for ongoing violations of his federal rights, he has satisfied the

Supreme Court's "straightforward inquiry," and the Eleventh Amendment does not

bar the suit against the individual defendants in their official capacities.  See, e.g.,

McCarthy v. Hawkins, 381 F.3d 407, 417 (5th Cir. 2004).

In PASPA, Congress created a private right of action and limited it to

professional and amateur sports leagues injured by state-sponsored violations of

the law.  Per Ex parte Young, a lawsuit brought against a State by a sports league

for prospective injunctive relief would not violate the Eleventh Amendment.  Cf.

Markell, 579 F.3d at 295 (holding Delaware's sports betting scheme violated

PASPA where sports leagues sought injunctive relief).  This claim, which

Plaintiffs do not have standing to raise in any event, is without merit.[21]

---

[21] It is unclear whether Plaintiffs claim the Eleventh Amendment would bar the United States from seeking injunctive relief against a State under PASPA.  If Plaintiffs do raise this contention, it also must fail.  The Supreme Court has long recognized that, "[i]n ratifying the Constitution, the States consented to suits brought by other States or by the Federal Government."  Alden v. Maine, 527 U.S. 706, 755-56 (1999).  Thus, "States retain no sovereign immunity as against the Federal Government."  West Virginia v. United States, 479 U.S. 305, 312 n.4 (1987); see, e.g., Travis v. Reno, 163 F.3d 1000, 1006 (7th Cir. 1998) ("[T]he eleventh amendment does not curtail the national government's ability to sue a state in federal court.").

-36-

**6.     PASPA Violates Neither Senator Lesniak Nor Senator Sweeney's First Amendment Rights**

The First Amendment affords the broadest protection to the "[d]iscussion of public issues," which "are integral to the operation of the system of government established by our Constitution."  Buckley v. Valeo, 424 U.S. 1, 14 (1976).  But as a regulation of unprotected *conduct* that itself neither contains nor manifests protected expression, PASPA is not subject to First Amendment scrutiny at all. See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 446 (3d Cir. 2000); see, e.g., Barnes v. Glen Theatre, Inc., 501 U.S. 560, 572 (1991) (Scalia, J., concurring) ("[A] general law regulating conduct and not specifically directed at expression . . . is not subject to First Amendment scrutiny at all.").  PASPA prohibits the sponsorship of sports betting.  Such conduct implicates no constitutionally protected form of expression and is entitled to no protection under the First Amendment.  The Act contains no prohibition on speech, legislative or otherwise, and it violates no Senator's First Amendment rights.[22]  Senator Lesniak's sponsorship of Senate Resolution 12 and the passage of Assembly Bill

_____

[22] "The First Amendment protects political association as well as political expression." Buckley, 424 U.S. at 15.  To the extent the Senators may argue that PASPA infringes the First Amendment by burdening expressive association freedoms, this claim also lacks merit.  PASPA has no adverse impact, much less a significant one, on any Senator's ability to express his views on sports betting.  Notwithstanding PASPA, the Senators remain free to promote sports betting; nothing in the Act implicates their expressive activities.  Cf. iMEGA, 2008 WL 5586713, at *7.

No. 1909 "by a large majority" aptly demonstrate that New Jersey legislators' First Amendment rights to speak and vote as they see fit are intact.[23]

### 7.   PASPA Violates Neither Procedural Nor Substantive Due Process

Procedural and substantive due process claims are examined under a two-part analysis.  First, a plaintiff must establish that he has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause in the first place.  See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972).  Only after identifying such a right does a court continue to consider whether the deprivation of that interest contravened the notions of due process.  Id. at 570-71.  Here, Plaintiffs have not identified any protected interest at stake.  Instead, Plaintiffs' due process claims appear to be a retread of their void for vagueness and equal protection claims.  This amalgamation of meritless grievances does not establish that Plaintiffs have been deprived of any life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause.  These claims should be dismissed.

---

[23] Moreover, state legislators are entitled to absolute immunity from suit at common law for their legislative activities.  See Tenney v. Brandhove, 341 U.S. 367, 372 (1951) (interpreting the federal Speech and Debate Clause, U.S. Const., Art. I, § 6, to provide state legislators with absolute immunity from liability under § 1983 for their legislative activities).

### 8.     PASPA Interferes With No Constitutional Right to Privacy

The Supreme Court has recognized an implicit Constitutional right to privacy for "fundamental" personal rights.  See Roe v. Wade, 410 U.S. 113, 152 (1973).  Notwithstanding this acknowledged right to privacy, the Third Circuit has held there is no constitutional right to engage in internet gambling from one's home.  See iMEGA, 580 F.3d at 118.  Contrasting gambling to certain forms of sexual conduct between consenting adults, the Court held that "[g]ambling, even in the home, simply does not involve any individual interests of the same constitutional magnitude.  Accordingly, such conduct is not protected by any right to privacy under the constitution."  Id.; cf. Am. Future Sys., Inc. v. Pennsylvania State Univ., 688 F.2d 907, 915-16 (3d Cir. 1982) ("We are unwilling to extend the constitutional right of privacy to commercial transactions completely unrelated to fundamental personal rights [.]").  Just as there is no constitutional privacy right to engage in internet gambling, no right to engage in sports betting exists.  Even if iMEGA had standing to raise this claim, it is meritless and should be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above, Federal Defendants' Motion to Dismiss should be granted, and all of Plaintiffs' claims should be dismissed with prejudice.

Dated: August 2, 2010                    Respectfully submitted,

TONY WEST                                */s/ Peter D. Leary*
Assistant Attorney General               PETER D. LEARY
                                         Trial Attorney, Federal Programs Branch
PAUL J. FISHMAN                          U.S. Department of Justice, Civil Division
United States Attorney                   Tel: (202) 514-3313
                                         Fax: (202) 616-8470
VINCENT M. GARVEY                        E-mail: peter.leary@usdoj.gov
Deputy Branch Director,
Federal Programs Branch                  <u>Mailing Address</u>:
                                         Post Office Box 883
                                         Washington, D.C. 20044

                                         *Counsel for Federal Defendants*