## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERACTIVE MEDIA ENTERTAINMENT & GAMING ASSOCIATION, INC., NEW JERSEY THOROUGHBRED HORSEMEN'S ASSOCIATION, INC., THROROUGHBRED BREEDERS ASSOCIATION OF NEW JERSEY, STANDARDBRED BREEDERS & OWNERS ASSOCIATION OF NEW JERSEY, AND RAYMOND J. LESNIAK, individually and as a member of the New Jersey Senate,<br><br>*Plaintiffs,*<br><br>vs.<br><br>UNITED STATES ATTORNEY GENERAL ERIC H. HOLDER, JR., and UNITED STATES ATTORNEY FOR THE DISTRICT OF NEW JERSEY RALPH J. MARRA, JR., and ABC SPORTS ORGANIZATIONS, 1 to 1000,<br><br>*Defendants.* | CIVIL ACTION<br><br>DOCKET NO. 09-1301(GEB-TJB)<br><br>HON. GARRETT E. BROWN, JR., U.S.D.J.<br><br>**BRIEF OF PLAINTIFFS INTERACTIVE MEDIA ENTERTAINMENT & GAMING ASSOCIATION, INC., NEW JERSEY THOROUGHBRED HORSEMEN'S ASSOCIATION, INC., THROROUGHBRED BREEDERS ASSOCIATION OF NEW JERSEY, STANDARDBRED BREEDERS & OWNERS ASSOCIATION OF NEW JERSEY, AND RAYMOND J. LESNIAK IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS.**<br><br>**Oral Argument Requested.** |

WEINER LESNIAK, LLP
629 Parsippany Road
Parsippany, New Jersey 07054-0438
(973) 403-1100    (973) 403-0010 (fax)
Attorneys for Plaintiffs New Jersey
Thoroughbred Horsemen's Association,
Inc., Thoroughbred Breeders Association
of New Jersey, the Standardbred
Breeders and Owners Association of
New Jersey, and Raymond J. Lesniak

Richard L. Rudin, Esquire
Of Counsel and on the Brief

ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.
Two North Road
P.O. Box 4922
Warren, New Jersey 07059
(732) 805-3360
(732) 805-3346 Facsimile
Attorneys for Plaintiff Interactive Media
Entertainment & Gaming Association, Inc.

Eric M. Bernstein, Esquire
Of Counsel and on the Brief

Philip G. George, Esquire
On the Brief

# TABLE OF CONTENTS

Page

1. Table of Citations                                                        iii

2. Statement of Facts                                                        1

3. Procedural History                                                        6

4. Legal Argument                                                            7

   Point One – Defendants' Motion to Dismiss the Complaint Based on an
   Alleged Lack of Standing Should Be Denied Because  All of the Plaintiffs
   Have Standing Under the United States Constitution, Article III, Associational
   Standing and Tenth Amendment Standing.                                    7

   A. The Standard of Review.                                                7

   B. All of the Plaintiffs Demonstrate the Requisite Article III Standing to
      Maintain this Action.                                                  10

   C. Plaintiffs Possess the Requisite Standing to Assert the Invalidity of PASPA
      Under the Tenth Amendment to the United States Constitution.           20

   D. Senators Sweeney and Lesniak Have Article III Standing to Challenge
      PASPA Because PASPA Restrains Their Right To Enact Legislation to
      Authorize a Form of Wagering Under the New Jersey State Constitution.  23

   Point Two - Defendants' Motion to Dismiss Plaintiffs' Complaint Based Upon
   an Alleged Lack of A Uniformity Requirement Under the United States
   Constitution's Commerce Clause Must Be Denied Because Inconsistent
   Treatment Of States is Only Permissible When Geographic or Other Market
   Factors Vary From State to State.                                         28

   A. Uniformity Is Required of All Legislation Enacted Under the Tenth
      Amendment Unless Objective Standards for Such Distinctions Based on
      Regulatory Conditions or Geographic Differences are Recognized and
      Incorporated in the Legislation.                                       28

   B. Wagering Among the States Requires Uniformity Of Application of All
      Federal Regulatory Schemes Under the Commerce Clause and the Changing
      Jurisprudential Landscape Within Which Wagering Legislation is Reviewed. 31

   Point Three - Defendants' Motion to Dismiss the Complaint Must Be Denied

Because PASPA's Prohibitions Against "Advertising" and "Promoting" A Sports Wagering Scheme Violate the First Amendment's Protection of Commercial Speech Which May Reach Across State Lines.    35

Point Four - The Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Claims That PASPA Violates the Tenth Amendment Because Tenth Amendment Jurisprudence Requires That States May Regulate the Nature And Extent of Gambling As a Power Traditionally Reserved to the States.    44

Point Five - PASPA's Prohibition on "Promoting" Professional and Amateur Sports Wagering Is Void for Vagueness and Unconstitutional Under the First Amendment.    49

Point Six - PASPA's Authorization for Private Professional Sports Organizations Is an Impermissible Violation of The States' Sovereign Immunity Under the Eleventh Amendment.    52

5.    Conclusions    54

## TABLE OF CITATIONS

### Federal Statutes

|  | **Page** |
|---|---|
| 1 *U.S.C.* § 1 | 12 |
| 7 *U.S.C.* § 510, *et seq.* | 29 |
| 13 *U.S.C.* § 1304 | 32, 36, 41 |
| 18 *U.S.C.* §1301 | 18 |
| 18 *U.S.C.* § 1955 | 45 |
| 18 *U.S.C.* § 229(a)(1) | 21 |
| 25 *U.S.C.* § 2710 | 53 |
| 28 *U.S.C.* §3701 *et seq.* | 8 |
| 28 *U.S.C.* §3701 | 28 |
| 28 *U.S.C.* § 3702 | 11-12 |
| 28 *U.S.C.* § 3702(1-2) | 37, 40, 52 |
| 28 *U.S.C.* § 3702(3) | 12, 17 |
| 28 *U.S.C.* § 3703 | 52 |
| 28 *U.S.C.* § 3704 | 41 |
| 47 *U.S.C.* § 223(a)(1)(B) | 50 |
| Article I, § 8, Clause 3 | 53 |

### Federal Cases

| | |
|---|---|
| *44 Liquormart, Inc. v. Rhode Island,* 517 *U.S.* 484, 116 *S.Ct.* 1495 (1996) | 39 |
| *ACLU v. Reno,* 521 *U.S.* 844, 117 *S.Ct.* 2329 (1997) | 49 |
| *ACLU v. Reno,* 929 *F. Supp.* 824 (E.D.Pa. 1996) | 49 |
| *Alaska Legislative v. Council v. Babbitt, 181 F.3d 1333 (D.C. Cir. 1999)* | 25 |

**Page**

*Ashcroft* v. *Iqbal, 556 U.S.* ----, 129 *S.Ct.* 1937 (2009)                                    8

*Baggett v. Bullitt,* 377 *U.S.* 360, 84 *S.Ct.* 1316 (1964)                              50-51

*Borawski v. Henderson*, 265 *F.Supp.2d* 475 (D.N.J. 2003).                    10, 36

*Bruesewitz v. Wyeth Inc.,* 561 *F.3d* 233, 245 (Third Cir. 2009)                 12

*In re Burlington Coat Factory Securities Litigation*, 114 *F.3d* 1410
    (Third Cir.1997)                                                                                     7, 44

*Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 *F.3d* 431
    (Third Cir. 2006)                                                                                  13, 38

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447
    *U.S.* 557, 100 *S.Ct.* 2343 (1980)                                                           37-38

*Citizens for Health v. Leavitt*, 428 *F.3d* 167 (Third Cir. 2005)                   18

*City of Chicago v. Morales, 527 U.S.* 41, 199 *S.Ct.* 1849 (1999)                 49

*Coleman v. Miller*, 307 *U.S.* 433, 59 *S.Ct.* 972 (1939)                              23

*Currin v. Wallace*, 306 *U.S.* 1, 59 *S.Ct.* 379 (1939)                             29-30

*Dennis v. Luis*, 741 *F. 2d* 628 (Third Cir. 1984)                                      26

*Federal Maritime Commission v. South Carolina State Ports Authority,*
    535 *U.S.* 743, 122 *S.Ct.* 1864 (2002)                                                  52-54

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 *U.S.* 167 (2000)     18

*Gilstrap v. United States*, 389 *F. 2d* 6 (Fifth Cir. 1968)                            45

*Greater New Orleans Broadcasting Ass'n v. United States, 527 U.S.* 173,
    119 *S.Ct.* 1923 (1999)                                      32-37, 41-42, 46, 48, 51

*Greater New Orleans Broadcasting Ass'n v. U.S.*, 149 *F.3d* 334 (Fifth Cir. 1998)   32

*Gould Elects. Inc. v. United States*, 220 *F.3d* 169 (Third Cir. 2000)              7

*Interactive Media Entertainment and Gaming Ass'n Inc. v. Attorney General*
    *of U.S.*, 580 *F.3d* 113 (Third Cir. 2009)                                       9, 34, 46

                                                                    **Page**

*Interactive Media Entertainment & Gaming Association Inc.,*
   2008 *WL* 5586713 (D.N.J. 2008)                        9

*Jenkins v. McKeithen,* 395 *U.S.* 411 (1969)                           9

*In re Burlington Coat Factory Securities Litigation,* 114 *F.3d* 1410
   (Third Cir.1997)                                        7

*Karcher v. May,* 484 *U.S.* 72, 108 *S.Ct.* 388 (1987)                 22

*Kennedy v. Sampson,* 511 *F.2d* 430 (D.C. Cir. 1974)                   26

*Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,*
   510 *F.3d* 253 (Third Cir. 2007)                        12

*Lujan v. Defenders of Wildlife,* 504 *U.S.* 555 (1992)            10, 16, 18

*Melrose, Inc., v. City of Pittsburgh,* 613 *F.3d* 380 (Third Cir. 2010)  38, 40

*Mortensen v. First Federal Savings and Loan Assoc.,* 549 *F.2d* 884
   (Third Cir.1977)                                        7

*New York v. United States,* 505 *U.S.* 144, 112 *S.Ct.* 2408 (1992)  44, 46-48

*OFC Comm. Baseball v. Markell,* 579 *F.3d* 293 (Third Cir. 2009)   10, 16-17

*Pennsylvania Dept. of Corrections v. Yeskey,* 524 *U.S.* 206,
   118 *S.Ct.* 1952 (1998)                                 12

*Pic-A-State Pa, Inc. v. Reno,* 517 *U.S.* 1246, 116 *S.Ct.* 2504 (1996)  18

*Pic-A-State Pa, Inc. v. Reno,* 76 *F.3d* 1294 (Third Cir. 1996)        18

*Raines v. Byrd,* 521 *U.S.* 811, 117 *S.Ct.* 2312 (1997)            24-25

*Rappa v. New Castle County,* 18 *F.3d* 1043 (Third Cir. 1994)         38

*Rhode Island Liquor Stores Assn. v. Evening Call Pub. Co.,* 517 *U.S.* 484,
   116 *S.Ct.* 1495 (2006)                                 39

*Russell v. DeJongh,* 491 *F.3d* 130 (Third Cir. 2007)                  26

*Saint Francis College v. Al-Khazraji,* 481 *U.S.* 604, 107 *S.Ct.* 2022 (1987)  12

| | **Page** |
|---|---|
| *Secretary of Agriculture v. Central Roig Refining Co.*, 338 *U.S.* 604, 70 *S.Ct.* 403 *(1950)* | 30-31 |
| *Seminole Tribe of Florida v. Florida*, 517 *U.S.* 44, 116 *S.Ct.* 1114 (1996) | 53-54 |
| *Sierra Club v. Morton*, 405 *U.S.* 727 (1972) | 18-19 |
| *State of Rhode Island v. Palmer*, 253 *U.S.* 350, 397, 40 *S.Ct.* 486 (1920) | 12 |
| *The Pitt News v. Fisher*, 215 *F3d* 354 (Third Cir. 2000) | 18 |
| *Sturm v. Clark*, 835 *F.2d* 1009 (Third Cir. 1987) | 10 |
| *United States v. Avarello*, 592 *F.2d* 1139 (Fifth Cir. 1979) | 45 |
| *United States v. Bond*, 581 *F.3d* 128 (2009) | 20 |
| *U.S. v. Parker*, 362 *F.3d* 1279 (Tenth Cir. 2004) | 21 |
| *United States v. Villano*, 529 *F. 2d* 1046 (Tenth Cir. 1976) | 45 |
| *Valley Broadcasting Co. v. U.S.*, 107 *F.3d* 1328 (9th Cir. 1997) | 41 |
| *Warth v. Seldin*, 422 *U.S.* 490 (1975) | 9-10, 16, 18 |

**State Statutes**

None

**State Cases**

None

**Court Rules**

| | |
|---|---|
| *F.R.Civ.P.* 12(b)(1) | 7-8 |
| *F.R.Civ.P.* 12(b)(6) | 7, 9 |

**Other Sources**

| | |
|---|---|
| *Dictionary.com, http://dictionary.reference.com/promote*, last visited Tuesday, September 7, 2010 | 13 |

Michael C. Macchiarola, *Rethinking Sports Wagering, 85 Ind. L.J.*
    *Supplement 1, 6, 18 Indiana Law Journal Supplement* (2010)      11, 34

## STATEMENT OF FACTS

Plaintiff Interactive Media Entertainment & Gaming Association, Inc., (hereinafter individually referred to as "iMEGA") is a not-for-profit corporation that generally engages in the collection and dissemination of information and advice regarding Internet electronic gaming to its members and members of the general public in various media. Complaint and Demand for Declaratory Relief (hereinafter referred to as the "Complaint") ¶3 and ¶4. The various members of iMEGA are businesses engaged in electronic gaming by and through the Internet, while some of its other members are individuals and/or business entities engaged in the business of providing interactive entertainment services to individuals through the use of personal computers. Complaint ¶5.

The New Jersey Thoroughbred Horsemen's Association, Inc. (hereinafter referred to individually as the "Thoroughbred Horsemen" or collectively with plaintiffs Thoroughbred Breeders Association of New Jersey and the Standardbred Breeders & Owners Association of New Jersey, Inc. as the "N.J. Horsemen's Associations"), which is also a not for profit entity, is the official representative of the interests of thoroughbred owners, trainers and others associated with the thoroughbred racing industry in New Jersey. Complaint ¶8. In part, the purpose of the Thoroughbred Horsemen is to foster, promote and otherwise encourage a healthier economic climate and a higher level of public acceptance of the thoroughbred horse industry in New Jersey and to promote better relations among its participants. Complaint ¶9.

The Thoroughbred Breeders Association of New Jersey (hereinafter referred to individually as the "Thoroughbred Breeders"), is an organization dedicated to fostering and promoting the breeding and ownership of thoroughbred horses in the State of New Jersey.

Complaint ¶ 13.  The Thoroughbred Breeders represent its membership in government to secure passage of legislation which supports the New Jersey breeding program.  Complaint, ¶14.

The Standardbred Breeders & Owners Association of New Jersey, Inc. (hereinafter referred to individually as the "Standardbred Breeders") is an association of horse breeders, drivers, trainers, owners and backstretch personnel.  Complaint ¶16.  The Standardbred Breeders authorizes stallion, mare and foal registrations, negotiates with track management, actively oversees and administers a benefits program and advances legislation favorable to the New Jersey Standardbred industry. Complaint ¶18.  The Standardbred Breeders negotiate contracts on behalf of horsemen and horsewomen and is presently playing a significant role in the potential installation of video lottery terminals at New Jersey racetracks.  Complaint ¶20.

Raymond J. Lesniak (hereinafter individually referred to as "Senator Lesniak") serves as a New Jersey State Senator, where he represents the 20th Legislative District and serves as the Chairman of the Senate Economic Growth Committee, the Vice-Chairman of the Senate Commerce Committee and serves as a member of the Senate Judiciary Committee. Complaint ¶21.  Plaintiff-Intervenor Stephen M. Sweeney (hereinafter individually referred to as "Senator Sweeney") is the President of the New Jersey Senate and represents Legislative District 3 consisting of municipalities in Salem, Cumberland and Gloucester Counties. Complaint on Behalf of Plaintiff-Intervenor Senator Stephen M. Sweeney, President of the New Jersey Senate (hereinafter referred to as "Intervenor-Complaint") ¶6.  As President of the Senate, Senator Sweeney is responsible for implementing the principal functions of the Legislature, which is to enact laws. Intervenor-Complaint ¶7.  He decides the meeting schedules and the daily calendar of bills to be considered, presides over the sessions, appoints committee chairs and members, refers bills to committees for consideration, and directs the business of the Senate. *Id.*  Likewise, as the

President of the Senate, Senator Sweeney is entitled to exercise the powers, privileges, duties delegated to him or imposed by law. Intervenor-Complaint ¶8.

On or about October 28, 1992, Congress enacted the "Professional and Amateur Sports Protection Act of 1992," codified as 28 *U.S.C.* §3701, *et seq.* (hereinafter referred to as "PASPA"). In relevant part, PASPA provides that:

> It shall be unlawful for--
>
> a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or
>
> a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity,
>
> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 *U.S.C.* § 3702.

Nevertheless, by its own terms, PASPA provided a limited "grandfathering" provision, which allowed sports betting, to the extent that such betting had been authorized by a State or governmental entity at any time between January 1, 1976 through August 31, 1990. *See* 28 *U.S.C.* §3704(a)(1). Likewise, PASPA's prohibitions were not extended to apply to pari-mutuel animal racing or jai alai games. *See* 28 *U.S.C.* §3704(a)(4).

Thus, as a direct result of the restrictions imposed under PASPA in 1992, sports betting is lawfully permitted in only four (4) states: Nevada, Delaware, Oregon and Montana (Complaint ¶44). While the State of New Jersey would have been permitted to approve sports betting in accordance with PASPA's "grandfathering" provisions, New Jersey was simply unable to pass legislation with this limited one (1) year time frame mandated under PASPA. Complaint ¶45 and ¶46.

The competitive disadvantage to the other states that has been created by PASPA is undeniable. PASPA clearly discriminates against New Jersey and deprives the State of the same opportunity afforded to Nevada, Delaware, Oregon and Montana to choose to raise revenues from Sports Betting by reason of legislation authorizing Sports Betting.  Complaint ¶54. Accordingly, a number of members of the New Jersey State Senate, including Plaintiffs Senator Lesniak and Intervenor-Plaintiff Senator Sweeney, and a number of members of the New Jersey General Assembly have become proponents of lifting the ban on Sports Betting due to the revenues that would be generated from such activities which would attract more visitors to the State and would enable the funding of several State programs.  Complaint ¶54.

In furtherance of the efforts to lift the ban on Sports Betting, on February 7, 2008, the General Assembly passed by an overwhelming majority Assembly Bill No. 1909, **Exhibit 1,** which would authorize certain Sports Betting opportunities if approved by the voters of New Jersey.  Intervenor-Complaint ¶35.  Although the Senate did not move on this Bill because of PASPA, Intervenor-Complaint ¶35, on February 23, 2009, Senator Lesniak and New Jersey State Senator Jeff Van Drew, co-sponsored the introduction of Senate Resolution SR12.  **Exhibit 2.** Recognizing that the State of New Jersey could generate significant revenue as a result of the taxes that could be generated through the legalization of Sports Betting, the Senate unanimously voted to approve SR12, which urged the United States Congress to lift the ban on Sports Betting. Complaint ¶55.

Plaintiffs assert that the unanimous adoption of SR12 by the New Jersey Senate manifests the undeniable intent of the Legislature to act to pass legislation to authorize a form of Sports Betting should PASPA be declared to be unconstitutional.  Complaint ¶56. This intent to so act by the New Jersey Senate is buttressed by the subsequent Voice Vote approval of Senate

Resolution No. 19 on February 22, 2010. **Exhibit 3.** SR19 specifically authorized Senator Sweeney, as the President of the New Jersey Senate, to take the necessary and appropriate legal action on behalf of the New Jersey Senate to challenge the continued enforcement of PASPA. Intervenor-Complaint ¶9.

As a result of the restrictions imposed on Sports Betting under PASPA, Plaintiffs assert that they share a joint and common interest in challenging PASPA's continued viability as each of the separate parties seeks to promote the legalization of Sports Betting in New Jersey in furtherance of the interests of themselves and constituent members of their respective associations. PASPA not only vests the Attorney General of the United States with the authority to file a civil action in the United Stated District Court to enjoin an alleged violation of PASPA and its prohibition, it vests any professional or amateur sports organizations whose competitive game is alleged to be the basis of such a violation, with the same enforcement authority. *See* 28 *U.S.C.* § 3701.

## PROCEDURAL HISTORY

On March 23, 2009, Plaintiffs, iMEGA, the Horsemen's Association and Senator Lesniak and, on or about April 21, 2010, Intervenor Plaintiff Senator Sweeney, filed the within actions seeking to challenge PASPA's validity and its program of private and public injunctive relief.

In the interim period prior to the present motion, the court granted leave for the then-Governor of New Jersey, Jon S. Corzine, to determine whether the Governor and/or Attorney General of the State of New Jersey would file a Complaint seeking to intervene in the action. In November 2009, Governor Corzine was defeated in the gubernatorial race and, in January 2010, Governor Chris Christie was sworn in as New Jersey's Governor. The court therefore extended the deadline for the Governor to determine whether or not to intervene in the litigation. On July 12, 2010, Jeffrey S. Chiesa, Esquire, Chief Counsel to the Governor, advised the court by letter that Governor Christie would not intervene in the action. **Exhibit 4.**

Defendants, the United States Attorney General, Eric H. Holder, Jr. and the United States Attorney for the District of New Jersey, Paul Fishman (hereinafter collectively referred to as "Defendants"), have filed a Motion to Dismiss in lieu of filing an answer, seeking to dismiss the Complaint filed by Interactive Media Entertainment & Gaming Association, Inc., the New Jersey Thoroughbred Horsemen's Association, Inc., Thoroughbred Breeders Association of New Jersey, Standardbred Breeders & Owners Association of New Jersey, Inc. and New Jersey State Senator Raymond J. Lesniak, as well as the Complaint filed by Plaintiff-Intervenor, New Jersey State Senator and Senate President Stephen M. Sweeney (hereinafter collectively referred to as "Plaintiffs").

## LEGAL ARGUMENT

### Point One

**Defendants' Motion to Dismiss the Complaint
Based on an Alleged Lack of Standing Should Be
Denied Because All of The Plaintiffs Have Standing
Under the United States Constitution, Article III,
Associational Standing and Tenth Amendment Standing.**

### A.  The Standard of Review.

Defendants have filed a motion to dismiss the Plaintiffs' Complaints in lieu of filing an

Answer pursuant to *F.R.Civ.P.* 12(b)(1), asserting that Plaintiffs lack standing, but Defendants

also assert that the Complaint should be dismissed on substantive grounds for failing to assert

claims for which relief can be granted under *F.R.Civ.P.* 12(b)(6).   Plaintiffs submit that the

differences between the standards for assessing a motion brought pursuant to *F.R.Civ.P.* 12(b)(1)

challenging standing, versus the standards under *F.R.Civ.P.* 12(b)(6) asserting that there are no

grounds for relief, are vitally important.  *Mortensen v. First Federal Savings and Loan Assoc.*,

549 F.2d 884, 890 (Third Cir.1977).   Indeed, a motion seeking to dismiss a complaint in

accordance with *F.R.Civ.P.* 12(b)(6) necessitates a ruling on the merits as presented on the face

of the Complaint, whereas a motion in accordance with *F.R.Civ.P.* 12(b)(1) addresses <u>only</u>

procedural defects. *Id.*  Thus, the courts have specifically cautioned against treating a *F.R.Civ.P.*

12(b)(1) motion to dismiss for lack of subject matter jurisdiction as a motion for failure to state a

claim under *F.R.Civ.P.* 12(b)(6).  *In re Burlington Coat Factory Securities Litigation*, 114 *F.3d*

1410, 1420 (Third Cir.1997).

The court, in *Gould Elects. Inc. v. United States,* 220 *F.3d* 169, 179 (Third Cir. 2000),

restated the standard of review and the burden placed on the moving party under a *F.R.Civ.P.*

12(b)(6) motion to dismiss, explaining that:

In a Rule 12(b)(6) motion, the court evaluates the merits of the claims <u>by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs, and determining whether they state a claim as a matter of law.</u> The defendant bears the burden of showing no claim has been stated. (Citations omitted; emphasis provided). *Id.* at 178.

The *Gould* court further explained the less demanding burdens imposed by a motion filed under

*F.R.Civ.P.* 12(b)(1):

In contrast, in a factual attack under Rule 12(b)(1), the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction. The plaintiff has the burden of persuasion to convince the court it has jurisdiction. A claim may be dismissed under Rule 12(b)(1) <u>only if it clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous.</u> *Id.* (Citations omitted; internal quotations omitted; emphasis provided).

The United States Supreme Court, in *Ashcroft v. Iqbal, 556 U.S. ----,* 129 *S.Ct.* 1937

(2009), stated that the issue before a court evaluating a motion under *F.R.Civ.P.* 12(b)(6) is not

whether the legal conclusions are ultimately denied, but whether the legal conclusions asserted in

the Complaint present a plausible argument for entitlement to relief after a fact-sensitive review

of the Complaint. The *Ashcroft* Court stated that:

a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. <u>When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.</u> *Id.* at 1950 (Emphasis provided).

Plaintiffs submit, therefore, that they will demonstrate under this standard that the

Complaints clearly establish a plausible entitlement to some and/or all of the relief regarding the

provisions of the Professional and Amateur Sports Protection Act, 28 *U.S.*C. §3701 *et seq.*

(hereinafter referred to as "PASPA"). Further, Plaintiffs submit that under these standards,

Defendants' attack on their standing pursuant to *F.R.Civ.P.* 12(b)(1), **D-5 through Db-7,**

Defendants' Point I(A); **Db-18 through Db-20,** Defendants' Point (I)(B)5), fails because

sufficient factual information is pled in the Complaint to establish that Plaintiffs have Article III

standing to challenge the statutory scheme of PASPA and are plausibly entitled to injunctive

relief concerning PASPA.   Further, this Federal District Court has already determined that

iMEGA has a sufficient interest in challenging another Congressional enactment, the Unlawful

Internet Gambling Enforcement Act, 31 *U.S.C.* § 5362, *et seq.*   (hereinafter referred to as

"UIGEA").  In *Interactive Media Entertainment & Gaming Association Inc.,* 2008 *WL* 5586713

at 4-5 (D.N.J. 2008), *aff'd Interactive Media Entertainment and Gaming Ass'n Inc. v. Attorney

General of U.S.,* 580 *F.3d* 113 (Third Cir. 2009), the court stated that:

> [t]he Court will not dismiss the claims for lack of standing under the theory that the
> underlying claim of right is not legally protected, as the claim is not so preposterous as to
> be legally frivolous." Whether the UIGEA burdens a protected legal right requires a
> merits determination of the First Amendment claims, an inquiry that should not be
> conflated with standing. . . .  The plaintiff thus has shown that its members satisfy the
> Article III requirements for standing: the existence of an injury-in-fact, which is traceable
> to UIGEA and redressable by favorable judicial action. *Id* at 4-5.

This District Court had also noted that iMEGA had prudential standing as well as Article III

standing, even though iMEGA ultimately did not prevail in challenging UIGEA on privacy

grounds under the United States Constitution.  2008 *WL* 5586713 at 6.  Judge Cooper noted that

this federal circuit does not confuse standing to raise a constitution violation with the merits of

the matter, since there may still be standing even if the Plaintiff ultimately does not prevail on

the merits, citing  *The Pitt News v. Fisher, 215 F.3d* 354, 361 n. 4 (Third Cir. 2000).

For purposes of ruling on a motion to dismiss for want of standing, this court must accept

as true all material allegations of the complaint and must construe the complaint in favor of the

complaining party. *Warth v. Seldin,* 422 *U.S.* 490, 501 (1975); *Jenkins v. McKeithen,* 395 *U.S.*

411, 421-422 (1969).   Further, at the pleading stage, general factual allegations of injury

resulting from the defendant's conduct may suffice.  *Id.* For a motion to dismiss under either

*F.R.Civ.P.* 12(b)(1) or *F.R.Civ.P.* 12(b)(6), the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 *U.S.* 555, 561 (1992). A motion to dismiss the Complaint under this Rule does not attack the merits of the case, but merely tests the legal sufficiency of the Complaint. *Sturm v. Clark*, 835 *F.2d* 1009, 1011 (Third Cir. 1987). The court may not dismiss a Complaint unless it appears that the Plaintiff can prove no set of facts in support of any claim which would entitle him to relief. *Borawski v. Henderson*, 265 *F.Supp.2d* 475, 481 (D.N.J. 2003).

Plaintiffs submit, therefore, that they will demonstrate under these standards that the Complaint clearly establishes a plausible entitlement to injunctive relief regarding the provisions of PASPA. Further, they will demonstrate that they have the requisite standing to bring these claims.

### B. All of the Plaintiffs Demonstrate the Requisite Article III Standing to Maintain this Action.

Defendants claim that Plaintiff iMEGA and the other Plaintiffs (which includes the Plaintiff/Intervenor) have no standing under the United States Constitution, Article III, to challenge the statutory scheme of PASPA. **Db-7 through Db-11,** Defendants' Point I(B) and Point I(B)(1). Plaintiffs submit that they have "alleged such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [their] behalf." *Warth v. Seldin, supra,* at 498-499 (1975).

But, in fact, iMEGA and its co-Plaintiffs demonstrate not only standing but a common interest and need to challenge the statute in question. One commentator noted with respect to the recent decision of the Third Circuit in *OFC Comm. Baseball v. Markell, 579 F.3d* 293 (Third Cir. 2009), which invalidated the State of Delaware's proposed rules for extension of a sports

betting game, that contemporary society cannot afford such dated, patchwork legislation and requires the kind of public/private efforts which are endorsed and proposed by the Plaintiffs, but banned by PASPA.

In fact, allowing sports certain wagers under the umbrella of the federal securities laws could:

(1) mitigate the effects of the accidental, arbitrary, clumsy, and unfair monopoly that currently exists for the four (4) states exempted from the PASPA;

(2) afford those individuals wishing to wager on their favorite sports team legitimacy and market protections that they do not currently enjoy; and,

(3) provide politicians a rare opportunity to raise additional revenue without facing the political wrath that generally accompanies any increase in income, sales, or property taxes.

If our current economic lassitude fails to be the catalyst for the federal government to revisit the issue of sports gambling within the United States, the absurdity of the current patchwork highlighted by the recent Delaware case should be enough to promote change. Michael C. Macchiarola, *Rethinking Sports Wagering*, 85 *Ind. L.J. Supplement* 1, 6, 18 Indiana Law Journal Supplement (2010)(Citations and internal quotations deleted).

Plaintiff iMEGA, as well as all of the other Plaintiffs, challenge PASPA's validity and program of private and public injunctive relief and seek to enjoin any efforts to enforce the Act because of the importance of reaching the merits of the validity of PASPA.  PASPA provides that:

It shall be unlawful for--

(1) a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or,

(2) a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity,

a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.  28 *U.S.C.* § 3702.

11

Under 28 *U.S.C.* § 3701(2), a governmental entity is defined as a State, a political subdivision of a State, or an entity or organization which has governmental authority within the territorial boundaries of the United States.  A "person" subject to regulation and to injunctive action under PASPA includes corporations, companies, associations, firms, partnerships, societies, joint stock companies and individuals pursuant to 1 *U.S.C.* § 1, the general definitions section of the United States Code which PASPA incorporates by reference. Further, PASPA creates a civil cause of action for injunctive relief against any person or private or governmental entity which sponsors, operates, advertises, or promotes a gambling or wagering scheme based on competitive games in which amateur or professional athletes participate, pursuant to the laws of a governmental entity.  28 *U.S.C.* § 3703.

Under the facial terms of the PASPA statute,  Plaintiffs submit that they have satisfied the first requirement for Article III standing, injury in fact, <u>because they seek to "promote" Internet based sports betting and its adoption in the State of New Jersey, but PASPA prevents such activities from occurring</u>.  PASPA is silent as to what circumstances constitute an action to "promote" sports gambling which subjects iMEGA or any of the other Plaintiffs to a lawsuit by a sports organization under the statute.   <u>However</u>, Third Circuit jurisprudence refers to the dictionary to ascertain the meaning of statutory language which is not specifically defined. *See, e.g., Saint Francis College v. Al-Khazraji,* 481 *U.S.* 604, 610 107 *S.Ct.* 2022, 2027 (1987)( "race"); *Pennsylvania Dept. of Corrections v. Yeskey,* 524 *U.S.* 206, 211, 118 *S.Ct.* 1952, 1955 (1998) ("eligibility" and "participation"); *State of Rhode Island v. Palmer,* 253 *U.S.* 350, 397, 40 *S.Ct.* 486 U.S. 486, 492 (1920)("concurrent"); *Bruesewitz v. Wyeth Inc.,* 561 *F.3d* 233, 245 (Third Cir. 2009) ("unavoidable"); *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,* 510 *F.3d* 253, 284, n. 29 (Third Cir. 2007)("assembly" and "institution").   To

"promote" a gambling or wagering scheme based on competitive games in which amateur or professional athletes participate, as iMEGA does and as the individual Plaintiffs who are State Legislators have attempted to do, means to "help or encourage to exist or flourish, or to aid in organizing as in business undertakings, or to encourage the sales, acceptance, and so on, especially through advertising or other publicity." *Dictionary.com, http://dictionary.reference.com/promote,* last visited Tuesday, September 7, 2010.

The Third Circuit relied upon *Webster's Ninth Collegiate Dictionary* for the definition of "promote" in *Canal Ins. Co. v. Underwriters at Lloyd's London,* 435 *F.3d* 431 (Third Cir. 2006), stating that:

> [t]he term "promotes" is defined in Webster's Ninth Collegiate Dictionary (1990) as "to contribute to the growth or prosperity of" or "furthers." *Id.* at 436.

The factual allegations of the Plaintiffs' Complaint, which the court must assume as true for the purposes of the Defendants' motion, assert that PASPA prohibits the very "promotion," "advertising" and/or "authorizing" which the Plaintiffs do conduct and wish to pursue but which is <u>facially</u> prohibited under PASPA.  Plaintiffs allege and will establish that they do, and seek to, "contribute to the growth or prosperity of" the citizens and taxpayers of New Jersey, the thoroughbred industry in New Jersey which drives a substantial economic engine within the State, and the members of iMEGA who are prevented from pursuing the Internet sports wagering industry in New Jersey which the State Legislature wishes to "authorize" through legislation. <u>Clearly</u>, there is the requisite causal connection between the prohibited act and the statutory proscription which iMEGA and the other Plaintiffs seek to enjoin.

iMEGA asserts in its Complaint that:

> iMEGA itself does not engage in electronic gaming by and through the Internet, but engages in the collection and dissemination of information and advice regarding such services to its members and members of the general public in various media, including

speech, print and Internet media although members engage in electronic gaming through the internet. *Complaint*, ¶4.

The members of iMEGA engage in electronic gaming by and through the Internet as hereinafter described, and some of its members are individuals and/or business entities engaged in the business of providing interactive entertainment services to individuals through the use of personal computers, both with and without a fee, for the said entertainment services. *Complaint*, ¶5.

Among other entertainment services, some of iMEGA's members provide an Internet gambling opportunity to private individuals located both within and beyond the territorial borders of the United States of America as a form of entertainment which can be engaged in by persons within the privacy of their homes and/or other places using private personal computers. *Complaint*, ¶6.

iMEGA members who are engaged in the business of providing an Internet gambling opportunity to private individuals are located within the territorial limits of the State of New Jersey, in all fifty (50) states of the United States and its territories, as well as Tribal lands, and throughout the world. *Complaint*, ¶7.

PASPA allows Nevada, Delaware, Oregon, and Montana to have a cartel on Sports Betting in general in the United States to the detriment of the remaining 46 states. *Complaint*, ¶92.

PASPA has an inconsistent effect on iMEGA members and members of the N.J. Horsemen's Associations similarly situated in the 46 remaining states, including New Jersey, who desire to take advantage of multiple forms and platforms for Sports Betting services and Sport Betting in general based solely on their status as residents of different jurisdictions as aforesaid. *Complaint*, ¶94

PASPA creates liability on the part of plaintiffs and their members and private citizens similarly situated in the 46 remaining states, including New Jersey, who wish to take advantage of iMEGA members' services and/or Internet Sports Betting, or Sports Betting in general based solely on their status as residents of different jurisdictions as aforesaid. *Complaint*, ¶97

In addition, the Horsemen's' Associations assert similar factual claims and are entitled to similar

standing under Article III.  The Horsemen's Associations have alleged a severe and economic

interest in that:

Thoroughbred racing within New Jersey is an extensive industry which provides substantial economic and other benefits to the general public and employment opportunities for thousands of people as well as providing substantial revenues to the State of New Jersey. *Complaint*, ¶50.

14

The New Jersey horse racing industry has lost many fans as interest in horse racing and horse betting has waned in the past several years for economic reasons, which make its survival highly problematic. *Complaint,* ¶51.

More than 142,000 acres of New Jersey's horse farms are disappearing due to the fact that horse breeders can no longer maintain the costs associated with raising and racing horses in New Jersey. *Complaint,* ¶52.

Members of the N.J. Horsemen's Associations are prohibited from engaging in the business of Sports Betting due to the prohibitions contained in PASPA. *Complaint,* ¶60.

Respective horse associations located in Nevada, Delaware, Oregon and Montana are permitted to engage in the business of Sports Betting in the United States due to the provisions contained in PASPA. *Complaint,* ¶61.

PASPA places Delaware, Nevada, Montana, and Oregon in the advantageous position of being able to collect tax revenues from legal sports betting in order to support their respective state budgets and respective state social programs. *Intervenor Complaint,* ¶49.

PASPA allows Delaware the opportunity to conduct sports betting activities, and Delaware attempted to do so through legislation and/or regulations enacted last year. Intervenor Complaint, ¶51.

The unequal advantage which PASPA accords Delaware has allowed Delaware to siphon off revenues that would otherwise go to New Jersey businesses, including the N.J. Horsemen's Association and, thus, deprive those businesses and the State of New Jersey of revenue. *Intervenor Complaint,* ¶58.

New Jersey race tracks will continue to lose customers to Delaware and other states exempt from PASPA that can offer features that accommodate Sports Betting at their race tracks which PASPA precludes in New Jersey. *Complaint,* ¶64.

In an effort to promote more commercial business in thoroughbred breeding for horse racing, the members of the N.J. Horsemen's Associations need to compete with other horse breeding and horse racing facilities located in nearby States like Delaware where Sports Betting is permitted under PASPA. *Complaint,* ¶65.

Some of the members of the N.J. Horsemen's Associations face imminent financial ruin, closure, forfeiture and termination of their employees due to the prohibitions contained in PASPA that, at the same time, permit horse racing tracks in Nevada, Delaware, Oregon, and Montana to participate in Sports Betting. *Complaint,* ¶66.

Further, the Plaintiffs assert that the competitive disadvantages created by PASPA, which discriminate in favor of the four (4) states where sports betting is permitted under PASPA,

cannot be overcome by the other states without enabling governmental action, but governmental action is prevented by PASPA, a circular route from which no legitimate interest such as the Plaintiffs assert can escape. *Complaint*, ¶58-59; ¶73; *OFC Comm. Baseball v. Markell, supra*, at 300. Defendants incorrectly claim that PASPA "contains no provision that forecloses the Senators from introducing, sponsoring or voting for whatever sports betting bill they would like. . . ." **Db-17 through Db-18.** <u>To the contrary, such legislation is expressly prohibited by 28 U.S.C. 3702(1), which plainly prohibits "a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact" any sports betting activity</u>.

In addition, iMEGA has further alleged that its members operate legally in the country(ies) or place(s) wherein they are incorporated and where their servers are located. *Complaint*, ¶57. The members of iMEGA are prohibited from engaging in the business of Internet Sports Betting in the United States due to the prohibitions contained in PASPA. *Complaint*, ¶58. Members of iMEGA face civil actions to enjoin their participation and engagement in the business of engaging in Internet Sports Betting in the United States due to the prohibitions contained in PASPA. *Complaint*, ¶59. iMEGA submits therefore that it has demonstrated that the injuries complained of are causally connected and traceable to PASPA. *Lujan, supra*, at 560-561; *Warth v. Seldin, supra*, at 508. Simply stated, PASPA prohibits what iMEGA does, which is advocate, advertise and promote its members' business interests in Internet based wagering and gaming. This activity is prohibited by PASPA.

iMEGA must show, on the face of the pleadings accepting as true all the allegations therein, that it is likely, as opposed to merely speculative, that the injury can be redressed by a favorable decision. *Lujan, supra*, at 560-561; *Warth v. Seldin, supra*, at 508. A recent case involving PASPA clearly shows that iMEGA's position is no mere legal conclusion asserted to

16

overcome the standing issue, and that it has established the third requisite element required to demonstrate Article III standing as well.  Recent litigation in the Third Circuit predicts that it is likely, not merely speculative, that the Plaintiffs will be sued under 28 *U.S.C.* § 3703 if they are successful in their promotion and advertisement of sports wagering in New Jersey and/or the passage of legislation which authorizes it <u>unless PASPA's provisions are enjoined</u>. Conversely, if PASPA's provisions are enjoined as to the Plaintiffs, the legislative and business processes can move forward unimpeded.

In *OFC Comm. Baseball v. Markell, 579 F.3d* 293 (Third Cir. 2009), the Governor of Delaware, in 2009, proposed legislation authorizing sports betting and table gaming at existing and future facilities in the State of Delaware.   Following receipt of a favorable Delaware Supreme Court advisory opinion, Delaware published proposed regulations to implement sports betting, including wagers in which the winners are determined based on the outcome of any professional or collegiate sporting event but excluding certain Delaware-based events.  As a result of this plan an association composed of Major League Baseball, the National Basketball Association,  the National Collegiate Athletic Association, the National Football League and the National Hockey League filed a complaint against the Governor and others, claiming that elements of Delaware's proposed sports betting scheme violated PASPA.

Clearly then, the promotion of sports wagering in New Jersey, on the Internet and through brick and mortar establishments and even though the Plaintiffs herein assert that PASPA's provisions are wrongfully applied to New Jersey, is reasonably likely to invite civil litigation under 28 *U.S.C.* § 3703 unless PASPA's provisions are enjoined and/or found unconstitutional.  Under *Markell, supra,* even pre-enactment legislative action may result in a civil lawsuit, such as happened in Delaware, if New Jersey attempts to move a necessary

legislative program forward.  Thus, Plaintiffs continue to submit that they have the requisite standing to bring this action.

To meet the Article III standing requirement, a Plaintiff must demonstrate that he or she: (1) has suffered an injury-in-fact, which is the invasion of a legally protected interest that is concrete and particularized, and actual and imminent, not conjectural or hypothetical; (2) that the injury is causally connected and traceable to an action of the defendant; and, (3) that it is likely, as opposed to merely speculative, that the injury can be redressed by a favorable decision. *Lujan, supra*, at 560-561; *Warth v. Seldin, supra*, at 508; *Sierra Club v. Morton*, 405 *U.S.* 727, 740-741 (1972); *The Pitt News v. Fisher*, *supra*, at 359 (Third Cir. 2000).

A Plaintiff satisfies the injury-in-fact prong of the requirement where he or she alleges an injury that affects him or her in a personal and individual way. *Citizens for Health v. Leavitt*, 428 *F.3d* 167, 176 (Third Cir. 2005).  An injury is redressable for standing purposes where plaintiff can show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 *U.S.* 167, 181 (2000).  Further, whether a Plaintiff will have standing depends considerably upon whether the Plaintiff is himself an object of the government action at issue and if he is, there is usually no question that the action has caused him injury. *Lujan*, 504 *U.S.* at 561-562.

In *Pic-A-State Pa, Inc. v. Reno*, 76 *F.3d* 1294 (Third Cir. 1996), *cert. denied* 517 *U.S.* 1246, 116 *S.Ct.* 2504 (1996), Plaintiff brought suit claiming the Interstate Wagering Amendment, 18 *U.S.C.* §1301, was unconstitutional with regard to lottery ticket sales.  The government argued that plaintiff had no standing because it had never been threatened with prosecution.  The Third Circuit held that:

> "Although Pic-A-State has not been prosecuted under the Interstate Wagering Amendment, the impact of the Amendment is sufficiently direct and immediate to create

an adversity of interest between Pic-A-State and the Government.  Not only has Pic-A-State terminated its business and suffered economic loss in response to the passage of this Amendment, <u>but any further attempt to pursue its line of business would risk serious criminal penalties</u>." *Id.* at 1298  (Emphasis provided).

The court also noted that strong policy reasons dictated against requiring Plaintiff to engage in illegal conduct before its challenge could be heard.  The court further stated that:

> "Fear that courts may find the statute valid will deter many from risking violation; defense of criminal proceedings on constitutional grounds simply is not an adequate remedy. In addition to this practical fact, more abstract principles suggest that a citizen should not be required to sacrifice his wish to conform to valid social prescriptions in order to test his belief of invalidity; <u>citizens should be allowed to prefer official adjudication to private disobedience</u>." (Emphasis provided).

*Id.* at 1299, n.4 (citations omitted).

It is axiomatic that financial or economic injury is the most common type of injury upon which standing is based and is a legally protected interest.  *Sierra Club v. Morton*, 405 *U.S.* 727, 734-735 (1972).   As with other types of injury, any economic injury must be concrete, particularized, actual and imminent, not conjectural or hypothetical.  *Sierra Club*, 405 *U.S.* at 735.  In the instant matter, there can be little doubt from the face of the pleadings that PASPA is inflicting some concrete injury on the trade associations and their members.  The thoroughbred industry is moribund, imperiling a long standing industry in the State of New Jersey which employs a significant number of people.  Further, iMEGA's members cannot access the State for legitimate business purposes, which New Jersey supports and which is perfectly legal elsewhere, but for the uneven and partial treatment of wagering amongst the various States under PASPA.

For all of these reasons, therefore, iMEGA and the other Plaintiffs submit that sufficient facts have been pled to establish Article III standing.  First, they submit that the first requirement for Article III standing, injury in fact, has been demonstrated because the very terms of PASPA itself prohibit the "promotion" or "authorization" of Internet sports wagering in the State of New

Jersey. The plain meaning of the statutory proscription, the mischief to be prevented, is not only the actual conduct of sports wagering, but the mere promotion and advertising of the same in all save a few other favored states. Second, Plaintiffs submit that they have demonstrated that the injuries set forth in the Complaint, including the direct and indirect economic injuries, the prohibition of legislation to seek an equality with other state; and, the development of legitimate business opportunities are causally connected and traceable to PASPA.

Finally, iMEGA and the other Plaintiffs assert that they have satisfied the final prong of Article III standing because, on the face of the pleadings and accepting as true all the allegations therein, it is likely, as opposed to merely speculative, that the injury can be redressed by a favorable decision. Enjoining the restrictive effects of PASPA will permit the activities of iMEGA to move forward without the risk of lawsuits to enjoin it and the other Plaintiffs from acting. A preemptive litigation was launched in Delaware when sports wagering had not even been implemented under the terms of PASPA. Thus, the injuries sustained by iMEGA, as well as the remaining Plaintiffs, would be amenable to redress when the Complaint moves forward. Therefore, iMEGA submits that it has demonstrated Constitutional standing under Article III.

### C. Plaintiffs Possess the Requisite Standing to Assert the Invalidity of PASPA Under the Tenth Amendment to the United States Constitution.

Defendants attack iMEGA's and the other Plaintiffs' standing to challenge PASPA's enactment or continued vitality under the Tenth Amendment to the United States Constitution. **Db-11 through D-15,** Defendants' Point I(B)(2). Defendants rely upon the Third Circuit case of *United States v. Bond,* 581 *F.3d* 128 (2009) for the proposition that private persons cannot

20

challenge a statute under the Tenth Amendment unless the state or its officers are parties.[1] Defendants' analysis is incorrect. *Bond, supra,* a case of first impression in the Third Circuit, involved the prosecution of a woman who sought to poison a romantic rival with chemicals obtained through interstate commerce in violation of 18 *U.S.C.* § 229(a)(1). She moved to dismiss the charges because the chemical weapons charges were unconstitutional. The Third Circuit dismissed her appeal on this ground, stating simply, as Defendants note, that:

> We are persuaded by the reasoning advanced by the majority of our sister courts and conclude that a private party lacks standing to claim that the federal Government is impinging on state sovereignty in violation of the Tenth Amendment, absent the involvement of a state or its officers as a party or parties. *Id.* at 137.

However, *Bond* continued to discuss such standing further, noting that the Defendant "does not even attempt to argue that her interests are aligned with those of a state." *Id.* In crafting this decision of first impression, the Third Circuit referred to *U.S. v. Parker,* 362 *F.3d* 1279 (Tenth Cir. 2004), which, while adopting the Third Circuit's lack of standing ruling, theorized that a private party could assert a Tenth Amendment claim by showing that their claim "align[s] with the state's interest." *Parker, supra,* at 1284. The *Bond* court further noted that:

> our conclusion does not bar individuals from any recourse in the face of Tenth Amendment violations accepted by a state. . . . the State represents the interests of its citizens in general, and, if it refuses to prosecute a viable Tenth Amendment claim, the citizens of that state may have recourse to local political processes to effect change in the state's policy of acquiescence. *Bond, supra,* at 138, n. 8.

However, PASPA forbids such "local political processes, and this is the very reason that State Legislators have joined in this litigation so that such political processes can proceed and if successful, be effective. Thus, the defect in Defendants' objection to iMEGA's Tenth Amendment standing is readily apparent from its reliance on only a small portion of the Third

---

[1] Defendants also assert that the Plaintiffs cannot assert a claim under the Eleventh Amendment, denominating such as a "sovereign immunity" defense only, **Db-15 through Db-16,** Defendants' Point I(B)(3), which is addressed in Point Six, below.

Circuit's reasoning in *Bond, supra.* First, in this litigation before this court, there is clearly the "involvement of a state or its officers as a party or parties." Defendants attempt to argue that the Governor's declining to join the lawsuit and the status of Intervenor Senator Sweeny and Plaintiff Senator Raymond Lesniak as individuals and State Senators falls short of this status as the "state or its officers as a party or parties." **Db-12 through Db-14.** This argument is more fully developed below, but here it is important to note that the United States Supreme Court has already ruled that New Jersey legislators have standing as officials of the state to challenge the constitutionality of a statute, <u>particularly where the Governor or his representative have declined to do so, as they recently did in this case</u>. The Governor's counsel advised this court, by letter dated July 12, 2010, and received on August 4, 2010, that the Governor would <u>not</u> be filing a Complaint to intervene in this case. **Exhibit 4.** In *Karcher v. May*, 484 *U.S.* 72, 108 *S.Ct.* 388, (1987), the United States Supreme Court held that New Jersey State legislators who intervened in their official capacities to defend a lawsuit challenging the constitutionality of a statute that had been enacted over the Governor's veto had standing <u>so long as the legislators held office</u>, notwithstanding the fact that the Attorney General had declined to defend the suit. 484 *U.S.* at 72-73, 108 *S.Ct.* at 390-391.

For all of the foregoing reasons, therefore, Plaintiff iMEGA submits that it and the other Plaintiffs have demonstrated that they have the requisite Tenth Amendment standing to assert the claims in the Complaint. Defendants' motion should therefore be dismissed because Defendants misconstrue both the intent of PASPA to prevent business alliances between entities and the states in only certain states, as well as iMEGA's representation of those very businesses as trade association and advocate for reform of PASPA's prohibitions. Further, because the Governor and Attorney General of New Jersey have declined to exercise their right to challenge PASPA,

the Plaintiff Intervenor, Senate President Senator Stephen Sweeney, and the Legislative Plaintiff, Senator Raymond Lesniak, satisfy the requirement in the Third Circuit that private parties can, as a matter of law, assert the public's rights to pursue legislation to effect change.   Plaintiffs iMEGA's and the Horsemen's' Associations' Tenth Amendment challenges are aligned and seek the same relief which sought in the challenges brought by state legislators in the same action, which is the enjoining of the effect of PASPA's <u>absolute</u> bar on "advertising," "promoting" or "authorizing" sports wagering in New Jersey.   Further, since iMEGA's claims are aligned with the State's interest in this matter, this court should confer Tenth Amendment standing for all Plaintiffs pursuant to *Karcher, Parker* and *Bond, supra.*

### D.   Senators Sweeney and Lesniak Have Article III Standing to Challenge PASPA Because PASPA Restrains Their Right To Enact Legislation to Authorize a Form of Wagering Under the New Jersey State Constitution.

Defendants assert that Plaintiff Senator Lesniak and Plaintiff/Intervenor Senator Sweeney, as Members of the New Jersey Senate, lack any standing to assert their First Amendment and other rights in this case.  **Db-16 through Db-18,** Defendants' Point I(B)(4) and Points I(B)(1-3).  However, Plaintiff Senator Lesniak and Plaintiff/Intervenor Senator Sweeney have shown that they have articulated a particularized injury to confer standing on them in accordance with *Coleman v. Miller*, 307 *U.S.* 433, 59 *S.Ct.* 972 (1939), in which the United States Supreme Court held that twenty (20) State Senator-Plaintiffs retained the right and privilege to ensure the effectiveness of their votes.  In *Coleman*, plaintiffs initiated a proceeding in mandamus, challenging the adoption of a resolution rejecting a Congressionally proposed amendment to the Constitution which the twenty (20) Senators had voted against.  The resolution was deemed approved as a result of the casting of tie-breaking vote by the Lieutenant Governor,

who acted as the presiding officer of the Senate.  Plaintiffs initiated action challenging the authority of the Lieutenant Governor to cast the deciding vote under such circumstances.

The standing of the Senators to assert the action, which arose under the Federal Constitution, was challenged on grounds that plaintiffs lacked an adequate interest in the outcome of the controversy so as to invoke the Court's jurisdiction.  The Court plainly rejected this argument, finding that the injury suffered by them met the standing requirement, explaining:

> The plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in the contentions their votes would have been sufficient to defeat ratification.  We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. Petitioners come directly within the provisions of the statute governing our appellate jurisdiction.  They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege. 307 *U.S.* at 438, *S.Ct.* at 975.

While the Court's subsequent decision in *Raines v. Byrd*, 521 *U.S.* 811, 117 *S.Ct.* 2312 (1997), may be viewed as having narrowed the scope of standing afforded to Legislators seeking to initiate action to protect the integrity of their votes, the Court's decision in *Raines* does not deprive Senator Lesniak or Senator Sweeny of standing.  In *Raines*, individual members of Congress initiated action challenging the constitutionality of the Line Item Veto Act.  Plaintiffs, who were six (6) members of Congress, asserted that the Act was unconstitutional in that it impermissibly expanded the President's power.  Appellants moved to dismiss the complaint, alleging that the Congressmen lacked standing and that the matter was not ripe for adjudication. Distinguishing its holding in *Coleman*, the Court found that the Congressmen did not have standing to assert a claim in accordance with the Article, explaining:

> It is obvious, then, that our holding in *Coleman* stands...for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.

It should be equally obvious that appellee's claim does not fall within our holding in *Coleman*, as thus understood. They have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect. They simply lost the vote. Nor can they allege that the Act will nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified. In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process. In addition, a majority of Senators and Congressmen can vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process. 517 *U.S.* at 824, 117 *S. Ct.* at 2319-2320.

However, such is not the case here. Plaintiff Lesniak's and Plaintiff/Intervenor Sweeney's ability to "authorize" any bill – to introduce, move to committee, move to the Legislative floor, to enact, to place on the ballot – is barred by an eighteen (18) year old law favoring private interests and certain states over New Jersey in an area reserved to the states and criticized by the United States Supreme Court as "obscure. They have in fact alleged this injury, that they are prevented from acting at all, by PASPA. Therefore, *Raines, supra,* is inapplicable to this case and standing must be granted to the Plaintiffs.

Defendants further assert that Senator Lesniak and Senator Sweeney do not have standing in light of the decision entered by the United Stated Court of Appeals in *Alaska Legislative v. Council v. Babbitt*, 181 *F.3d* 1333 (D.C. Cir. 1999). Defendants' assertions are clearly incorrect. Although the *Babbitt* court held that the "loss of political power" alone, suffered as a result of their inability to pass legislation effecting the regulation fishing and gaming on federal public land that would conflict with federal statutes and regulations, was not sufficient to inflict a personal injury on the individual legislators, Senator Lesniak and Senator Sweeney have alleged more than a mere "abstract dilution of institutional legislative power." *Babbitt*, 181 *F.3d* at 1338. As a result of PASPA, Senator Sweeney and Senator Lesniak are completely deprived of their ability to introduce, present and vote on legislation regulating sports betting in New Jersey

and raising revenue for budgetary purposes from an activity that is particularly a matter that has been relegated to the various State legislatures.  Thus, their standing is akin to the particularized interests of the legislators in *Dennis v. Luis,* 741 *F. 2d* 628, 631 (Third Cir. 1984), where the Third Circuit Court of Appeals determined that the members of the U.S. Virgin Islands Legislature had standing to challenge "recess" appointments because they had statutory authority to advise and consent to all such appointments.  *Id.* at 631.  As alleged in their Complaints, both Senate President Sweeney and Senator Lesniak have supported legislation that would regulate sports betting within New Jersey and thereby raise revenue for the State.  Further, statutory authority was granted to the New Jersey Legislature, to which they belong, to pass legislation under PASPA but for the arbitrary one-year window which Congress arrogated to New Jersey in 1992.  Indeed, Senate President Sweeney has the support of the entire Senate to challenge PASPA and Senator Lesniak introduced legislation that could not be moved because of the inhibiting impact of PASPA. This loss of opportunity to vote individually and as a body is substantively different from a challenge to executive non-enforcement of a law after it is already enacted, in which case the role of the legislature is essentially no different than the public at large.  *Compare Russell v. DeJongh*, 491 *F.3d* 130 (Third Cir. 2007).  Thus, the Federal law renders nugatory the effectiveness of the Senators' votes in connection with the legislative efforts to authorize State regulated sports betting in New Jersey.

As previously set forth at length, Defendants erroneously assert that PASPA does not prohibit the Senators from introducing, sponsoring or voting on a sports betting bill. Nevertheless, this is exactly what PASPA prohibits.  Indeed, PASPA expressly deprives the Senators of their right to engage in the legislative process.  Thus, it is inconceivable that

Defendants argue that that any alleged injury suffered by the Senators cannot be traced directly back to PASPA.

Thus, for all of the foregoing reasons, Plaintiffs Lesniak and Plaintiff/Intervenor Sweeney submit that they have alleged the requisite interest and individualize injury as legislators to confer standing to challenge PASPA in this case.   Clearly, PASPA's bar in part is to the "authorizing" of sports wagering in New Jersey, and the Senators here are in the unique class of New Jersey legislators with a particularized interest and who can, and in fact have, received endorsement of the entire New Jersey Senate and have acted to introduce legislation.   Further, the Governor of the State of New Jersey has declined to enter the litigation and thus Defendants' legislative standing arguments fail since the Third Circuit has recognized the standing of New Jersey legislators when the designated head of state declines to challenge Federal law. Therefore, Plaintiffs submit, Article III standing is clearly shown in this case for these Plaintiff legislators and the motion of the Defendants must be denied.

**POINT TWO**

**Defendants' Motion to Dismiss Plaintiffs'
Complaint Based Upon an Alleged Lack of
A Uniformity Requirement Under the United States
Constitution's Commerce Clause
Must Be Denied Because Inconsistent Treatment of
States is Only Permissible When Geographic or
Other Market Factors Vary From State to State.**

**A.  Uniformity Is Required of All Legislation Enacted
Under the Tenth Amendment Unless Objective
Standards for Such Distinctions Based on Regulatory
Conditions or Geographic Differences are
Recognized and Incorporated in the Legislation.**

Defendants assert that Plaintiffs' Complaints must be dismissed based on an assertion that the "gravamen of Plaintiffs' Commerce Clause challenge is the allegation that. . . Congress

is required to legislate uniformly amongst the several states." **Db-24; Db-34.** Defendants are correct that, in some limited cases, not applicable to this matter, there is a reduced requirement for uniformity of treatment of the several states under the Tenth Amendment based on objective criteria which differentiate states, regions or activities. However, in this specific case, where PASPA purported to give the State of New Jersey an opportunity to enact enabling legislation within one (1) year, uniformity of treatment is required. Further, a lack of uniform treatment is only permissible under the Tenth Amendment where a reasonable basis appears to treat states or the regulated community differently. With regard to the regulation of gambling, the Tenth Amendment requires uniformity between states. As noted in Point One(B)(1) above, Defendants incorrectly claim that PASPA "contains no provision that forecloses the Senators from introducing, sponsoring or voting for whatever sports betting bill they would like. . . ." **Db-17 through Db-18.** In the face of unequivocal language of the United States Supreme Court, this contention is clearly incorrect. PASPA's provision against state legislation is expressly set forth in 28 *U.S.C.* § 3702(1), which plainly forbids "a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact" any sports betting activity. However, that prohibition does not apply to Delaware, Nevada, Montana or Oregon.

Defendants' Commerce Clause arguments directed to a dismissal of the Complaints are thus misplaced and should be denied. The United States Supreme Court has stated that occasionally there is no requirement of national uniformity when Congress exercises its power under the Commerce Clause to determine whether Federal regulation will apply. However, such cases sustaining a lack of uniform treatment under the Tenth Amendment are only held to apply when the subject matter of the litigation requires, or is only susceptible to, non-uniform treatment. Defendants rely on *Currin v. Wallace*, 306 *U.S.* 1, 59 *S.Ct.* 379 (1939) for their

general proposition that the Tenth Amendment does not require uniformity in regulatory schemes. In *Currin, supra,* the United States Supreme Court was called upon to determine the constitutionality of the Tobacco Inspection Act of 1935, 7 *U.S.C.* § 510, *et seq.* The Tobacco Inspection Act allowed the United States Secretary of Agriculture to designate certain tobacco auctions as interstate tobacco markets, but not others. However, the Secretary's determination was not final until two thirds (2/3) of the growers using the particular market voted in favor of the designation. <u>However,</u> unlike the legislation in PASPA, the act under review, in *Currin,* <u>did not render tobacco markets illegal;</u> it merely designated some as appropriate for designation as an interstate market subject to quality and price inspections. <u>Once the growers voted, their activities or others' activities did not become illegal, as it does with PASPA.</u> Further, in *Currin, supra,* the Supreme Court noted that the government's reason for disparate treatment was based on the inadequate ability to inspect and police all of the tobacco markets.

> The lack of a sufficient number of expert inspectors made it impracticable to supply inspection and grading at all tobacco auction markets. Having this practical difficulty in mind, Congress directed that when for that reason or others the Secretary was unable to provide for inspection and certification at all such markets within a type area, he should first designate those where the greatest number of growers may be served with the facilities that are available. We do not doubt that such a selection was within the congressional power. 306 *U.S.* at 13, 59 *S.Ct.* at 386.

Similarly, in *Secretary of Agriculture v. Central Roig Refining Co.,* 338 *U.S.* 604, 70 *S.Ct.* 403 (1950), the United States Supreme Court validated disparate regulations which controlled the production and refining of sugar under the Sugar Act of 1948. The Act provided for different requirements for mainland production than from production by Puerto Rican plants in order to stabilize sugar production. The distinction was based in part on an assumption by Congress that costs of refining sugar were significantly less in Puerto Rico based on the restricted quotas in Puerto Rico, but with lesser costs of production, which tended to "even out"

differences of costs and volume of production between the mainland United States and Puerto Rico. The Supreme Court noted that "[n]or does the Commerce Clause impose requirements of geographic uniformity. Congress may devise, as it has done in the Sugar Act of 1948, a national policy with due regard for the varying and fluctuating interests of different regions." 338 *U.S.* at 616, *S.Ct.* at 409 (Citation omitted; emphasis provided). The Supreme Court, however, noted that the statute in question was an attempt in "experimental economics" to deal with a substantial and significant sugar production problem which had existed since before World War II. 338 *U.S.* at 616, *S.Ct.* at 409. It therefore interpreted the Commerce Clause in that specific case to permit "hardships here and there; the incidence of hardship may shift in location and intensity." 338 *U.S.* at 619, *S.Ct.* at 410.

For these reasons, Plaintiff iMEGA and the other Plaintiffs submit that the Complaint should not be dismissed based upon an erroneous application by the Defendants of the limited exceptions to the Commerce Clause's uniformity requirements. Sports wagering, indeed virtually any interstate commerce in today's Internet business communications framework, does not have any of the differentiating factors which permitted a limited departure from uniformity of legislation affecting Interstate Commerce in Depression and war-era mercantile cases. It has no geographical boundary; it is not restricted by any unique market or geographical feature. In short, the restrictions which existed in 1935-1950 as to technology, geography and available resources for regulation and which justified a departure from the uniformity requirement of the Tenth Amendment simply do not exist anymore. Further, in this case, Defendants have failed to assert any factual basis by which the court could evaluate the uniformity requirement, or lack thereof in this matter. The Defendants' motion must therefore be denied.

### B. Wagering Among the States Requires Uniformity Of Application of All Federal Regulatory Schemes Under the Commerce Clause and the Changing Jurisprudential Landscape Within Which Wagering Legislation is Reviewed.

In this case, Defendants fail to establish criteria for their asserted "non-uniformity" rule or distinguish the difference between non-uniform treatment, which merely regulates based on "varying and fluctuating interests of different regions", from that form of uneven legislation which discriminates between states without reason. Nowhere is this inconsistent regulation more apparent than with regard to gambling. In fact, it is recognized by the Federal courts that Congress's treatment of gambling is uneven, ambivalent and increasingly eroding. While reviewing the broadcast gambling advertisement prohibition set forth in 13 *U.S.C.* § 1304, the Fifth Circuit Court of Appeals noted that:

> The Federal government's policy toward legalized gambling is consciously ambivalent. What began as a prohibition on all interstate lottery advertising has been successively, but gingerly modified to respect varying state policies and the Federal government's encouragement of Indian commercial gambling. The remaining advertising limits reflect congressional recognition that gambling has historically been considered a vice; that it may be an addictive activity; that the consequences of compulsive gambling addiction affect children, the family, and society; and that organized crime is often involved in legalized gambling. *Greater New Orleans Broadcasting Ass'n v. U.S.,* 149 *F.3d* 334, 339 (Fifth Cir. 1998).

However, in *Greater New Orleans Broadcasting Ass'n v. United States,* 527 U.S. 173, 119 *S.Ct.* 1923 (1999), (discussed in greater length in Point Three, *infra,* regarding PASPA's impermissible chilling effect on commercial speech under the First Amendment), the United States Supreme Court reversed the Fifth Circuit and struck down Federal legislation which prohibited the broadcasting of wagering related advertising. The United States Supreme Court, in *Greater New Orleans, supra,* straining to make sense of the changing jurisprudence regarding the Federal regulation of gambling advertising since the statute's predecessor was enacted in 1934 as well as its own evolving rulings regarding commercial advertising nationwide, described

the enactment of PASPA itself as containing "a variety of exemptions, some with obscured congressional purposes." 527 *U.S.* at 180, 119 *S.Ct.* at 1928. The Supreme Court specifically noted that "unlike the uniform federal antigambling policy that prevailed in 1934 when [the statute] was enacted, <u>federal statutes now accommodate both progambling and antigambling segments of the national polity.</u>" *Id.* (Emphasis provided).

The Federal Defendants in *Greater New Orleans, supra*, argued that Congress had an overriding purpose in regulating the interstate effects of gambling, asserting that gambling contributed to crime, narcotics trafficking and other illegal conduct, as well as causing familial and economic woes. 527 *U.S.* at 185-186, 119 *S.Ct.* at 1931. The Fifth Circuit Court of Appeals noted that without a factual basis being laid in the trial court, these arguments "intuitively sensible though some of them are, raise numerous fact issues at a belated stage of this litigation." 149 *F.3d* at 339. <u>However</u>, the United States Supreme Court, while recognizing these social goals and concerns generally, <u>rejected these arguments</u> as justification for a ban on <u>any</u> form of gambling advertising. The Supreme Court found that contemporary jurisprudence required a balance between earlier restrictions and current social engineering, specifically citing to PASPA's exceptions and stating that:

> [n]o one seriously doubts that the Federal Government may assert a legitimate and substantial interest in alleviating the societal ills recited above, or in assisting like-minded States to do the same. But in the judgment of both the Congress and many state legislatures, the social costs that support the suppression of gambling <u>are offset, and sometimes outweighed, by countervailing policy considerations, primarily in the form of economic benefits</u>. Despite its awareness of the potential social costs, Congress has not only sanctioned casino gambling for Indian tribes through tribal-state compacts, but has enacted other statutes that reflect approval of state legislation that authorizes a host of public and private gambling activities. <u>See, e.g.</u>, . . . 28 *U.S.*C. § 3704(a). That Congress has generally exempted state-run lotteries and casinos from federal gambling legislation reflects a decision to defer to, and even promote, differing gambling policies in different States. . . . Whatever its character in 1934 . . . the federal policy of discouraging gambling in general, and casino gambling in particular, is now decidedly equivocal. 527 *U.S.* at 186-187, 119 *S.Ct.* at 1932 (Citations omitted, emphasis provided).

32

Therefore, Plaintiffs submit that the Defendants' assertion that Congress may ignore "uniformity" in enacting Federal legislation regarding gambling, regardless of that legislation's historic context or intended regulatory impact or effect, is not correct and is without a basis in law or fact.   The United States Supreme Court ruled conclusively in *Greater New Orleans, supra,* that:

> [h]ad the Federal Government adopted a more coherent policy, or accommodated the rights of speakers in States that have legalized the underlying conduct, this might be a different case. But under current federal law, as applied to petitioners and the messages that they wish to convey, the broadcast prohibition . . . violates the First Amendment. 527 *U.S.* at 195-966, 119 *S.Ct.* at 1936 (Citations omitted).

Further, in reviewing the recent Third Circuit decision in *Markell, supra,* one commentator has noted that:

> [t]he Tenth Amendment's empowerment only permits a lack of uniformity when the unique conditions of the regulated community justify such distinctions, such as the geographic center of the target industry or the varying market conditions based upon varying costs of labor based on location.  . . . PASPA regulates along state lines and exempts certain states from its scope, yet the problem that it addresses--sports gambling-- is not 'geographically isolated.' . . . The only geographic distinction between the exempted states and the covered states was the variation in existing state laws at the time that Congress took up the issue. Michael C. Macchiarola, *Rethinking Sports Wagering, supra,* at 4, fn. 18 (Citations and internal quotations deleted; emphasis provided).

The Third Circuit has recognized that geographic location can form a basis to discriminate between Internet based transmissions of gambling proceeds <u>only</u> where the transmitting state's law already makes Internet wagering illegal under the Unlawful Internet Gambling Enforcement Act, 31 *U.S.C.* § 6310, *et seq*.  As the Third Circuit has noted, "[i]t bears repeating that the Act itself does not make any gambling activity illegal." *Interactive Media, supra,* at 117.  Here, however, PASPA itself distinguishes between states without reference to any standard permitting a departure from the uniformity standard of the Commerce Clause, and declares that sports

wagering is illegal for some states but not for other states without even the mere mention of rationale, distinctions and/or standards.

Unlike the regulation which was sustained in *Interactive Media, supra,* PASPA does not permit states to regulate sports betting internally after the expiration of its one (1) year voting ratification period.  Just as clearly, the United States Supreme Court, with regard to the evolving Federal regulatory environment concerning gambling among the states, acknowledges the equivocal nature of contemporary regulations and has criticized Federal attempts to regulate wagering among and between states.  In the process, the United States Supreme Court has noted the "obscure" nature of PASPA's attempts at limiting sports regulation as early as 1999.  *Greater New Orleans, supra,* 527 *U.S.* at 180, 119 S.Ct. at 1928.  Finally, the United States Supreme Court has recognized that the legality, extent and regulation of wagering in all its forms has been, and continues to be, a matter of state interest which extends beyond the social ills for which regulation exists to the contemporary "countervailing policy considerations, primarily in the form of economic benefits" which iMEGA and the other Plaintiffs seek to move forward. *Greater New Orleans, supra,* 527 *U.S.* at 186-187, 119 *S.Ct.* at 1932.

For all of these reasons, Plaintiffs submit that the Defendants erred in asserting that PASPA need not have uniformity among states under the Tenth Amendment.  In fact, PASPA has been criticized for its "obscure" statutory reasoning and gambling amongst the states has no geographic or market-driven force which justifies a departure from uniform application amongst state jurisdictions which are entitled to implement such laws related to gambling as may be determined by their populace and legislatures.  Therefore, the Defendants' motion should be denied and the court should proceed to the substance of this case.

**POINT THREE**

**Defendants' Motion to Dismiss the Complaint
Must Be Denied Because PASPA's Prohibitions
Against "Advertising" and "Promoting"
A Sports Wagering Scheme Violate the First Amendment's
Protection of Commercial Speech Which May
Reach Across State Lines.**

Many of the Plaintiffs are engaged in commercial speech protected by the First Amendment in their "advocating" and "promoting" and "authorizing" activities against PASPA's restrictions on the State of New Jersey, its non-profit thoroughbred racing groups and iMEGA and its members which cannot engage in authorized businesses which New Jersey wants to see developed within its borders. Defendants miss the central point in their own motion to dismiss the Complaint in this matter, **Db-21 through Db-34,** Defendants' Points II(B)(1-3, 6), with regard to their assertion that the First Amendment to the United States Constitution does not protect the activities of the Plaintiffs. The protected activities which are improperly prevented by PASPA's aging legislation, based on "obscure" Congressional reasoning, as noted in *Greater New Orleans, supra,* are protected commercial speech under the First Amendment. As already noted, at this stage of the litigation, the Defendants' motion merely tests the legal sufficiency of the Complaint. *Sturm v. Clark, supra,* 835 *F.2d* at 1011. The court should not dismiss the Complaint unless it appears that the Plaintiffs can prove <u>no</u> set of facts in support of <u>any</u> claim which would entitle them to relief. *Borawski v. Henderson, supra,* at 481. However, as Plaintiffs submit, Plaintiffs' Complaints should not be dismissed because, at trial, Plaintiffs will show that the proscriptions in PASPA impermissibly restrict "advocating" and "advertising" any aspect of sports wagering under prevailing standards for review of commercial speech under the First Amendment.

In *Greater New Orleans Broadcasting Ass'n v. U.S.,* 527 *U.S.* 173, 119 *S.Ct.* 1923 (1999), the United States Supreme Court struck down Federal legislation which prohibited the broadcasting of lottery information, including advertising.  Significantly, in analyzing the statute in question therein, 18 *U.S.C.* § 1304, seven (7) years after the enactment of PASPA, the United States Supreme Court, in *Greater New Orleans,* compared the statute under review with PASPA and stated clearly that PASPA's statutory bar against advertising was not only unclear, but also broad and prohibitive.  The United States Supreme Court stated that PASPA's "exemptions make the scope of § 3702's advertising prohibition somewhat unclear, but the prohibition is not limited to broadcast media and does not depend on the location of a broadcast station or other disseminator of promotional materials."    527 *U.S.* at 179-180, 119 *S.Ct.* at 1929 (Emphasis provided).  The United States Supreme Court did not, however, rule that PASPA itself was unconstitutional because the issue of PASPA was not specifically before it.

As shown above in Point One (B)(2) above, the statutory prohibition in PASPA prevents iMEGA and its members from sponsoring, operating, advertising or promoting any professional sports wagering enterprise in conjunction with the State of New Jersey. 28 *U.S.C.* § 3702(1-2); *Greater New Orleans, supra,* 527 *U.S.* at 179-180, 119 *S.Ct.* at 1929.  Plaintiff Senator Lesniak and the Plaintiff/Intervenor Senator Sweeney represent the New Jersey State Legislature and the State itself, because the Governor has declined to represent the State of New Jersey.  Under such, they are able to assert that, because of PASPA, the State cannot "authorize by law" any such professional sports wagering.  While the issue of the State's sovereign immunity and ability to enact laws are dealt with below, it is clear that the prohibition in PASPA against any promotion and/or advertising is unconstitutional under the First Amendment.

The United States Supreme Court, in *Greater New Orleans, supra,* applied the four (4) part test first enunciated in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 *U.S.* 557, 100 *S.Ct.* 2343 (1980) to determine whether commercial advertisement expression concerning gambling is protected by the First Amendment. *Central Hudson* invalidated legislative restrictions on commercial speech which place a blanket ban on <u>all</u> advertising or promotion. 447 *U.S.* at 565, 100 *S.Ct.* at 2351.

> For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." 447 *U.S.,* at 566, 100 *S.Ct.* at 2351.

In the Third Circuit, the court will first test the statute in question to determine whether it is content based or content neutral with regard to commercial speech. "[T]he proper framework for evaluating these claims is governed by our decision in *Rappa v. New Castle County,* 18 *F.3d* 1043 (Third Cir. 1994)." *Melrose, Inc., v. City of Pittsburgh,* 613 *F.3d* 380, 388 (Third Cir. 2010). In *Melrose,* the Third Circuit Court of Appeals affirmed and refined this framework for evaluation of First Amendment commercial speech claims by stating that:

> If the statute is content-based, <u>the government must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end</u>. If instead the statute is found to be content-neutral in that it merely restricts the total quantity of speech by regulating the time, the place or the manner in which one can speak, a very different test applies. *Melrose, Inc.,* 613 *F.3d* at 388, *citing Rappa,* 18 *F.3d* at 1053 (Citations and internal quotation marks deleted; emphasis added).

Under *Rappa, supra,* once the initial decision that the statute under review is "content based," the stricter standards of *Central Hudson* still apply. In essence, under *Rappa, supra,* this test is the "strict scrutiny" standard of First Amendment judicial review. *Melrose, Inc., supra,* at 388-389, fn. 4. Without question, PASPA is clearly content based under the criteria of *Rappa*

and *Melrose, Inc.,* because its prohibition against promotion and advertising of any sports wagering efforts is absolute and content based.  Further, under the analysis of content based commercial speech restrictions first set out in *Central Hudson, supra,* this analysis would subsume both overbreadth and void-for-vagueness challenges, since such challenges would apply even though the challenger did not engage in any constitutionally protected speech or the challenge is brought on behalf of persons not before the court.  *Central Hudson, supra,* 447 *U.S. at* 566, *100 S.Ct.* at 2351, fn. 8.  Thus, Defendants' arguments against the equal protection, due process, overbreadth and vagueness challenges in this case are misplaced, as they all depend on the direct First Amendment content based challenge.  **Db-27 through Db-34,** Defendants' Points II(B)(2-3); **Db-38 through Db-40,** Defendants' Points II(B)(7-8).

As already noted, the statute's prohibition is against "promoting" or "advertising" a gambling or wagering scheme under state action "authorized by law" and based on amateur or professional competitive games such as iMEGA and its members seek to do and as the individual Plaintiffs , some of whom are State legislators, have attempted to do.  PASPA's prohibition is against such promotion, meaning to "help or encourage to exist or flourish, or to aid in organizing as in business undertakings, or to encourage the sales, acceptance, and so on, especially through advertising or other publicity."  *Dictionary.com, http://dictionary. reference.com/promote, supra,* last visited Tuesday, September 7, 2010.  Additionally, in iMEGA's standing arguments, *supra,* Plaintiffs have noted that the Third Circuit itself has defined the function to "promote" thus:

> [t]he term "promotes" is defined in Webster's Ninth Collegiate Dictionary (1990) as "to contribute to the growth or prosperity of" or "furthers."  *Canal Ins. Co., supra,* at 436.

Under the strict First Amendment standards of *Central Hudson, supra,* governing the regulation of content based commercial advertising speech, the United States Supreme Court has

struck down state regulations concerning advertising in context of statutes seeking to regulate content based promotion and advertising in a number of commercial activities, <u>not on interstate commerce grounds but on First Amendment grounds as shown above</u>. *See Rhode Island Liquor Stores Assn. v. Evening Call Pub. Co.*, 517 *U.S.* 484, 116 *S.Ct.* 1495 (2006)(alcoholic beverage prices); *Greater New Orleans, supra,* 527 *U.S.* at 179-180, 119 *S.Ct.* at 1929 (state lottery winnings and information); *44 Liquormart, Inc. v. Rhode Island*, 517 *U.S.* 484, 116 *S.Ct.* 1495 (1996)(alcoholic beverage pricing).   In *44 Liquormart, Inc.,* the United States Supreme Court stated that "<u>when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands</u>." 517 *U.S.* at 501, 116 *S.Ct.* at 1507 (Emphasis provided).

Therefore, Plaintiffs submit that PASPA's absolute ban on promotion, advertising or enactment of laws which relate to the activity of wagering on professional and/or amateur sports clearly violates the Plaintiff's First Amendment rights to engage in such speech.   Under the strict standards of *Central Hudson* and *Melrose, Inc., and Rappa, supra,* the relaxed "rational basis" standard urged by the Defendants, **Db-29,** <u>is not the correct standard</u> under which PASPA's impermissible restrictions must be evaluated.   The standard under *Central Hudson, supra,* as adopted and adapted in the Third Circuit in *Rappa* and *Melrose, Inc., supra,* is the higher standard of strict scrutiny of content based regulations.   The Defendants must demonstrate that PASPA is necessary to serve a compelling state interest <u>and that it is narrowly drawn to achieve that end.</u>

The Defendants in this case have presented nothing to justify the complete and absolute ban on commercial speech set forth in PASPA. To reiterate, the statute under scrutiny here

completely forbids any state government "to sponsor, operate, advertise, promote, license, or authorize by law or compact, or a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity, . . . betting, gambling, or wagering scheme based. . . [on] competitive games in which amateur or professional athletes participate. . . . 28 *U.S.C.* § 3702(1-2). Plaintiffs submit that PASPA's ban on advertising, promotion or authorization cannot stand because neighboring states permit such activities. <u>The Defendants themselves have conceded that the Plaintiffs may conduct any activities and enact any laws within New Jersey related to sports betting</u>, stating that PASPA "contains no provision that forecloses the Senators from introducing, sponsoring or voting for whatever sports betting bill they would like. . . ." **Db-17 through Db-18.**

Further, Plaintiffs submit that the United States Supreme Court in *Greater New Orleans, supra,* applying the same content based scrutiny required by *Central Hudson, Melrose, Inc.,* and *Rappa, supra,* invalidated a similar statute after it even criticized PASPA for a similar reason: on its face, without having to delve into evidence, the statute failed to narrowly address the alleged ills of the regulated activity and was filled with holes wherein the very same activities were permitted without a rational basis.

> We need not resolve the question whether any lack of evidence in the record fails to satisfy the standard of proof under *Central Hudson,* however, because the flaw in the Government's case is more fundamental: <u>The operation of § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it.</u>   *Greater New Orleans, supra,* 527 *U.S.* at 190, 119 *S.Ct.* at 1932 (Emphasis provided).

*Accord, Valley Broadcasting Co. v. U.S.,* 107 *F.3d* 1328 (9th Cir. 1997).

A review of PASPA's exceptions shows that they are nearly the same "carve outs" as were found to impermissibly permeate § 1304 in *Greater New Orleans, supra.* 28 *U.S.C.* § 3704 provides that it shall not apply to:

(1) a lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, to the extent that the scheme was conducted by that State or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990;

(2) a lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity where both—

    (A) such scheme was authorized by a statute as in effect on October 2, 1991; and

    (B) a scheme described in section 3702 (other than one based on parimutuel animal racing or jai-alai games) actually was conducted in that State or other governmental entity at any time during the period beginning September 1, 1989, and ending October 2, 1991, pursuant to the law of that State or other governmental entity;

(3) a betting, gambling, or wagering scheme, other than a lottery described in paragraph (1), conducted exclusively in casinos located in a municipality, but only to the extent that--

    (A) such scheme or a similar scheme was authorized, not later than one year after the effective date of this chapter, to be operated in that municipality; and

    (B) any commercial casino gaming scheme was in operation in such municipality throughout the 10-year period ending on such effective date pursuant to a comprehensive system of State regulation authorized by that State's constitution and applicable solely to such municipality; or

(4) parimutuel animal racing or jai-alai games.

The prohibition in 18 *U.S.C.* § 1304, which *Greater New Orleans, supra,* specifically found

unconstitutional, refers to broadcasting and advertising.

    Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined under this title or imprisoned not more than one year, or both. 18 *U.S.C.* § 1304.

The United States Supreme Court found this language, as applied by both the courts and the

regulatory agency, to be riddled with such exceptions which rendered it unconstitutional, the

same sort of exceptions which rendered PASPA "obscure." The United States Supreme Court

added up the exceptions which rendered the statute invalid:

> a broadcaster may not carry advertising about privately operated commercial casino gambling, regardless of the location of the station or the casino. On the other hand, advertisements for tribal casino gambling authorized by state compacts - whether operated by the tribe or by a private party pursuant to a management contract - are subject to no such broadcast ban, even if the broadcaster is located in, or broadcasts to, a jurisdiction with the strictest of antigambling policies. Government-operated, nonprofit, and "occasional and ancillary" commercial casinos are likewise exempt.
> * * *
> The FCC's interpretation and application of §§ 1304 and 1307 underscore the statute's infirmity. Attempting to enforce the underlying purposes and policy of the statute, the FCC has permitted broadcasters to tempt viewers with claims of "Vegas-style excitement" at a commercial "casino," if "casino" is part of the establishment's proper name and the advertisement can be taken to refer to the casino's amenities, rather than directly promote its gaming aspects. While we can hardly fault the FCC in view of the statute's focus on the suppression of certain types of information, the agency's practice is squarely at odds with the governmental interests asserted in this case. 527 *U.S.* at 190-191, 119 *S.Ct.* at 1934 (Citations and footnote omitted).

The *Greater New Orleans* Court also found that the content based ban on casino related

"advertising" was not justified under <u>any</u> of the social factors put forward by the Federal

Defendants in that case. 527 *U.S.* at 188-189, 119 *S.Ct.* at 1932-1933. Further, the United States

Supreme Court found that the legislative purpose of the content based advertising ban could be

accomplished by less intrusive, state based policies and regulations. The Court held that:

> There surely are practical and nonspeech-related forms of regulation-including a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements - that could more directly and effectively alleviate some of the social costs of casino gambling. 527 *U.S.* at 192, 119 *S.Ct.* at 1934.

Therefore, for all of the foregoing reasons, Plaintiff iMEGA joins the other Plaintiffs in

submitting that the Defendants' motion to dismiss the matter must be dismissed. Under the

United States Supreme Court and Third Circuit holdings with regard to the high standard of

scrutiny applied to content based commercial speech, PASPA fails such scrutiny because it

uniformly bans the commercial speech based activity of "promoting" and "advertising."  In fact, the United States Supreme Court has already criticized PASPA as being riddled with "obscure" prohibitions, and Plaintiffs submit that PASPA is "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it." *Greater New Orleans, supra, 527 U.S.* at 190, 119 *S.Ct.* at 1932.  Furthermore, PASPA fails fundamental First Amendment prohibitions on commercial content based speech on its face, even without the taking of evidence, because the act is so fundamentally flawed as shown above.  Therefore, Plaintiff iMEGA and the other Plaintiffs submit that the motion to dismiss the Complaint must be denied.

### POINT FOUR

**The Court Should Deny Defendants' Motion to Dismiss
Plaintiffs' Claims That PASPA Violates the Tenth Amendment
Because Tenth Amendment Jurisprudence Requires That
States May Regulate the Nature And Extent of Gambling
As a Power Traditionally Reserved to the States.**

Plaintiffs submit that the above analysis shows clearly that PASPA's prohibitions have a substantial likelihood of being declared unconstitutional in whole or part when the case is finally decided.  However, as shown above, accepting all allegations as true, the present inquiry is limited to evaluating the merits of Plaintiffs' claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs, and determining whether they state a claim as a matter of law.  *In Re Burlington Coat Factory Securities Litigation,* 114 *F.3d, supra* at 1420.  In addition to the violation of the Commerce Clause demonstrated above, Plaintiffs assert that PASPA violates the United States Constitution's Tenth Amendment. Defendants contend that the Tenth Amendment "is not a limit on the powers delegated to the Congress by the Commerce Clause." **Db-34.**  They assert simply that the courts have repeatedly upheld gambling regulations against Tenth Amendment challenges.  *Id.*

Defendants err, however, in asserting that the claims concerning PASPA's distinct prohibitions which are asserted in Plaintiffs' Complaint should be dismissed for failure to demonstrate a Tenth Amendment claim, because the Tenth Amendment does not prohibit New Jersey from permitting gambling and gambling is an activity traditionally relegated to the states. Further, under the Tenth Amendment, Congress lacks the authority to compel the State of New Jersey to enact legislation for <u>legal</u> gambling of any kind under New Jersey's own Constitution and/or to impose a time limitation on such actions by its Legislature.

The Tenth Amendment to the United States Constitution provides that:

[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The powers "delegated to the United States by the Constitution" include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary and Proper Clause. Virtually by definition, these powers are not powers that the Constitution "reserved to the States." *New York v. United States,* 505 *U.S.* 144, 166, 112 *S.Ct.* 2408, 2423 (1992). Article I, § 8, cl. 3 of the United States Constitution provides that "The Congress shall have Power. . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Defendants argue, without basis drawn from the factual allegations of the Complaint, that "PASPA is a constitutional exercise of Congress' authority under the Commerce Clause, and courts have repeatedly upheld such regulation against Tenth Amendment challenges." **Db-34.**

However, this overbroad conclusion is not correct. All the cases cited by Defendants to support the contention that PASPA is constitutionally sound under the Tenth Amendment in fact turn upon a Federal prosecution for Federal crimes premised solely upon the underlying gambling activity being illegal under State law. *Gilstrap v. United States,* 389 *F. 2d* 6 (Fifth Cir.

1968) involved a prosecution for illegal use of interstate wire facilities in violation of the Federal Travel Act, 18 *U.S.C.* § 1952 to engage in an unlawful gambling enterprise <u>under Georgia laws.</u> *United States v. Villano,* 529 *F. 2d* 1046 (Tenth Cir. 1976) also involved a prosecution under 18 *U.S.C.* § 1952 for use of telephone lines to transmit illegal bookmaking information between Nebraska and Colorado, where the activity was illegal <u>under Nebraska and Colorado laws.</u> *United States v. Avarello,* 592 *F.2d* 1139 (Fifth Cir. 1979) involved a Federal prosecution under 18 *U.S.C.* § 1955 for layoff betting on the halftime line of certain sports betting, <u>which was illegal under Texas law.</u>

In the case before this court, however, Plaintiffs again emphasize that Defendants' concentration on illegal gambling is incorrect and misplaced. PASPA's prohibition limits the right of states to "authorize" professional and amateur sports betting: the states can never reach the point of legal or illegal because PASPA regulates legislation itself. Moreover, PASPA permits an Attorney General or a sports organization to sue to enjoin any state from legalizing sports betting, or organization allied with a state from "advertising" or "promoting" any sports wagering or participating in the same. Thus, PASPA ignores the rights of states to <u>legalize</u> any kind of sports betting by constitutional amendment or otherwise and subjects the State of New Jersey and its lawmakers to suit. Further, PASPA forbids the exercise of iMEGA and its members to "advocate" and/or "promote" any kind of sports betting by constitutional amendment, legislation or otherwise and subjects them to a declaratory judgment action seeking to enjoin their activities. <u>PASPA is not based, as are the cases cited without analysis by Defendants, on an underlying illegal act under state law.</u> This is the essential distinction between the Congressional act sustained in *Interactive Media, supra,* and PASPA. As already noted, the

Third Circuit has stated that "[i]t bears repeating that the Act itself does not make any gambling activity illegal." *Interactive Media, supra,* at 117.

Simply stated, PASPA is unconstitutional under the Tenth Amendment because there is no requisite illegal act occurring which is being facilitated by use of interstate commerce: PASPA instead interferes with the right of the several states, including New Jersey, to enact such legislation at the outset.  Thus, PASPA violates the Tenth Amendment because it interferes with the rights of the sovereign states.  In *New York v. United States, supra,* the United States Supreme Court clearly explained that the Commerce Clause was not intended to limit the right of States to regulate their internal matters, stating that:

> [i]n providing for a stronger central government, therefore, the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States. As we have seen, the Court has consistently respected this choice. We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.
>
> This is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices. Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests. Two of these methods are of particular relevance here.
>
> First, under Congress' spending power, Congress may attach conditions on the receipt of federal funds. . . . Second, where Congress has the authority to regulate private activity <u>under the Commerce Clause</u>, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation. 505 *U.S.* at 166-167, 112 *S.Ct.* at 2423-2324 (Citations and internal quotations omitted; emphasis provided).

PASPA only reaches private activity when it is in partnership with state action and is therefore an unconstitutional exercise in preventing state action.  <u>The professional and amateur sports betting which PASPA purports to limit or prevent was not passed on in New Jersey within</u>

one (1) year from its effective date, but PASPA would purport to prevent the State of New Jersey or its Legislature from ever in the future considering such legalization again, which is a power not granted to Congress. It bears repeating that the advertisement and promotion of gambling, not the activity itself, is constitutionally protected under *Greater New Orleans, supra*, and that Federal statutes only regulate the use of interstate commerce to further gambling which is already illegal under state law.

In *New York v. United States, supra*, the United States Supreme Court struck down portions of a Federal act which mandated states to enact legislation providing for the disposition of low level radioactive waste generated within the state or else become responsible for that waste. The United States Supreme Court upheld certain portions of the act, which provided for incentives through grants and other programs to encourage such regulation, but overturned that provision of the act which mandated the state to act, as did PASPA when enacted, stating that:

> where the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished. If the citizens of New York, for example, do not consider that making provision for the disposal of radioactive waste is in their best interest, they may elect state officials who share their view. That view can always be pre-empted under the Supremacy Clause if it is contrary to the national view, but in such a case it is the Federal Government that makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular. But where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation. 505 *U.S.* at 168-169, 112 *S.Ct.* at 2424.

The United States Supreme Court therefore concluded that the act's requirement that the states either enact legislation or, in the absence of legislation, be deemed to be declared by Congress to be responsible for the waste, was beyond the power of Congress and thus was a violation of the Tenth Amendment. This principle was affirmed *in Printz v. U.S.,* 521 *U.S.* 898, 912, 117 *S.Ct.*

2365, 2373 (1997), which stated that "[w]e have held, however, that state legislatures are not subject to federal direction, " citing *New York v. United States, supra.*

Plaintiffs submit that this same reasoning applies to PASPA in this case before this court. Even though the issue of promoting gambling as an evil or an economic engine, or both, is a matter of State law as definitively established in *Greater New Orleans, supra,* PASPA sought to compel legislation by requiring states to vote to legalize, implement and operate sports betting within one (1) year of its effective date under certain limited conditions or otherwise not at all being allowed to do such. However, if states failed to act within the time line set out in PASPA, then the states would be unable to act <u>as a state legislative function</u> to enact or not enact sports wagering now nor be permitted to decide the issue ever in the future. It is this aspect of PASPA that violates the Tenth Amendment. Rather than regulating the conduct of individuals, which was clearly spelled out in *Flagler, supra,* PASPA impermissibly regulates the exercise of state legislative prerogatives directly by prohibition, not indirectly by economic or other federal "encouragement." Further, PASPA is unconstitutional because it attempts to regulate the legislative actions of sovereign states and, while on the one hand it imposes deadlines whereby sports betting could have been legalized in New Jersey, on the other hand it purports to deny any ability to pass legislation later, even as other states continue to operate identical legislative schemes! For all of these reasons, Defendants' motion should be denied on the face of the Complaint, which shows sufficient facts to allege that PASPA acts on areas delegated to the states and not subject to Congress' authority under the Commerce Clause.

## POINT FIVE

### PASPA's Prohibition on "Promoting" Professional and Amateur Sports Wagering Is Void for Vagueness and Unconstitutional Under the First Amendment.

In *City of Chicago v. Morales*, 527 *U.S.* 41, 199 *S.Ct.* 1849 (1999), the United States Supreme Court restated the constitutional requirement that a statute must reasonably give notice of the conduct which is prohibited, stating that:

> even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests. 527 *U.S.* at 52, 199 *S.Ct.* at 1857.

In *ACLU v. Reno*, 929 *F. Supp.* 824 (1996), *aff'd* 521 *U.S.* 844, 117 *S.Ct.* 2329 (1997), the District Court for the Eastern District of Pennsylvania granted a preliminary injunction in regard to the enforcement of the provisions contained in the Communications Decency Act of 1996 (hereinafter referred to as the "CDA") and the Supreme Court of the United States upheld the granting of the injunction.  The CDA attempted to criminalize the knowing transmission of "obscene or indecent" communications to minors "by means of a communications device".  47 *U.S.C.* § 223(a)(1)(B).  The Federal District Court stated that:

> [i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.  Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.   Third, but related, where a vague statute "abuts upon sensitive areas of basic First Amendment freedoms," it" operates to inhibit the exercise of those freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." 929 *F. Supp.* 824, 860-61 (1996).

In this case, Plaintiffs have already demonstrated the impact on Plaintiffs' First Amendment rights in Point Three, above.   Further, Plaintiffs have demonstrated that the prohibition against any action to "promote," "advertise" or "authorize" sports wagering clearly grants Article III standing because of the reach of the statutory prohibition.   This prohibition against statutory enactments, which fail to limit the reach of a statute barring "promotion" in the civil context, was set forth in *Baggett v. Bullitt*, 377 *U.S.* 360, 84 *S.Ct.* 1316 (1964), which overturned a loyalty certification which required teachers to promise to "promote" loyalty to the United States and the State of Washington.   The United States Supreme Court stated that:

> [i]t is likewise difficult to ascertain what might be done without transgressing the promise to promote * * * undivided allegiance to the government of the United States. It would not be unreasonable for the serious-minded oath-taker to conclude that he should dispense with lectures voicing far-reaching criticism of any old or new policy followed by the Government of the United States. He could find it questionable under this language to ally himself with any interest group dedicated to opposing any current public policy or law of the Federal Government, for if he did, he might well be accused of placing loyalty to the group above allegiance to the United States.

> Indulging every presumption of a narrow construction . . . consistent, however, with a proper respect for the English language, we cannot say that this oath provides an ascertainable standard of conduct or that it does not require more than a State may command under the guarantees of the First and Fourteenth Amendments. 377 *U.S.* at 372-373, 84 *S.Ct* at 1322-1323 (Emphasis provided).

The United States Supreme Court thus invalidated the statute because the language under scrutiny, keyed upon the promise to "promote" loyalty, failed to draw a line between constitutionally protected conduct and conduct which could be legitimately regulated.   That same fatal defect exists here, where iMEGA and the other Plaintiffs cannot determine what actions subject them and their members, or indeed the esteemed Senate leaders in this lawsuit, to the prohibitions and prophylactic measures of PASPA.   As shown above, the accepted definition of "promoting", both in accepted language and in the jurisprudence of the Third Circuit Court of Appeals, means simply "to contribute to the growth or prosperity of" or "furthers." *Canal Ins.*

*Co., supra,* at 436.  Such definition is so neutral and inoffensive that the restrictions of PASPA were called "obscure" by the United States Supreme Court in *Greater New Orleans, supra,* 520 *U.S.* at 180, 119 *S.Ct.* at 1928.

Thus, Plaintiffs submit that PASPA's restrictions against "promoting" sports wagering not only violate the First Amendment's prohibition against banning content based commercial speech, but the prohibitions are also void for vagueness and must be overturned.  No reasonable guidance to iMEGA or its members, to the various Horsemen's Associations or even to the legislators of the State of New Jersey is set out in the statute which can establish a reasonable demarcation of conduct which will subject them to the proscriptions of the statute.  Given the United States Supreme Court's warning that PASPA's language and purpose are "obscure" under current jurisprudence, Plaintiffs submit that they demonstrate sufficient basis to withstand Defendants' motion to dismiss the Complaint.

## POINT SIX

### PASPA's Authorization for Private Professional Sports Organizations Is an Impermissible Violation of The States' Sovereign Immunity Under the Eleventh Amendment.

PASPA creates a statutory cause of action for an attorney general or any professional or amateur sports association to sue a sovereign state which authorizes by law any "lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly . . . on one or more competitive games in which amateur or professional athletes participate. . . ."  28 *U.S.C.* § 3702(2).  Further, 28 *U.S.C.* § 3703 authorizes a "civil action to enjoin a violation [which] may be commenced in an appropriate district court of the United States by the Attorney General of the United States, <u>or by a professional sports organization or amateur sports organization whose competitive game is alleged to be the basis of such violation</u>" (Emphasis

51

provided).  Plaintiffs submit that this enforcement provision is invalid and of no force and effect and makes PASPA constitutionally invalid, because Congress cannot waive the sovereign immunity of a state and permit private lawsuits by private parties against a state.  This doctrine is set forth in the Eleventh Amendment, which Defendants wrongly assert cannot be urged offensively against the effects of PASPA.

In *Federal Maritime Commission v. South Carolina State Ports Authority,* 535 *U.S.* 743, 122 *S.Ct.* 1864 (2002), the United States Supreme Court affirmed the continued validity of the doctrine of sovereign immunity which prohibits a federal statute from allowing private lawsuits against states.  In *Federal Maritime Commission, supra,* a company offering cruises on which passengers were allowed to gamble while in international waters requested permission from the Defendant South Carolina State Ports Authority, a state agency, for permission to berth a cruise ship at the Ports Authority's port facilities in Charleston, South Carolina. The Ports Authority denied permission for the berth, citing an established policy of denying berths to vessels whose primary purpose was gambling.  The cruise company then appealed to the Plaintiff Federal Maritime Commission alleging that the policy was implemented unequally and the matter was heard before an administrative law judge.   The administrative law judge ruled that sovereign immunity barred any federal court action by the cruise company against the State, but the Commission reversed, holding that that sovereign immunity did not apply to executive branch tribunals such as the Federal Maritime Commission. The Ports Authority appealed and the Fourth Circuit Court of Appeals reversed; that decision was appealed by the Commission to the United States Supreme Court.

The United States Supreme Court confirmed the enduring federal doctrine of sovereign immunity under the Eleventh Amendment, stating that:

> [t]he States, in ratifying the Constitution, did surrender a portion of their inherent immunity by consenting to suits brought by sister States or by the Federal Government. Nevertheless, the Convention did not disturb States' immunity from private suits, thus firmly enshrining this principle in our constitutional framework. 535 *U.S.* at 752, 122 *S.Ct.* at 1870.

The United States Supreme Court held that the bar against Congressional authorization of judicial actions against states extended even to actions against states in quasi-judicial and administrative actions. 535 *U.S.* at 756-757, 122 *S.Ct.* at 1872-1873.

In *Seminole Tribe of Florida v. Florida*, 517 *U.S.* 44, 116 *S.Ct.* 1114 (1996), the United States Supreme Court held that the Commerce Clause, Article I, § 8, Clause 3, cited above, prohibited Congress from waiving a state's sovereign immunity under the Indian Gaming Regulatory Act, 25 *U.S.C.* § 2710. In that act, Congress had authorized Federal court suits by Indian tribes against the states for prospective injunctive relief to enforce legislation enacted pursuant to the Indian Commerce Clause which would permit gambling on tribal lands. The United States Supreme Court, overruling its prior decision in *Pennsylvania v. Union Gas Co.,* 491 *U.S.* 1, 109 *S.Ct.* 2273 (1989), as "wrongly decided,", held that:

> [i]n overruling *Union Gas* today, we reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government. <u>Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States.</u> The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction. 517 *U.S.* at 73, 116 *S.Ct.* at 1132. (Emphasis provided).

The United States Supreme Court has thus, contrary to Defendants' claims unsupported by law or fact, continued to uphold the vitality of the Eleventh Amendment and has continued to state unequivocally that Congress cannot use the Commerce Clause to circumvent the constitutional proscription against Federal legislation which permits suits against states by

private persons.  While PASPA's enabling of lawsuits by the Attorney General of the United States may have some continuing vitality, Plaintiffs submit that *Federal Maritime Commission* and *Seminole Tribe, supra,* clearly establish that PASPA's authorization of a private lawsuit by professional or amateur sports organizations against states who attempt to authorize legislation permitting sports wagering is unconstitutional and unenforceable.  Further, since injunctive relief is the sole remedy provided in the statute, the continuing validity of the statute must be viewed in the further light of other constitutional infirmities already shown.  Plaintiffs therefore submit that Defendants' motion to dismiss based upon the Eleventh Amendment must be denied.

<h2 style="text-align:center">CONCLUSIONS</h2>

For purposes of ruling on a motion to dismiss for want of standing this court must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.  The issue before the  court evaluating this motion is not whether Plaintiffs' legal conclusions are ultimately denied, but whether the legal conclusions asserted in the Complaint present a plausible argument for entitlement to relief after a fact-sensitive review of the Complaint.  The Federal District Court for the District of New Jersey has held that iMEGA had prudential standing as well as Article Three Standing to challenge Federal statutes which affect its members, even if it ultimately does not prevail in challenging them under the United States Constitution.  The Third Circuit does not confuse standing to raise a constitution violation with the merits of the matter, and thus Defendants' motion should be denied.  This same argument applies to the various Horsemen's Associations.

Further, the motion of the Defendants to dismiss the matter should be denied because Plaintiffs have the requisite Tenth Amendment standing to assert the claims in the Complaint. Defendants' misconstrue both the intent of PASPA to prevent business alliances between entities

and the states in only certain states, as well as iMEGA's representation of those very businesses as trade association and advocate for reform of PASPA's prohibitions.  Further, because the Governor and Attorney General of New Jersey have declined to exercise their right to challenge PASPA, the Plaintiff Intervenor, Senate President Senator Stephen Sweeney, and the Legislative Plaintiff, Senator Raymond Lesniak, satisfy the requirement in the Third Circuit that private parties can, as a matter of law, assert the public's rights to pursue legislation to effect change. Plaintiffs iMEGA's and the Horsemen's' Associations' Tenth Amendment challenges are also aligned with those of the state and its legislators and seek the same relief which sought in the challenges brought by state legislators in the same action, which is the enjoining of the effect of PASPA's absolute bar on "advertising," "promoting" or "authorizing" sports wagering in New Jersey.  Further, since iMEGA's claims are aligned with the State's interest in this matter, this court should confer Tenth Amendment standing in any case.

Plaintiff Lesniak and Plaintiff/Intervenor Sweeney submit that they have alleged the requisite interest and individualized injury as legislators to confer standing to challenge PASPA in this case.  PASPA's bar in part is to the "authorizing" of sports wagering in New Jersey, and the Senators here are in the unique class of New Jersey legislators  with a particularized interest and who can, and in fact have, received endorsement of the entire New Jersey Senate and have acted to introduce legislation.  Since the Governor of the State of New Jersey has declined to enter the litigation, Defendants' legislative standing arguments fail because the Third Circuit has recognized the standing of New Jersey legislators when the designated head of state declines to challenge Federal law.

Plaintiffs further submit that the Defendants erred in asserting that PASPA need not have uniformity among states under the Tenth Amendment.  In fact, PASPA has been criticized for its

"obscure" statutory reasoning, while Internet sports wagering among the states has no geographic or market-driven force which justifies a departure from uniform application amongst state jurisdictions which are entitled to implement such laws related to gambling as may be determined by their populace and legislatures.   Therefore, the Defendants' motion should be denied and the court should proceed to the substance of this case.

Plaintiffs submit that the Defendants' motion to dismiss the matter must be dismissed because, under the United States Supreme Court and Third Circuit holdings with regard to the high standard of scrutiny applied to content based commercial speech, PASPA fails such scrutiny because it uniformly bans the commercial speech based activity of "promoting" and "advertising."   In fact, the United States Supreme Court has already criticized PASPA as being riddled with "obscure" prohibitions and Plaintiffs assert that PASPA is "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it," similarly to the opinion in *Greater New Orleans, supra.* Furthermore, PASPA fails fundamental First Amendment prohibitions on commercial content based speech on its face, even without the taking of evidence, because the act is so fundamentally flawed as shown above.

Plaintiffs further submit that the Defendants' motion must be denied because the issue of promoting gambling as an evil or an economic engine, or both, is a matter of State law as definitively established by the United States Supreme Court under the Tenth Amendment. PASPA sought to compel legislation by requiring states to vote to legalize, implement and operate sports betting within one (1) year of its effective date under certain limited conditions or otherwise not at all being allowed to do such ever.   However, if states failed to act within the time line set out in PASPA, then the states would be unable to act as a state legislative function

to enact or not enact sports wagering, much less those states not permitted to decide the issue ever in the future. It is this aspect of PASPA that violates the Tenth Amendment.

Further, PASPA is unconstitutional because it attempts to regulate the legislative actions of sovereign states and, while on the one hand it imposes deadlines whereby sports betting could be legalized in New Jersey, on the other hand it purports to deny any ability to pass legislation later, even as other states continue to operate identical legislative schemes. For these reasons, Defendants' motion should be denied on the face of the Complaint, which shows sufficient facts to allege that PASPA acts on areas delegated to the states and not subject to Congress' authority under the Commerce Clause.

Plaintiffs submit that PASPA's restrictions against "promoting" sports are also void for vagueness and must be overturned. No reasonable guidance to iMEGA or its members, to the Horsemen's Associations or even to the legislators of the State of New Jersey is set out in the statute which can establish a reasonable demarcation of conduct which will subject them to the proscriptions of the statute. Given the United States Supreme Court's warning that PASPA's language and purpose are "obscure" under current jurisprudence, Plaintiffs submit that they demonstrate sufficient basis to withstand Defendants' motion to dismiss the Complaint.

Finally, Plaintiffs submit that PASPA's authorization of a private lawsuit by professional or amateur sports organizations against states who attempt to authorize legislation permitting sports wagering is unconstitutional and unenforceable as an unwarranted invasion of constitutional guarantees of sovereignty within a Federal system. Further, since the injunctive relief is the sole remedy provided in the statute, the continuing validity of the statute must be viewed in the further light of other constitutional infirmities already shown. Plaintiffs therefore submit that Defendants' motion to dismiss based upon the Eleventh Amendment must be denied.

Dated: October 1, 2010

WEINER LESNIAK, LLP
629 Parsippany Road
Parsippany, New Jersey  07054-0438
(973) 403-1100   (973) 403-0010 (fax)
Attorneys for Plaintiffs New Jersey Thoroughbred
Horsemen's Association, Inc., Thoroughbred
Breeders Association of New Jersey,
the Standardbred Breeders and Owners
Association of New Jersey, and Raymond J. Lesniak
Our File No. 20192F

*Richard L. Rudin*

By:     _____
Richard L. Rudin, Esquire
For the Law Firm

ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.
Two North Road
P.O. Box 4922
Warren, New Jersey 07059
(732) 805-3360
(732) 805-3346 Facsimile
Attorneys for Plaintiff Interactive Media Entertainment
& Gaming Association, Inc.

*Eric M. Bernstein*

By:     _____
Eric M. Bernstein, Esquire
For the Law Firm

58