NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

INTERACTIVE MEDIA ENTERTAINMENT ) 
& GAMING ASSOCIATION, INC., ) 
NEW JERSEY THOROUGHBRED ) 
HORSEMEN'S ASSOCIATION, INC., ) 
THOROUGHBRED BREEDERS ASSOCIATION ) 
OF NEW JERSEY, and ) 
RAYMOND J. LESNIAK, individually and as a ) 
member of the New Jersey Senate, ) 
  )      Hon. Garrett E. Brown, Jr.
      Plaintiffs, ) 
  )      Civil Action No. 09-1301 (GEB)
      v. ) 
  )      **MEMORANDUM OPINION**
UNITED STATES ATTORNEY GENERAL ) 
ERIC H. HOLDER, JR., and UNITED STATES ) 
FOR THE DISTRICT OF NEW JERSEY RALPH ) 
J. MARRA, JR., and ABC SPORTS ) 
ORGANIZATIONS, 1 to 1000, ) 
  ) 
      Defendants. ) 
_____)

**BROWN**, **Chief Judge:**

       This matter comes before the Court on the motion to dismiss (Doc. No. 40) filed by

Defendants Eric H. Holder, the Attorney General of the United States, and Paul J. Fishman, the

United States Attorney for the District of New Jersey (collectively, the "Government"). The

Government seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6)

for lack of standing and for failure to state a claim. The Court has considered the parties'

submissions and decided the matter without oral argument pursuant to Federal Rule of Civil

Procedure 78. For the following reasons, the Court will grant the Government's motion and

dismiss Plaintiffs' Complaint for lack of standing.

## I.      BACKGROUND

This matter involves a challenge to the constitutionality of the Professional and Amateur Sports Protection Act of 1992 (PASPA), 28 U.S.C. § 3701 et seq.  Plaintiffs include: Interactive Media Entertainment & Gaming Association, Inc. (iMEGA), a New Jersey non-profit corporation that disseminates information regarding electronic gaming via the Internet, and has members that provide Internet gambling services; The New Jersey Thoroughbred Horsemen's Association, Inc., The Thoroughbred Breeders Association of New Jersey, and The Standardbred Breeders & Owners Association of New Jersey (collectively, "N.J. Horsemen's Associations"), who represent various interests of the thoroughbred and standardbred horse industries; and Raymond J. Lesniak, the New Jersey State Senator for the 20th Legislative District.  On April 21, 2010, State Senator and President of the New Jersey Senate Stephen M. Sweeney filed an Intervenor Complaint.  By letter of July 12, 2010, Governor Chris Christie declined to intervene in this action.

Congress enacted PASPA in 1992 to curtail the expansion of sports gambling.  PASPA makes it unlawful for

> (1) a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or
>
> (2) a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity,
>
> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

2

28 U.S.C. § 3702.  To enforce these restrictions, PASPA authorizes the United States Attorney

General or "a professional sports organization or amateur sports organization whose competitive

game is alleged to be the basis of [a § 3702] violation" to file a civil enforcement action.  28

U.S.C. § 3703.  PASPA also included a grandfather provision, which exempted from § 3702's

restrictions those States and governmental entities that conducted a sports wagering scheme prior

to the Act's passage.  *Id.* § 3704(a)(1)–(2).[1]  For states that already permitted casino gambling

during the ten years prior to enactment, PASPA gave these states one year from the Act's

effective date to authorize a sports wagering scheme.  *Id.* § 3704(a)(3).  It appears that this

bypass provision only applied to the state of New Jersey.  Although the New Jersey legislature

considered legislation to bypass PASPA's restrictions under this provision, it failed to enact such

legislation during the statutory period.  *See In re Casino Licensees*, 268 N.J. Super. 469, 470–71

(App. Div. 1993).

　　　　Plaintiffs claim that PASPA's limitation on sports-related gambling activities violates the

following provisions of the U.S. Constitution: the Commerce Clause, the First Amendment

freedoms of expression and assembly, the Tenth Amendment, the Eleventh Amendment, the

substantive and procedural protections of the Due Process Clause of the Fifth and Fourteenth

Amendments, and the Equal Protection Clause.  Plaintiffs ask this Court to find PASPA

unconstitutional and permanently enjoin its enforcement.  The Government moves to dismiss,

arguing (1) that this Court lacks jurisdiction because Plaintiffs lack standing to challenge the

constitutionality of PASPA, and (2) that Plaintiffs' constitutional claims fail as a matter of law.

---

[1]The grandfather provision exempted Delaware, Montana, Nevada, and Oregon from
§ 3702's restrictions.

3

While this motion was pending, the Court permitted supplemental briefing regarding the impact

of pending state legislation on the legal issues presented by this motion.  Plaintiffs filed their

supplemental briefs on January 18, 2011, informing the Court that the New Jersey legislature

passed Senate Concurrent Resolution No. 132, which will place a proposed amendment to the

New Jersey Constitution on the ballot for voter referendum during the next general election.  If

approved by the voters, SCR 132, which was sponsored by Senator Lesniak, would amend

Article IV, § VII, paragraph 2 of the New Jersey constitution to permit the legislature to authorize

sports wagering at Atlantic City casinos and certain horse racetracks, so long as the gambling did

not extend to sporting events taking place in New Jersey or involving New Jersey collegiate

teams.  *See* SCR 132.

## II.     ANALYSIS

The Court begins with the Government's standing argument, because standing is a

jurisdictional requirement.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992);

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Government of Virgin Islands*, 218 F.3d 232,

240 (3d Cir. 2000).  Standing derives from Article III of the Constitution, which limits the

exercise of judicial power to "cases" and "controversies" arising under the Constitution and laws

of the United States and/or between specified parties.  U.S. Const. art. III, § 2; *see also Allen v.

Wright*, 468 U.S. 737, 750 (1984) ("Article III of the Constitution confines the federal courts to

adjudicating actual 'cases' and 'controversies.'").  Standing jurisprudence consists of both

constitutional and prudential "strands."  *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1,

11 (2004).  "In its constitutional dimension, standing imports justiciability: whether the plaintiff

has made out a 'case or controversy' between himself and the defendant within the meaning of

Art. III.  This is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Prudential standing "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction,'" such as "'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Elk Grove*,  542 U.S. at 11–12 (quoting *Allen*, 468 U.S. at 751).

The constitutional "core" of standing requires that "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen*, 468 U.S. at 751.  Put another way, a plaintiff must demonstrate an injury, traceability, and redressability.  With regard to injury, a plaintiff must allege an "injury in fact" that is either "(a) concrete and particularized" or "(b) actual or imminent," but "not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  "[I]n order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate . . . .'"  *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).  The traceability, or causation, element of standing ensures that the correct parties are before the court.  "[T]he injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted).  Lastly, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (internal quotation marks and citation omitted).  By requiring the

federal court plaintiff to have "a personal stake in the outcome of the controversy," the standing doctrine "assure[s] that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Standing is "an indispensable part of the plaintiff's case," and before a federal court may consider the merits of a plaintiff's claims, the plaintiff must demonstrate that it has standing to bring those claims. *Lujan*, 504 U.S. at 561. At the pleading stage, a plaintiff's burden is determined by reference to the standard for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See id.* Thus, the plaintiff need not set forth specific proofs of injury, traceability, and redressability, but must "clearly . . . allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Warth*, 422 U.S. at 518); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (citation omitted).

Mindful of these guiding principles, the Court examines Plaintiffs' standing to bring their respective claims.

### A.  iMEGA & N.J. Horsemen's Associations Claims

iMEGA and the N.J. Horsemen's Associations assert that they have standing because PASPA prohibits the promotion of sports betting, and because PASPA prevents their respective members "from pursuing the Internet sports wagering industry in New Jersey." (Pls.' Joint Resp. Br. at 13.) Specifically, these Plaintiffs allege the following facts:

6

4.  iMEGA itself does not engage in electronic gaming by and through the Internet, but engages in the collection and dissemination of information and advice regarding such services to its members and members of the general public in various media, including speech, print and Internet media although members engage in electronic gaming through the Internet.

60.  Members of the N.J. Horsemen's Associations are prohibited from engaging in the business of Sports Betting due to the prohibitions contained in PASPA.

94. PASPA has an inconsistent effect on iMEGA members and members of the N.J. Horsemen's Associations, and private citizens similarly situated in the 46 remaining states, including New Jersey, who desire to take advantage of multiple forms and platforms for Sports Betting services . . . based solely on their status as residents of different jurisdictions . . . .

95.  PASPA creates liability on the part of plaintiffs and their members and private citizens similarly situated in the 46 remaining states, including New Jersey, who wish to take advantage of iMEGA members' services and/or . . . Sports Betting in general based solely on their status as residents of different jurisdictions . . . .

(Compl. ¶¶ 4, 60, 94, 95.)

This Court finds that these Plaintiffs have not satisfied the injury and redressability

requirements for standing.  Beginning with Plaintiffs' argument that they have suffered an injury,

because PASPA exposes them to liability for *promoting* sports betting "and its adoption in the

State of New Jersey" (*see* Pls.' Joint Response Br. at 12), the Court finds that these Plaintiffs

have not alleged an actual or imminent injury.  The Court is not persuaded by Plaintiffs' broad

interpretation of § 3702, which reads PASPA's prohibition on "sponsor[ing], operat[ing],

advertis[ing], or promot[ing] . . . a lottery, sweepstakes, or other betting, gambling, or wagering

scheme" to extend civil liability to individuals that merely support legalizing sports gambling

through the usual political processes.  Indeed, § 3702 expressly contemplates that the forbidden

7

sponsorship, operation, advertisement, and promotion of sports betting would be done "pursuant to the law or compact of a governmental entity."  28 U.S.C. § 3702.  However, assuming that PASPA extends civil liability to persons who merely advocate legalizing sports gambling, any injury would be speculative, because Plaintiffs have not shown that it would be likely that such advocacy would result in civil liability.  Plaintiffs have pointed to no instance where an individual has been threatened with imminent legal action, from the Government or interested third parties, under PASPA's civil enforcement provisions.  Indeed, Plaintiffs supplemental submissions revealed that the New Jersey legislature not only considered, but passed a concurrent resolution that, if approved by the voters, would amend the New Jersey constitution to permit the legislature to authorize sports betting.  *See* SCR 132.  Plaintiffs have not indicated that this interstitial legislative action resulted in a civil enforcement action to preempt the referendum.

Plaintiffs argue that the procedural history of *OFC Comm Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009), demonstrates that "the promotion of sports wagering in New Jersey . . . is reasonably likely to invite civil litigation under [PASPA] unless [its] provisions are enjoined . . ." (Pls.' Joint Resp. Br. at 17), but the PASPA civil enforcement action was not filed in *Markell* until after the Delaware Governor signed the sports gambling legislation into law and the State issued regulations to implement the state law, 579 F.3d at 296.[2]  Here, the Government asserts, and Plaintiffs do not contest, that New Jersey law does not presently allow the sports betting

---

[2]*Markell* involved various sports leagues' attempt to enjoin enforcement of a Delaware law that they believed authorized sports gambling beyond the limits of PASPA's grandfather provision.  The Court of Appeals found that portions of the Delaware law violated PASPA. *Markell*, 579 F.3d at 304.  Although Delaware sought a construction of PASPA that would not affect Delaware's sovereign status, *see id.* at 303, *Markell* did not involve a challenge to the constitutionality of PASPA.

Plaintiffs seek to legalize.  Thus, the voters of New Jersey must approve SCR 132 to amend the

New Jersey constitution before the legislature may pass a law allowing sports gambling.  *See* N.J.

const. art. IV, § 7, ¶ 2; *Atlantic City Racing Ass'n v. Attorney General*, 98 N.J. 535, 540–45

(1985).[3]  Any civil enforcement action at this stage would be premature, because New Jersey law

does not permit the sports gambling sought by Plaintiffs.  Consequently, the threat of a civil

enforcement action at this juncture is just as speculative as Plaintiffs' forecast that the voters will

pass SCR 132 and the legislature will subsequently authorize sports gambling through

legislation.

      To the extent that Plaintiffs assert an injury from PASPA's prohibition on operating

sports gambling enterprises, it does not appear that these Plaintiffs actually engage in gambling

activities themselves, but rather they seek to represent the interest of their respective members.

(*See* Compl. ¶¶ 4–20.)  In order to have third-party standing for its members, "(1) the plaintiff

must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and (3)

the third party must face some obstacles that prevent it from pursuing its own claims."  *Nasir v.

Morgan*, 350 F.3d 366, 376 (3d Cir. 2003).  iMEGA and the N.J. Horsemen's Associations have

not shown that they have third-party standing to represent their members (who seek to engage in

sports gambling activities prohibited by PASPA), because these Plaintiffs have not shown an

---

[3]Plaintiffs cite case law for the proposition that the threat of criminal penalties constitutes
a sufficiently concrete injury for purposes of standing.  *See, e.g.*, *Pic-A-State Pa., Inc. v. Reno*, 76
F.3d 1294, 1298–1300 (3d Cir. 1996) (concluding that interstate lottery ticket vendor had
standing to challenge constitutionality of federal law prohibiting interstate transmission of lottery
ticket information, explaining that "any further attempt to pursue its line of business would risk
serious criminal penalties").  Such cases are not persuasive under the circumstances of this case,
where state law already prohibits the conduct Plaintiffs seek to legalize, and the alleged injury is
the possibility of a civil enforcement action down the road, if the legislature succeeds in changing
state law to permit sports gambling prohibited by PASPA.

actual injury, and they have not shown that such members face obstacles in pursuing their own claims.

Even if Plaintiffs had alleged a sufficiently concrete injury, the current status of New Jersey law reveals that a favorable ruling would not redress Plaintiffs' asserted injury.  If PASPA were found unconstitutional, New Jersey law would still prohibit the sports gambling activities Plaintiffs and their members seek to legalize.  Plaintiffs do not presently claim that New Jersey law violates the Federal Constitution.  Thus, until New Jersey law changed, Plaintiffs and their members would not be able to engage in sports gambling activities.  As the Court explained above, significant legislative obstacles remain before New Jersey law would permit such gambling.  It would be improper for this Court to assess a party's standing on speculation that a legislative proposal will be passed.

Faced with a similar constitutional challenge to PASPA in *Flagler v. U.S. Attorney for the District of New Jersey*, then United States District Judge and now Circuit Judge Joseph A. Greenaway dismissed the plaintiff's complaint for lack of standing, finding that Plaintiff failed to demonstrate injury in fact and redressability.  Civ. No. 06-3699, 2007 WL 2814657, at *2–3 (D.N.J. Sept. 25, 2007).  Judge Greenaway emphasized that the plaintiff, a citizen of New Jersey, "provided this Court with no explanation of how a right to gamble on professional and amateur sports would be or could be a 'legally protected interest.'  Additionally, Plaintiff has made no showing of any harm suffered, i.e., an invasion of his right to gamble, that is both 'concrete and particularized' and 'actual or imminent.'" *Id.* at *2.  Furthermore, Judge Greenaway noted that "Congress has allocated to the State of New Jersey a full year to enact legislation allowing gambling on sports; the state legislature, however, never has passed such a law. Therefore it

is unlikely that invalidating the PASPA will entitle Plaintiff to gamble on professional and amateur sports." *Id.* at *3. Although the New Jersey legislature has authorized SCR 132 since *Flagler*, New Jersey law has not changed yet, and these Plaintiffs' alleged injuries and redressability remain as speculative as the plaintiff's asserted injuries and redressability in *Flagler*. Consequently, the Court concludes that iMEGA and the N.J. Horsemen's Associations lack standing to challenge the constitutionality of PASPA.

### B. Senators Sweeney & Lesniak

"'[L]egislators, like other litigants in federal court, must satisfy the jurisdictional prerequisites of Article III standing.'" *Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 265 (3d Cir. 2009) (citations omitted). Like other individuals, a legislator has standing to sue when he or she personally suffers an injury in fact. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 496, 512–514 (1969) (concluding that a member of Congress had standing to challenge the constitutionality of his exclusion from the House of Representatives). The Supreme Court has also recognized that, in limited circumstances, legislators have institutional standing to challenge an executive branch decision that nullifies the effect of their votes. *Coleman v. Miller*, 307 U.S. 433 (1939). Senators Sweeney and Lesniak contend that they have institutional standing to challenge PASPA, because § 3702 interferes with their discretionary rights as legislators to propose, consider, and enact legislation they believe is in the best interest of the people of New Jersey. Senator Sweeney, as president of the Senate, appears in his official capacity on behalf of the New Jersey Senate.[4] The Court concludes that the

---

[4] Pursuant to Senate Resolution No. 19, passed on February 22, 2011, the New Jersey Senate authorized Senator Sweeney to take legal action challenging PASPA. (Intervenor Compl. ¶ 9 & Ex. 1.)

Senators, like iMEGA and the N.J. Horsemen's Associations, have failed to demonstrate an injury in fact and redressability, and the Court finds that the institutional standing doctrine of *Coleman* does not apply.

The Supreme Court revisited *Coleman*'s institutional standing doctrine in *Raines v. Byrd,* which involved individual Congress members challenge to the constitutionality of the Line Item Veto Act.  The *Raines* Court emphasized the narrow scope of the institutional standing doctrine, noting the unique legislative procedure that precipitated *Coleman*.  *Raines*, 521 U.S. 811, 821–26 (1997).  *Coleman* arose from the ratification process of the proposed "Child Labor Amendment" to the Federal Constitution.  Twenty of Kansas's forty state senators voted against ratification—an amount sufficient to defeat ratification—but the state's lieutenant governor cast a tie-breaking vote in favor of ratification.  The twenty state senators that voted against ratification, joined by another state senator and members of the state house of representatives, filed a mandamus action in the Kansas Supreme Court seeking a declaration that the state legislature had not ratified the amendment.  The Kansas Supreme Court and, subsequently, the U.S. Supreme Court found that the state legislators had standing to pursue this claim.  *Raines*, 521 U.S. at 822 (citing *Coleman*, 307 U.S. at 436–37).  The *Raines* Supreme Court explained that "*Coleman* stands . . . for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified."  *Id.* at 823.  By comparison, the Congress members in *Raines* asserted standing on the grounds that the Line Item Veto Act weakened the effectiveness of their votes.  The Act authorized the President to veto portions of a bill while signing the remainder of the bill into law.

12

This power, they argued, enabled the President to substantively modify the bills that they passed without their prior approval.  Nevertheless, the *Raines* Court declined to extend the *Coleman* doctrine, finding that "[t]here is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power" made possible by the Line Item Veto Act.  521 U.S. at 826.  Whereas the lieutenant governor's vote in *Coleman* effectively overrode the legislators votes against ratification, the Line Item Veto Act only made it *possible* that a portion of legislation would be nullified.  *See Raines*, 521 U.S. at 824 ("Nor can they allege that the Act will nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified. In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process.").[5]

The institutional injury alleged here more closely resembles the abstract injury rejected in *Raines*, because the New Jersey constitution currently precludes the New Jersey legislature from legalizing sports gambling.  Before the New Jersey legislature may attempt to authorize sports gambling, the voters of New Jersey must approve SCR 132.  *See* N.J. Const. art. IV, § 7, ¶ 2; *Atlantic City Racing Ass'n v. Attorney General*, 98 N.J. 535, 540–45 (1985).  The Senators' argument thus puts the cart before the horse in many respects, because they presume voter passage of the referendum, subsequent legislative authorization, and then federal preemption via a civil enforcement action.  To the extent that Plaintiffs' claim that PASPA has chilled their ability to consider and pass contrary legislation, the very existence of SCR 132 reveals otherwise.  Essentially, this lawsuit is an attempt to preempt the federal preemption of PASPA.  Under these

---

[5]The Line Item Veto Act was subsequently deemed unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998).

circumstances, the Court finds persuasive the D.C. Circuit's decision in *Alaska Legislative Council v. Babbitt*, which rejected the notion that the threat of federal preemption caused sufficient institutional injury for state legislators to have standing to challenge the constitutionality of a federal law.  181 F.3d 1333, 1338–39 (D.C. Cir. 1999).  The *Babbitt* court reasoned:

> While state legislation or regulations in conflict with the federal statute or federal regulations may be unenforceable . . . that type of injury does not entitle individual legislators to seek a judicial remedy.   Their supposed injury is nothing more than an 'abstract dilution of institutional legislative power' to regulate and manage fish and wildlife resources [regulated by the federal law], and we are not sure it amounts to even this much.  *See Raines*, 521 U.S. at 826, 117 S.Ct. 2312.

*Babbitt*, 181 F.3d at 1338.

This Court's conclusion is supported by prudential considerations, as well.  The Court notes that Senator Sweeney does not have the authority to represent the entire New Jersey legislature, but only the New Jersey Senate.   Furthermore, the New Jersey legislature had the opportunity to avoid § 3702's sports-gambling restrictions through PASPA's bypass provision in § 3704(a)(3), but the legislature failed to pass the legislation within the one-year window.  *See Flagler*, 2007 WL 2814657, at *3.

Because Senators Sweeney and Lesniak have not shown an injury in fact, redressability, or institutional standing under *Coleman*, the Court concludes that they lack standing to challenge the constitutionality of PASPA.

### C.  Tenth Amendment Claim

Beyond the standing deficiencies noted above, all Plaintiffs lack standing to challenge PASPA on Tenth Amendment grounds, because such a claim is reserved for the States, and the

14

State of New Jersey is not a party to this lawsuit.  *See United States v. Bond*, 581 F.3d 128, 137

(3d Cir. 2009) (concluding "that a private party lacks standing to claim that the federal

Government is impinging on state sovereignty in violation of the Tenth Amendment, absent the

involvement of a state or its officers as a party or parties.").[6]  Plaintiffs argue (i) that *Bond* did not

foreclose private party standing for Tenth Amendment claims where a federal law denies access

to local political processes, and (ii) that Senators Sweeney and Lesniak have standing under the

Supreme Court's decision in *Karcher v. May*, 484 U.S. 72 (1987), to "challenge the

constitutionality of a statute, particularly where the Governor or his representatives have declined

to do so" (Pls.' Joint Br. at 22).  Neither of Plaintiffs' arguments are availing.

　　　Beginning with *Bond*, Plaintiffs emphasize two portions of the opinion that they contend

leave the door open for private-party standing to bring Tenth Amendment claims.  First,

Plaintiffs note that *Bond*'s holding invoked a Tenth Circuit case that *Bond* characterized as

---

　　　[6]By notice of November 15, 2010, the Government informed the Court that it has
appealed the judgment in *Bond*, and the Supreme Court has granted certiorari.  (*See* Doc. No.
55.)  However, the Government's challenge to *Bond* is limited to the specific claim advanced in
that case, which the Government characterizes as a different type of "Tenth Amendment claim"
primarily focused on the limitations to Congress's Article I power to legislate.  Whereas the
Government contends that criminal defendants, like the defendant in *Bond*, have standing to
challenge a criminal statute as exceeding Congress's enumerated Article I powers, the
Government maintains that individuals lack standing to pursue "commandeering" Tenth
Amendment claims, wherein the gravamen of the claim is that the federal law intrudes into an
area of state sovereignty.  In drawing this distinction, the Government cites with approval the
Court of Appeals' recent decision in *United States v. Shenandoah*, which confirmed that "[a]
private party does not have standing to assert that the federal government is encroaching on state
sovereignty in violation of the Tenth Amendment absent the involvement of a state or its
instrumentalities."  595 F.3d 151, 162 (3d Cir. 2010) (citation and internal quotation marks
omitted).  This Court has no occasion to consider the issue now pending before the Supreme
Court—*i.e.*, the application of the *Shenandoah* rule to a *Bond*-type claim—because Plaintiffs'
Tenth Amendment claim asserts that PASPA improperly intruded into a matter of state
sovereignty.  For present purposes, the Court is satisfied that the Government's position on
appeal in *Bond* is not inconsistent with the Government's position in this case.

"speculating that a private party could assert a Tenth Amendment claim by showing that her claim 'align[s] with the state's interest.'"  *Bond*, 581 F.3d at 138 (quoting *United States v. Parker*, 362 F.3d 1279, 1284 (10th Cir. 2004)).  Second, Plaintiffs point to the *Bond* court's assurance in footnote 8 that "'if [the state] refuses to prosecute a viable Tenth Amendment claim, the citizens of that state may have recourse to local political processes to effect change in the state's policy of acquiescence.'"  581 F.3d at 138 n.8 (quoting *Medeiros v. Vincent*, 431 F.3d 25, 35 (1st Cir. 2005)).  Plaintiffs' reliance on these statements is misplaced.

Plaintiffs' aligned-interest reading of *Bond* is flawed, both because *Bond* expressly held that private parties lack standing to bring state-sovereignty Tenth Amendment claims, 581 F.3d at 137,[7] and because neither *Bond* nor *Parker* may be fairly read to endorse a finding of private-party standing on a theory of aligned interests with the State.  In *Parker*, the court *sua sponte* rejected a criminal defendant's claim on appeal that his federal prosecution violated the Tenth Amendment because the court determined "that Parker lacks standing as a private citizen to pursue this claim."  *Parker*, 362 F.3d at 1284.  The court found that the issue was squarely controlled by the prior Tenth Circuit case, *Mountain States Legal Foundation v. Costle*, 630 F.2d 754 (10th Cir. 1980), the holding of which *Parker* described as "private plaintiffs do not have standing to bring Tenth Amendment claims when their interests are not aligned with the state's interests."  *Parker*, 362 F.3d at 1284.  However, neither *Parker* nor *Costle* suggested that a private party's interests *could* be sufficiently aligned with the state's interests such that private parties would have standing to assert a state's Tenth Amendment claim where the State was not a

---

[7]As the Court explained in note 6, *supra*, the Third Circuit reaffirmed this principle in *United States v. Shenandoah*, 595 F.3d 151, 162 (3d Cir. 2010).

16

party.  Indeed, *Costle* rejected the claim that state senators had standing to raise a Tenth

Amendment claim, concluding that "[o]nly the State has standing to press claims aimed at

protecting its sovereign powers under the Tenth Amendment."  *Costle*, 630 F.2d at 761.

As for *Bond*'s footnote 8, the Court fails to see how this observation supports Plaintiffs'

standing argument.  Plaintiffs appear to argue that private party standing should be permitted

because  PASPA "forbids [the usual] 'local political processes.'"  (Pls.' Joint Br. at 21.)  Once

again, Plaintiffs refer to PASPA's restriction that governmental entities shall not "sponsor,

operate, advertise, promote, license, or authorize by law or compact" sports wagering, 28 U.S.C.

§ 3702(1), which they contend forbids supporting local-level political efforts to legalize sports

wagering.  The Court found this overly broad interpretation of § 3702 to be dubious in Part II.A

*supra*.  In any event, this Court does not read footnote 8 as an exception to *Bond*'s rule that

private parties do not have standing to assert a Tenth Amendment claim, and the record in this

case reveals that PASPA has not shut down the local political processes.  *See* SCR 132.

Turning to Plaintiffs' argument that the Supreme Court's decision in *Karcher* found that

state legislators have standing to challenge a law, Plaintiffs overstate *Karcher*'s significance,

because that case did not involve state legislators' attempt to *challenge* a federal law.  Rather,

*Karcher* involved former state legislators' attempt to *defend* a state law against a First

Amendment challenge where the New Jersey attorney general declined to intervene.  *See*

*Karcher*, 484 U.S. at 75–77.  The Supreme Court held that appellants-intervenors, the former

speaker of the New Jersey General Assembly and president of the New Jersey Senate, were not

proper "parties" entitled to appeal under 28 U.S.C. § 1254(2), because they no longer held those

offices at the time of appeal.  *Id.* at 77–81.  In denying the appeal, the Supreme Court rejected

appellants alternative argument that the adverse judgment should be vacated "because no proper party-defendant ever intervened in the case." *See id.* at 81–82.  Citing the New Jersey Supreme Court's ruling in *In re Forsythe*, 91 N.J. 141 (1982), the *Karcher* Court concluded that the "New Jersey Legislature had authority under state law to represent the State's interests" in that case. *Karcher*, 484 U.S. at 82 (explaining that "The New Jersey Supreme Court has granted applications of the Speaker of the General Assembly and the President of the Senate to intervene as parties-respondent on behalf of the legislature in defense of a legislative enactment"). However, neither *Karcher* nor *In re Forsythe* speak to state legislators' standing to bring an affirmative challenge to a federal law.

Plaintiffs have presented no authority for the proposition that state legislators have standing to challenge a federal law on Tenth Amendment state sovereignty grounds.  State law determines which governmental agents may represent the state's interests in court.  *See, e.g.*, *Karcher*, 484 U.S. at 82; *Babbitt*, 181 F.3d at 1339; *Costle*, 630 F.2d at 771.  Like many states, New Jersey law vests the attorney general with the exclusive authority "attend to and control all litigation and controversies to which the State is a party or in which its rights and interests are involved."  N.J. Stat. Ann. § 52:17A-4(c); *accord May v. Cooperman*, 578 F. Supp. 1308, 1310 (D.N.J. 1984); *see also Costle*, 630 F.2d at 771 (concluding under Colorado law that the attorney general had "the exclusive right, in the absence of another statute providing otherwise, to represent the State in actions to protect its interests," and citing treatises to suggest that this is the "general rule" among the states).  Thus, under New Jersey law, the proper party to bring such a claim would be New Jersey's attorney general, but the governor and attorney general have not intervened in this lawsuit.

The institutional, legislative nullification injury recognized in *Coleman* does not speak to the authority of legislatures or individual legislators to bring a Tenth Amendment challenge to a federal law.  Rather, *Coleman* involved state legislatures' authority under Article V of the U.S. Constitution to ratify constitutional amendments.  Although the state legislature would have a vested institutional interest in defending a state law against a constitutional attack when the executive branch declines to defend it, this Court cannot say that state legislators have the same institutional interest in challenging a federal statute, absent some interest in defending a particular state law.  Here, Senators Sweeney and Lesniak are not defending a state law, but are prospectively trying to bypass PASPA's preemptive force.  To the extent that PASPA diminishes state authority over sports gambling, it injures state sovereignty, not legislative sovereignty.  *See Babbitt*, 181 F.3d at 1339.  Because the State has not intervened in this suit, Plaintiffs lack standing to present a Tenth Amendment claim.

## III.    CONCLUSION

For the aforementioned reasons, the Court will grant the Government's motion  (Doc. No. 40) and dismiss Plaintiffs' Complaint for lack of standing.  An appropriate form of order accompanies this Memorandum Opinion.


Dated: March 7, 2011

_____/s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.
